FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**Ocala, Florida**

2018 JUL 11 PM 2: 43

CLERK. US DISTRICT COURT
MIDDLE DISTRICT OF FL
OCALA FLORIDA

DAVID ALLYN, M.D., JAMES V.
LYNOTT, M.D., and JOSEPH M.
MASESSA, M.D.,

      Plaintiffs,

No.: 5:18-cv-355 oc-30PRL

vs.

AMERICAN BOARD OF MEDICAL
SPECIALTIES, INC., an Illinois corporation,
and AMERICAN BOARD OF DERMA-
TOLOGY, INC., a Delaware corporation,
authorized to do business in Massachusetts,

      Defendants.

_____/

**Verified Complaint for Damages and**
**for Injunctive Relief (Temporary and**
**Permanent) Against Combination in**
**Violation of Section 7 of the Clayton Act**
**and Sections 1 and 2 of the Sherman**
**Act and for Temporary Restraining**
**Order**

## VERIFIED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

### INJUNCTIVE RELIEF SOUGHT

    **COME NOW** Plaintiffs and class action representatives David Allyn, M.D., James V.

Lynott, M.D., and Joseph M. Masessa, M.D. (Plaintiffs), and sue Defendants the American Board

of Medical Specialties, Inc. (ABMS), an Illinois corporation, and the American Board of

Dermatology, Inc. (ABD), a Delaware corporation, stating as follows:

### NATURE OF THE ACTION

    1.    This is a class action suit by Plaintiffs against Defendant ABMS for violations of

antitrust law and restraint of trade because of its attempt to create a subspecialty board (referred

to herein as the "Mohs Surgery Board") to limit the practice of the procedure known as Micrographic Dermatologic Surgery, "Mohs surgery," or "MDS," which would reduce the availability of Mohs surgery for patients with skin cancer.

2.     Mohs surgery[1] is a single surgical procedure in which a physician cuts around and removes a visible skin cancer (a melanoma, basal cell carcinoma, or squamous cell carcinoma) on a patient's skin. The physician then removes a thin layer of surrounding tissue while the patient waits. The layer of tissue surrounding the lesion is then analyzed under a microscope to determine if there are any cancer cells in the margin of the tissue removed. If the physician finds that cancer cells are still present, then the physician removes a larger portion of tissue and analyzes that tissue under a microscope. The physician repeats this procedure until there are no more cancer cells seen in the margin of the tissue removed. This indicates that all cancer cells have been removed.

3.     Mohs surgery is a simple technique, usually performed using only a local anesthetic, in the physician's office. It can take from a few minutes to a few hours, depending on how many times the procedure must be repeated. A description of the Mohs Surgery procedure written for patients is set forth in Exhibit "1."

4.     Specifically, Defendant ABMS has conspired, combined, and agreed with other medical specialty organizations, with individual physicians, and with others, to limit the number of physicians who are "board certified" to perform Mohs surgery and thus are allowed to bill and collect for performing the Mohs surgery procedure on patients who need it. ABMS has conspired, combined, and agreed to restrain trade by reducing the availability of an essential skin surgery for

---

[1]     Mohs surgery was created by Frederic Mohs, M.D., in the 1930's.

skin cancer by creating the Mohs Surgery Board in violation of Sections 1 and 2 of the Sherman Act and state antitrust law.

5.      At the present time, Mohs surgery is merely one of the many different surgical procedures that physicians in different specialties are taught as part of their residency training programs, mostly in dermatology residency programs. However, general surgeons, oncologists, plastic surgeons, and other specialists may also routinely perform Mohs surgery.

6.      In order to become a member of and be certified by the proposed Mohs Surgery Board, a physician would be required to have a separate fellowship specifically in Mohs surgery.[2] This is regardless of the number of Mohs surgeries the physician had previously performed or the physician's actual clinical skills and experience in performing Mohs surgery.

7.      ABMS also falsely implies that the Mohs Surgery Board has or will have governmental approval and academic legitimacy, when it does not. ABMS misleadingly implies that the physicians who would be "board certified" by the Mohs Surgery Board are better qualified to perform the surgery than physicians who are not board certified by the Mohs Surgery Board.

8.      There is medical evidence showing that there is no difference in the quality of physicians who would be eligible to be certified by the Mohs Surgery Board and those who

---

[2]    A "fellowship" in graduate medical education (GME) is a specialty training program for a physician who has already completed a medical residency program in a medical specialty. An example would be a fellowship in maternal-fetal medicine, which is considered to be a subspecialty of the medical specialty of obstetrics and gynecology. Fellowships in Mohs surgery are either one year or two years of additional training. Thus, a physician who had already completed a residency program in dermatology and was already board certified as a dermatologist by the American Board of Dermatology, would be required to pursue an additional one or two year fellowship in Mohs surgery in order to become board eligible for certification in the subspecialty of Mohs surgery, as proposed by the Defendants.

currently perform Mohs surgery and who would not be eligible.  Furthermore, having a Mohs Surgery Board would cause a reduction in the number of physicians allowed to perform Mohs surgery, thus reducing the availability of a needed medical service for patients.

9.  In addition, Defendants are engaging in deceptive trade practices, because ABMS and its co-conspirators, specifically the American College of Mohs Surgery (ACMS), disparage the services and business of others by false or misleading representations.  Specifically, ABMS and ACMS misleadingly disparage physicians who decline to participate in a Mohs surgery fellowship by ABMS's Mohs Surgery Board, by falsely implying that such physicians will be of inferior quality to those who do Mohs surgery fellowships and will become certified by the Mohs Surgery Board.

10.  It is well known that the Medicare Program adopts rules, regulations, and guidelines that require board certification in order to qualify for receiving payment for performing certain medical procedures.  Other government payers such as Tricare, state Medicaid programs, the Veterans Administration, and private health insurance companies usually adopt the same guidelines as Medicare.

11.  If the Defendants and their co-conspirators are successful, they will convince payors for medical services, specifically the Medicare Program, to limit payments for Mohs surgery procedures to only those performed by Mohs Surgery Board certified physicians.  This will artificially reduce the number of physicians able to provide such services to patients.

12.  It is also well known that most hospitals in the U.S. limit the surgical procedures that are allowed to be performed on their premises to those performed by physicians who are

board certified to do so.  Most hospitals in the U.S. also limit physicians admitted to their medical staffs to those who are board certified in different medical specialties and subspecialties.

13.     In November 2009 and subsequently, ABMS and several of its member boards obtained the agreement of The Joint Commission (TJC) to require certification and recertification of hospital physicians by the ABMS's member boards, including Defendant ABD, as a condition of obtaining and holding hospital medical staff privileges.  TJC is a private company that accredits more than 20,000 health care facilities in the U.S., including more than eighty percent (80%) of all hospitals.  (<u>Association of Am. Physicians & Surgeons v. Am. Bd. of Med. Specialties</u>, Case No. 14-cv-02705, 2017 U.S. Dist. LEXIS 2105845, pp. 3-4 (N.D. Ill. Opinion of Dec. 13, 2017)).

14.     TJC accreditation is also a requirement for hospitals in the U.S. to become licensed by the state and maintain their licenses.  Additionally, all military hospitals and Veterans Administration hospitals in the U.S. are also accredited by The Joint Commission, in accordance with Federal Regulations.

15.     There is coordination, combination, conspiracy, and agreement by, between, and among the Defendants, TJC, U.S. hospitals, and others as detailed below to require certification of physicians by the Mohs Surgery Board as proposed by Defendants in order for physicians to be able to perform Mohs surgery in U.S. health facilities.

16.     If a Mohs Surgery Board is approved, then physicians who are not so certified will be prohibited from performing Mohs surgery on their premises.

17.     Plaintiffs seek declaratory relief and injunctive relief to prevent the actions from being pursued by the ABMS and its co-conspirators, by members of the Class, as defined below.

## GENERAL ALLEGATIONS

### A. The Parties

18.     Plaintiff David Allyn, M.D., is a medical doctor licensed in the state of Florida. He is board certified by the American Board of Dermatology.  He resides in Clermont, Florida. He has performed thousands of Mohs surgeries and routinely performs Mohs surgery on patients with skin cancer in his dermatology practice.

19.     The vast majority of Dr. Allyn's Mohs surgery procedures are performed on Medicare and Tricare patients and are paid by the Medicare and Tricare Programs.

20.     Plaintiff Dr. Allyn has not had a fellowship in Mohs surgery and would not be able to qualify to become certified by the Mohs Surgery Board.

21.     Plaintiff James V. Lynott, M.D., is a medical doctor licensed in the state of Wisconsin. He is board certified by the American Board of Dermatology.  He resides in Racine, Wisconsin.  He has performed thousands of Mohs surgeries and routinely performs Mohs surgery on patients with skin cancer in his dermatology practice.

22.     The vast majority of Dr. Lynott's Mohs surgery procedures are performed on Medicare and Tricare patients and are paid by the Medicare and Tricare Programs.

23.     Plaintiff Dr. Lynott, has not had a fellowship in Mohs surgery and would not be able to qualify to become certified by the Mohs Surgery Board.

24.     Plaintiff Joseph M. Masessa, M.D., is a medical doctor licensed in the state of Florida. He is board certified by the American Board of Dermatology.  He resides in West Palm Beach, Florida.  He has performed thousands of Mohs surgeries and routinely performs Mohs surgery on patients with skin cancer in his dermatology practice.

25.     The vast majority of Dr. Masessa's Mohs surgery procedures are performed on Medicare and Tricare patients and are paid by the Medicare and Tricare Programs.

26.     Plaintiff Dr. Masessa has not had a fellowship in Mohs surgery and would not be able to qualify to become certified by the Mohs Surgery Board.

27.     The foregoing three Plaintiffs have interest in common with the Class and are proper representatives of the Class.

28.     Defendant ABMS is a corporation which has its principal place of business in Chicago, Illinois.

29.     Defendant ABMS was established in 1933 and is a self-declared non-profit corporation that actively engages in lobbying activities.  It is an "umbrella organization" having 24 member medical specialty boards (officially referred to as the "Member Boards"), each representing a specific broad medical specialty.[3]

30.     Defendant ABMS creates various medical specialty boards which then are authorized to set requirements for and issue certifications for physicians who qualify in different medical specialties.

31.     To date, Defendant ABMS has never created a specialty board for a single isolated medical procedure such as Mohs surgery.  All boards created to date have been for broad general areas of medicine, such as general surgery and internal medicine.

---

[3]     The member boards represent broad medical specialties such as the American Board of General Surgery, Inc., the American Board of Internal Medicine, Inc., the American Board of Obstetrics and Gynecology, Inc., the American Board of Dermatology, Inc., etc.  The last two boards the ABMS created were the American Board of Emergency Medicine, Inc. (in 1979), and the American Board of Medical Genetics and Genomics, Inc. (in 1991).

    a.  In fact, creation of a separate specialty board for Mohs surgery was considered by Defendant ABMS in 1987 and rejected, because it centered on only one surgical procedure instead of an area of medicine.

    b.  In 2009, the same proposal as the present one was put forth again. However, the subspecialty was called "Procedural Dermatology" to create the false illusion that the subspecialty board would encompass a greater body of knowledge than just Mohs surgery. It was rejected by fifteen (15) state dermatology societies as being too narrow of a field of medicine to deserve a subspecialty board and the ABMS did not approve it.

  32.  Defendant American Board of Dermatology, Inc. (ABD), is a medical specialty board, originally created by the ABMS. It is a separate Delaware corporation authorized to do business in Massachusetts. Its principal place of business is Newton, Massachusetts. It certifies physicians in the medical specialities of dermatology, dermatopathology, and pediatric dermatology.

  33.  Defendant ABD is conspiring with, agreeing with, and acting in coordination with the ABMS to create the Mohs Surgery Board. It is conspiring with, agreeing with, and acting in coordination with the ABMS to prohibit the performance of Mohs surgery by anyone other than a physician certified by the Mohs Surgery Board.

  34.  Defendant ABD has submitted an application to the ABMS to create the Mohs Surgery Board. Exhibit "2."

  35.  The American College of Mohs Surgery (ACMS) is a membership-based organization of 1,500 physicians who are all fellowship-trained in Mohs surgery. Its principal place of business is in Milwaukee, Wisconsin. It is conspiring with, agreeing with, and acting in

coordination with the ABMS to create the Mohs Surgery Board.  It is conspiring with, agreeing with, and acting in coordination with the ABMS to prohibit the performance of Mohs surgery by anyone other than a physician certified by the Mohs Surgery Board.  It is not being named as a defendant in this case at this time.

36.     The American Academy of Dermatology (AAD) is a professional association made up of dermatologists, having its principal place of business in Rosemont, Illinois.  It is not a member board of the ABMS.

37.     The AAD is conspiring with, agreeing with, and acting in coordination with the ABMS to create the Mohs Surgery Board.  It is conspiring with, agreeing with, and acting in coordination with the ABMS to prohibit the performance of Mohs surgery by anyone other than a physician certified by the Mohs Surgery Board.  It is not being named as a defendant in this case at this time.  The AAD is actively encouraging its members to support the efforts of the ABD and the ABMS to create the Mohs Surgery Board and is otherwise lobbying for it.

38.     Randall K. Roenigk, M.D., is a resident of Rochester, Minnesota.  He is a Mohs surgery fellowship trained dermatologist.  He is an officer of unnamed co-conspirator AAD.  He is also a member of the Board of Directors of Defendant American Board of Medical Specialties.  He is a member of the Committee on Certification (COCERT) of Defendant ABMS, the committee of ABMS which must approve the new Mohs Surgery Board application being submitted by Defendant ABD.  He is also the Assistant Executive Director of Defendant ABD.

39.     As such Dr. Roenigk he is coordinating, combining, and conspiring with the Defendants and with the Unnamed Co-conspirators to create the Mohs Surgery Board.  He is not named as a Defendant at this point in time.

40.     Brett M. Coldiron, M.D., is a resident of Cincinnati, Ohio. He is a Mohs surgery fellowship trained dermatologist. He is a member of the Board of Directors of Unnamed Co-conspirator AAD. He is the individual who is most aggressively advocating and lobbying the ABMS and individual physicians to create the Mohs Surgery Board.

41.     As such Dr. Coldiron is coordinating, combining, and conspiring with the Defendants and with the Unnamed Co-conspirators to create the Mohs Surgery Board. He is not named as a Defendant at this point in time.

42.     The individuals and organizations whose names appear above who are not named as Defendants shall collectively be referred to herein as the "Unnamed Co-conspirators."

## B. Venue and Jurisdiction

43.     This action arises under Section 16 of the Clayton Act, 15 U.S.C. Section 26, to secure equitable relief against a violation by Defendant ABMS of Sections 1 and 2 of the Sherman Act, 15 U.S.C. Sections 1 and 2. Interstate commerce for medical services is substantially affected by Defendants' conduct alleged herein. This Court has subject matter jurisdiction here pursuant to 15 U.S.C. Section 15, and 28 U.S.C. Sections 1331 and 1337(a).

44.     Supplemental jurisdiction over Plaintiffs' additional claims exists under 28 U.S.C. Section 1367. In addition, this Court has subject matter jurisdiction over these matters pursuant to 28 U.S.C. Section 1332, because there is diversity of citizenship of the parties and the amount in controversy exceeds $75,000.00, exclusive of attorney's fees, costs and interest, or is otherwise within the jurisdiction of the Court, as stated in each Count below.

45.     Venue is proper in this United States District Court for the Middle District of Florida, under 15 U.S.C. Sections 15 and 22, and 28 U.S.C. Section 1391(b)(1), because Plaintiff Dr. Allyn resides here; because the actions of the Defendants are causing harm or will cause harm here; because Defendants conduct their business here; because the actions of the Defendants will damage commerce here; because the Defendants transact substantial business here; and because one or more of the member boards of the ABMS are located here.[4] Defendants' actions extend into and they have a presence in the Middle District of Florida. The actions of Defendants will artificially restrain commerce in the Middle District of Florida.

## C. Standing

46.     Plaintiffs are each physicians who are experienced in performing Mohs surgery and who each now perform a large number of Mohs surgery procedures on patients every year.

47.     Plaintiffs each receive payment from the Medicare Program, the Tricare Program, and other government and private health care payors, for the Mohs surgery procedures they perform.

48.     Plaintiffs each have clinical privileges in hospitals that include authorization to perform Mohs surgery procedures in those facilities.

---

[4]     The American Board of Pathology, Inc., a member board of the ABMS, is a Michigan corporation, authorized to do business in and having its principal place of business in Tampa, Florida. On information and belief, it is also actively promoting the creation of the Mohs Surgery Board.

49.     If the actions of the Defendants are allowed to continue, each Plaintiff will suffer a loss of patients, a loss of income, and will have their ability to provide Mohs surgery procedures for their patients artificially restrained or prohibited.

50.     The actions of the Defendants will cause the Plaintiffs and other members of the Class to be excluded from insurance networks and the networks of private payors as providers of Mohs surgery.

51.     The actions of the Defendants will artificially and arbitrarily restrict the income of the Plaintiffs, reduce the number of physicians available to provide Mohs surgery procedures to patients, and reduce patient access to physicians having the ability to provide Mohs surgery.

52.     Access to Mohs surgery providers by patients will be reduced and restricted by the actions of the Defendants.  The price of Mohs surgery will increase because of the reduction in availability of the service.  The quality of patient care will not be increased.

53.     Plaintiffs have an interest in seeing that the availability of physicians who may provide Mohs surgery to patients is not limited or reduced;  that the payment for Mohs surgery procedures to patients by government payors and insurers is not controlled or limited by a small group of physicians;  that there are a sufficient number of physicians available to provide Mohs surgery procedures to patients across the U.S., especially in Medically Underserved Areas (MUSAs) and Health Professional Shortage Areas (HPSAs); and that physicians who are skilled and experienced in performing Mohs surgery are not restricted from providing such services to patients who need them.

54.     Plaintiffs have an interest in making sure that the maximum number of physicians who are experienced in or trained in Mohs surgery are allowed to provide it without the restrictions or limitations being placed on them such as those proposed by Defendants.

55.     For these reasons, the Plaintiffs are representative of the Class and have standing to bring this action.

### D. Creating a Board Certification for a Single Procedure Is Unique in the History of Defendant ABMS and must Be Seen as an Artificial Attempt to Restrain Trade

56.     The creation of a separate specialty board in Mohs surgery is a historically unique event in the history of the ABMS. All other specialty boards certify physicians in broad areas of medicine. If Defendants ABMS and ABD succeed in their attempts to create a Mohs Surgery Board, this will be the first time one individual surgical procedure will be placed under the province of its own board, thus creating an artificial limitation on it.[5]

57.     Currently Mohs surgery is being performed by dermatologists, general surgeons, plastic surgeons, oncologists and other types of physician specialists.

58.     Taking Mohs surgery and creating a separate board certification for it would be analogous to creating a separate board for labor and delivery of babies,[6] that would require a

---

[5]     As indicated above the ABMS considered doing this in 1987 and 2009 and rejected it because the certification would be for a single surgical procedure only and not a broad, general area of medicine. See paragraph 31, supra.

[6]     Currently, delivery of babies in the U.S. is routinely performed by obstetrician/ gynecologists, family practice physicians, certified nurse midwives and midwives, among others.

physician to take an extra one-year or two-year fellowship in labor and delivery of babies, before he or she would be qualified to perform such a delivery.

## ADDITIONAL FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

59.     Defendant ABD has submitted an application to Defendant ABMS to create the Mohs Surgery Board.  A copy of this application is attached as Exhibit "2."

60.     It is believed that Defendant ABMS and members of its board of directors will vote shortly after July 6, 2018, to create the new Mohs Surgery Board.

61.     Defendants ABMS and the Unnamed Co-conspirators have conspired and agreed to create a subspecialty board for Mohs surgery in order to monopolize the Mohs surgery market and are acting to accomplish that end.

62.     Once the Mohs Surgery Board is formed, Defendants and Unnamed Co-conspirators will act to require physicians to be board certified by the new Mohs Surgery Board in order for physicians to obtain clinical privileges in a hospital or surgical center to perform Mohs surgery procedures.

63.     Once the Mohs Surgery Board is formed, Defendants and Unnamed Co-conspirators will act to have the Medicare Program change its requirements so as to require physicians to be board certified by the new Mohs Surgery Board, in order for the physician to be reimbursed by Medicare for performing Mohs surgery procedures.

64.    Once the Mohs Surgery Board is formed, Defendants and Unnamed Co-conspirators will act to have health insurers require physicians to be board certified by the new Mohs Surgery Board in order for the physician to be paid by the health insurer for performing Mohs surgery procedures.

65.    Defendants' and Unnamed Co-conspirators' actions and agreements, as detailed above and as alleged in further detail below, constitute an illegal agreement in restraint of a trade, an illegal agreement to divide service markets, and an attempt to monopolize under the Sherman Act.

66.    The proposed requirements to become a member of the Mohs surgery subspecialty board include, among others:  a one (1) to two (2) year fellowship in Mohs surgery;  a passing score on an examination administered by the Mohs Surgery Board;  and payment of fees that would be paid to the Mohs Surgery Board.

### A. Defendants' Ability to Fix Prices and Eliminate Competition

67.    Because skin cancer is most predominant in elderly patients, most Mohs surgery patients have their surgery paid by the Medicare Program.

68.    Required guidelines for obtaining payments from the Medicare Program are set forth in documents known as National Coverage Determinations (NCDs) and Local Coverage Determinations (LCDs), the latter covering various geographical regions of the United States.

69. NCDs and LCDs for the Medicare Program[7] are prepared by specialists in the procedures that are covered by the NCDs and LCDs.

70. NCDs and LCDs require that the procedures they cover be performed only by physicians trained in and certified to provide the particular service or procedure covered by the NCD and the LCD, or Medicare will not pay for the procedure.

71. If board certification by the Mohs Surgery Board becomes authorized, then NCDs and LCDs will be rewritten to require that a physician can only be paid for a Mohs surgery procedure if he or she is certified by the Mohs Surgery Board.

72. Other federal programs such as the Tricare program usually adopt the same restrictions and payment guidelines as those of the Medicare Program.

73. State Medicaid programs usually adopt the same restrictions and payment guidelines as those of the Medicare Program.

74. Health insurance companies often adopt the same restrictions and payment guidelines as those of the Medicare Program.

75. Thus, by controlling board certification for performing Mohs surgery procedures, a Mohs Surgery Board is able to control payments to physicians for performing Mohs surgery. Those who are not board certified by the Mohs Surgery Board will not be able to obtain payment

---

[7] The Medicare Program is the federal insurance program for the elderly. It is administered by the Centers for Medicare and Medicaid Services (CMS), a division of the U.S. Department of Health and Human Services (HHS). CMS contracts with independent contractors, usually large health insurance companies, to provide administrative and regulatory services within a geographical areas of the U.S. These are known as Medicare Administrative Contractors or "MACs."

for performing Mohs surgery. This will greatly reduce the number of physicians available to provide Mohs surgery procedures to patients.

**B. Restraint of Trade by Defendants ABMS, ABD and Unnamed Co-conspirators**

76.     The Defendants and the Unnamed Co-conspirators, would restrain trade by acting to have hospitals, surgical centers, health insurers, and government payors (such as the Medicare Program, the Tricare Program, and the state Medicaid programs) impose the requirement of being certified by the Mohs Surgery Board as a condition for obtaining payment for performing Mohs surgery. This would decrease the number of physicians able to compete for performing Mohs surgery procedures, reduce the availability of Mohs surgery procedures, and increase the prices to consumers in the relevant market.

77.     Many physicians choose not to undergo a Mohs surgery fellowship because it would impinge on their time to spend caring for their patients. Furthermore, dermatologists are required to complete at least two (2) rotations (months) of training in performing Mohs surgery procedures. Thus all residency trained dermatologists already have training in performing the procedure.

78.     Physicians spend more time in training than most other professionals.

79.     Despite this, the additional burdens on physicians' time imposed by the ABMS's Mohs Surgery Board would be substantial, because physicians will now be forced to undergo an additional fellowship as well as recertification every five (5) years. Exhibit "2."

80.     It is contrary to public policy for ABMS and ABD, as private entities lacking in public accountability and transparency, to impose their own proprietary product as a condition for

patients to have access to Mohs surgery physicians through government programs such as Medicare, insurance networks, and in hospitals.

81.     Defendants' proposed Mohs Surgery Board imposes far greater burdens than any similar program in any other profession. A survey administered in 2017 by the American Academy of Dermatology showed that an overwhelming majority of dermatologists who have not completed a Mohs surgery fellowship (approximately sixty-four percent (64%)), believed that the creation of a Mohs Surgery Board was unjustified and unnecessary.

82.     Although Defendant ABD also proposes a five (5) year "grandfathering period," during which time the Mohs Surgery Board will be willing to certify dermatologists who are already board certified by Defendant ABD, this does not negate the anti-competitive effects of this conduct, in that:

a.     This is nothing more than a statement that Defendants will refrain from violating anti-competition laws for a period of five (5) years;

b.     The "grandfathering period" would include board certified dermatologists only and would exclude physicians in other medical specialty areas who are currently performing Mohs surgery; and

c.     The requirements set forth by the ABD for becoming certified are capricious and arbitrary and are subject to change or reinterpretation by the ABD at any time.[8]

---

[8]     The Defendant ABD enacted a somewhat similar proposal for dermatologists to become certified in the subspecialty of pediatric dermatology. However, after it was approved, the ABD arbitrarily and capriciously set a requirement that a dermatologist must prove that at least fifty-one percent (51%) of his/her patients were pediatric patients in order to obtain authorization to take its subspecialty examination. It would be able to do the same with a Mohs Surgery Board.

**C.** <u>Lack of Improvement in Quality of Care with Mohs Surgery Subspecialty</u>

83.     There is no proven benefit to patient care by requiring Mohs surgery physicians to become board certified with a subspecialty board.

84.     There is no proven benefit to patient care by requiring Mohs surgery physicians to undergo a fellowship in Mohs surgery.

85.     Medical studies have shown that Mohs surgery currently has a success rate of 99%. This means that 99% of all Mohs surgeries, whether performed by fellowship-trained Mohs surgeons or not, successfully cure the patient of the skin cancer.[9]

86.     Academic physicians have been critical of the lack of benefits from the proposed Mohs Surgery Board, observing that the additional years of fellowship training and board testing do not actually increase the quality of care, that is the quality of the Mohs surgery performed.

87.     The lack of any genuine value in certification by a Mohs Surgery Board as a measure of professional skill or competence is demonstrated by the high success rates of Mohs surgery when performed by physicians who currently perform it without such certification.

88.     In 2015, the effort to create a subspecialty board came forth and renamed the proposal as "Micrographic Dermatologic Surgery," which is the proposal that the ABMS will consider shortly after July 6, 2018. This renaming of the application is simply an attempt to trick the ABMS into thinking that the proposal now encompasses a large enough body of knowledge to merit the creation of a subspecialty board;  however, it is simply the same proposal that was

---

[9]     Unnamed Co-conspirator Dr. Coldiron has an article published in 2014 that gives this statistic. <u>See</u> <u>also</u>, Exhibit "3."

brought forth in 1987 and 2009 by a different name. The subspecialty board's only true purpose to is to regulate the Mohs surgery market.

### D. The Relevant Geographic Market

89.     The relevant geographic market is the United States.

90.     In 2018, the American Association of Dermatology ("AAD") estimated that there were at least 20,149 practicing dermatologists in the United States.

91.     However, in addition to dermatologists, other types of physicians also perform Mohs surgery, such as:

> Critical Care, Emergency Medicine, Family Practice, General Practice, General Surgery, Internal Medicine, Neurology, Otolaryngology, Pathology, Plastic and Reconstructive Surgery, and Surgical Oncology physicians.

92.     The number of dermatologists being produced by dermatology residency programs in the U.S. has not kept up with demand for dermatology services.

93.     The American Cancer Society ("ACS") estimates that about 91,270 new melanomas will be diagnosed in 2018 and 9,320 people are expected to die of melanoma. Exhibit "4"

94.     In 2012, the ACS estimated that about 5.4 million basal and squamous cell skin cancers are diagnosed each year in the United States. Exhibit "5."

95.     Statistics provided by the Medicare Program for 2016 show that 1,395,162 Mohs Surgery procedures were performed by physicians and reimbursed by the Medicare Program alone in that year. Exhibit "6."

96.     A market profile of dermatological services in the U.S. for 2015[10] showed that over fifty percent (50%) of dermatologists saw more than fifty (50) patients a day.  Exhibit "7."

97.     There is an average of one (1) dermatologist for approximately every 16,165 people in the United States.

98.     In 2017, there were only 85 physicians in the entire United States who were enrolled in a Mohs surgery fellowship.  Exhibit "2."

99.     In 2018, the number of physicians enrolled in a Mohs surgery fellowship increased to 86.  This reflects an increase of only 1.2% from the previous year, which is woefully behind the increasing rates of skin cancer.  Exhibit "2."


## E. The Relevant Product/Service Market

100.    The relevant product or service market is the provision of the Mohs surgery procedure to treat skin cancers.  This is true whether speaking of melanoma, squamous cell carcinomas, or basal cell carcinomas.  There is only the one procedure to effectively treat it.

101.    It does not matter whether the service is provided by a dermatologist, by a plastic surgeon, by an oncologist, or by a different medical specialist.

102.    The proposed Mohs Surgery Board would limit those who may apply to it for certification to only board certified dermatologists who are fellowship trained.  Exhibit "2."

---

[10]     This market analysis was published by Cegedim Relationship Management of Bedminster, N.J.  Exhibit "7."

103.    There is no substitute for the service.  There is no alternative medical treatment for Mohs Surgery that has proven effective.

104.    The proposed Mohs Surgery Board would not admit or certify plastic surgeons, oncologists, general surgeons, or the many other medical specialists who are currently performing Mohs surgery.

105.    Control of the performance of this one surgical procedure by one subspecialty board is an unjustifiable restraint of trade.

106.    Reduction of the number of physicians who can be reimbursed for providing this service is an unjustifiable restraint of trade.

F.  **Detrimental Impact on Relevant Market;  Injury to Market and Harm to Competition**

107.    Presently, in 2018, the United States has approximately one (1) dermatologist for every 4.5 new cases of melanoma.  This is calculated by dividing the number of new melanoma cases the ACS estimated for 2018 (91,270), by the number of dermatologists in the U.S. as estimated by the AAD (20,149).[11]

108.    The ACMS (American College of Mohs Surgery) states that there are approximately 1,500 physicians in the U.S. who have completed a fellowship in Mohs surgery.  Exhibit "3."

109.    If payment is artificially restricted to payment to physicians certified by the Mohs Surgery Board, most patients will be required to seek out one of the certified physicians.  This will result in a reduced supply of physicians to provide this service, down to approximately one (1)

---

[11]    It is noted that different organizations publish different estimates.  However, they are all roughly the same.

physician for every 60.85 new cases of melanoma. This figure is obtained by dividing the number of new melanoma cases the ACS estimated for 2018 (91,270), by the number of Mohs surgery fellowship trained physicians, as estimated by the number of members in the ACMS (1,500).

110.    Similarly, there is approximately one (1) dermatologist for every 268 new cases of basal and squamous cell skin cancers. This is calculated by dividing the number of estimated cases of basal and squamous cell skin cancers by the ACS (5.4 million), by the number of dermatologists estimated by the AAD (20,149).

111.    With the creation of a Mohs surgery subspecialty board, there will be approximately one (1) Mohs surgery physician for every 3,600 new cases of basal and squamous cell skin cancers. This figure is obtained by dividing the number of estimated cases of basal and squamous cell skin cancers as stated by the ACS (5.4 million), by the number of Mohs surgery fellowship trained physicians as estimated by the number of members in the ACMS (1,500).

112.    The creation of a Mohs Surgery Board reduces the available providers of Mohs surgery by approximately 92.6% of the original service provider market size. This figure is obtained by using the number of fellowship trained Mohs physicians as stated by the ACMS (1,500), and dividing that number by the total number of dermatologists in the United States (20,149).

113.    In addition, most patients would be forced to undergo two (2) different physician visits instead of just one(1), to have their skin cancer diagnosed and treated. The patient would ordinarily see a dermatologist (who would diagnose the skin cancer) and then be referred out to a Mohs surgeon (to have the Mohs surgery performed). This would double the number of required medical visits patients would have to make and would likewise increase the costs of

medical care. Currently, the same physician who diagnoses the skin cancer also performs the Mohs surgery.

114. The conduct of the Defendants and Unnamed Co-conspirators will reduce the number of physicians able to perform Mohs surgery and receive payment for it.

115. The conduct of the Defendants and Unnamed Co-conspirators will reduce the number of physicians allowed to perform Mohs surgery in U.S. hospitals.

116. The conduct of the Defendants and Unnamed Co-conspirators will decrease the availability of Mohs surgery in the market.

117. The actions of the Defendants and Unnamed Co-conspirators are an attempt to artificially fix the supply of the services available, by limiting the numbers and specialties of physicians allowed to provide them.

118. The actions of the Defendants and Unnamed Co-conspirators are an attempt to fix the demand for services, by acting with and agreeing with the insurance company payors and government programs that pay for such services.

119. The conduct of the Defendants and Unnamed Co-conspirators constitutes a horizontal agreement to fix prices and to divide the market.

120. The conduct of the Defendants and Unnamed Co-conspirators constitutes an attempt to monopolize the service market and the geographic market.

121. The market will be artificially limited vertically, as well. Hospitals and payors will restrict the number of physicians who will be allowed to perform Mohs surgery to those certified by the Mohs Surgery Board.

## CLASS ACTION ALLEGATIONS

**A. Plaintiffs bring these claims on behalf of a class (the "Class") defined as follows:**

122.    The Class is all physicians who perform Mohs surgery in the United States who have not taken a specific fellowship in Mohs surgery.

### B. Numerosity.  Fed. R. Civ. P. 23(a)(1).

123.    The Class members are so numerous that joinder of all is impractical.  The Class members total thousands of physicians.  There are currently 20,149 dermatologists in the United States.  It is estimated that at least one-third (1/3) of them perform Mohs surgeries.

124.    In addition, there are other medical specialists that perform Mohs surgery, numbered in the thousands.

### C. Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).

125.    Common questions of law and fact exist and predominate as to all members of the Class.  The common legal and factual questions include whether Defendants will improperly restrain trade under the Sherman Act.

### D. Typicality.  Fed R. Civ. P. 23(a)(3).

126.    Plaintiffs' claims are typical of the claims of each Class member.  Plaintiffs have the same claims for injunctive relief that it seeks for all the class members.

### E. Adequacy. Fed. R. Civ. P. 23(a)(4).

127.    Plaintiffs are adequate representatives of the Class. Plaintiffs' interests are aligned
with, and are not antagonistic to, the Class. Plaintiffs and their counsel intend to prosecute this
action vigorously on behalf of the Class. Plaintiffs counsel will fairly and adequately protect the
interests of the members of the Class.

### F. Injunctive Relief Appropriate. Fed. R. Civ. P. 23(b)(2).

128.    Defendant ABMS's conduct as alleged herein applies generally to the members of
the Class, such that final injunctive relief is appropriate with respect to the Class, as is set forth
in the relevant count below.

### G. Predominance and Superiority. Fed R. Civ. P. 23(b)(3).

129.    Questions of law and fact common to the Class predominate over questions affecting
only individual members, and thus a class action is superior to other available methods for
adjudication. Individual litigation would prove burdensome and expensive for the complex issues
presented. It would be virtually impossible for Class members individually to redress effectively
the wrongs done to them. Even if Class members could afford such individual litigation, it would
be an unnecessary, time-consuming burden on the courts. A class action would benefit litigants
and the Court by resolving individual claims in one proceeding, without the risk of inconsistent
results.

## CAUSES OF ACTION

### COUNT I

### RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

130.    This is a cause of action by Plaintiffs against both Defendants for damages for restraint of trade in violation of Section 1 of the Sherman Act.

131.    It is pleaded alternatively to and in addition to each other Count in this Complaint.

132.    For the purpose of this Count, Paragraphs 1 through 129 above are incorporated herein by reference.

133.    At all times relevant hereto, there existed the federal statute commonly known as the Sherman Antitrust Act, 15 U.S.C. § 1.

134.    Section 1 of the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

135.    Section 15 of the Sherman Act (15 U.S.C. Section 15) allows private persons injured by "anything forbidden in antitrust laws" to file suit and to recover treble damages and attorney's fees:

> (a)  Amount of recovery[.] [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

136.    Defendant ABMS will unreasonably restrain trade by creating a subspecialty board for Micrographic Dermatologic Surgery.

137.    Defendants' actions have no legitimate purpose and reduce the output of medical services by physicians in the relevant market.

138.    Defendants' actions have been undertaken with a common design and understanding to exclude from the relevant market dermatologists and other Mohs surgery physicians, including members of this class, who choose not to spend time and money on becoming board-certified in Mohs surgery.

139.    Defendants' actions will injure and continue to injure competition by causing anti-competitive effects within the relevant market for services provided by dermatologists, thereby reducing output and increasing prices on consumers.

140.    Defendants' conduct constitutes an unlawful tying agreement under Section 1 of the Sherman Act, where health insurers and hospitals having sufficient market power are induced by Defendant to require board certification by dermatologists and other physicians who wish to perform Mohs surgery.

141.    Defendant's agreements and tying arrangements constitute a per se violation of Section 1 of the Sherman Act because they are plainly anticompetitive, decreasing the supply of Mohs surgery providers and reducing patient choice of physicians while increasing insurance premiums and other prices to consumers.

142.    In the alternative, Defendant's agreements and tying arrangements violate Section 1 of the Sherman Act under the rule of reason, by unreasonably restricting the ability of members

of the Class to provide services in the relevant market, and reducing patient choice of physicians while increasing insurance premiums and other prices to consumers.

## COUNT II

### RESTRAINT OF TRADE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

143.   This is a cause of action by Plaintiffs against both Defendants for damages for restraint of trade in violation of Section 2 of the Sherman Act.

144.   It is pleaded alternatively to and in addition to each other Count in this Complaint.

145.   For the purpose of this Count, Paragraphs 1 through 129 above are incorporated herein by reference.

146.   At all times relevant hereto, there existed the federal statute commonly known as the Sherman Antitrust Act, 15 U.S.C. Section 2, et seq.

147.   Section 2 of the Sherman Act further provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce amount the several States, or with foreign nations, shall be deemed guilty of a felony.

148.   Section 15 of the Sherman Act allows private persons injured by "anything forbidden in antitrust laws" to file suit and to recover treble damages and attorney's fees:

> (a)  Amount of recovery[.] [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages

Page 29 of 41

by him sustained, and the cost of suit, including a
reasonable attorney's fee.

149.    Plaintiffs contend that Defendants and Unnamed Co-conspirators are attempting to monopolize, combine, and conspire with each other to monopolize, the medical service Mohs surgery.

## COUNT III

## RESTRAINT OF TRADE IN VIOLATION OF FLORIDA ANTITRUST LAW

150.    This is a cause of action by Plaintiffs against both Defendants for damages for restraint of trade in violation of Section 542.18, Florida Statutes.

151.    It is pleaded alternatively to and in addition to each other Count in this Complaint

152.    For the purpose of this Count, Paragraphs 1 through 129 above are incorporated herein by reference.

153.    Defendants have conspired with the Unnamed Co-conspirators, to unreasonably restrain trade and commerce in the state of Florida by attempting to create a Mohs Surgery Board.

154.    Defendants' actions have no legitimate purpose and reduce the output of medical services by physicians in the Florida market.

155.    Defendants' actions have been undertaken with a common design and understanding to exclude from the Florida market dermatologists and other Mohs surgery physicians, including members of this class, who choose not to spend time and money on becoming board-certified in Mohs surgery.

156.    Defendants' actions will injure and continue to injure competition by causing anti-competitive effects within Florida for services provided by dermatologists, thereby reducing output and increasing prices on Florida's consumers.

157.    Defendants' agreements and tying arrangements with insurance providers constitute a per se violation of Section 542.18, Florida Statutes, because they are plainly anticompetitive, decrease the supply of Mohs surgery providers, and reduce patient choice of physicians while increasing insurance premiums and other prices on consumers.

158.    In the alternative, Defendant's agreements and tying arrangement violate Section 542.18, Florida Statutes, under the rule of reason, by unreasonably restricting the ability of members of the Class to provide services to the Florida market, and reducing patient choice of physicians while increasing insurance premiums and other prices to consumers.

## COUNT IV

## <u>CONSPIRACY TO MONOPOLIZE IN VIOLATION OF FLORIDA ANTITRUST LAW</u>

159.    This is a cause of action by Plaintiffs against both Defendants for damages for attempting to monopolize the Mohs surgery market in the state of Florida in violation of Section 542.19, Florida Statutes.

160.    It is pleaded alternatively to and in addition to each other Count in this Complaint.

161.    For the purpose of this Court, Paragraph 1 through 129 above are incorporated herein by reference.

162.    Defendant ABMS will monopolize the Mohs surgery market by creating a Mohs Surgery Board.

163.    The proposed Mohs Surgery Board will exclude from the Florida market dermatologists and other Mohs surgery physicians, including members of this class, who choose not to spend time and money on becoming board certified in Mohs surgery.

164.    The proposed Mohs Surgery Board will have exclusive control of the supply of Mohs surgery providers in the state of Florida.

165.    Defendants have the specific intent to monopolize the Mohs surgery market.

166.    By forcing physicians to join a Mohs Surgery Board in order to be reimbursed by insurance providers, Defendant ABMS prevents all other Mohs surgery physicians from acting as effective competitors in the Mohs surgery market.

167.    Defendants ABMS and ABD engaged in this conspiracy for the purpose and effect of controlling who becomes a Mohs surgery physician.  It was understood by Defendants that the conduct alleged in this claim would greatly reduce the number of Mohs surgery physicians.

168.    By engaging in the practices described above, the Mohs Surgery Board will achieve monopoly power of the Mohs surgery market in Florida.

169.    There are no legitimate pro-competitive justifications of ABMS's and ABD's attempt to monopolize the Mohs surgery market.

## COUNT V

## VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

170.    This is a cause of action by Plaintiffs against both Defendants for damages for restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Section 501.204, Florida Statutes.

171.    It is pleaded alternatively to and in addition to each other Count in this Complaint.

172.    For the purpose of this Court, Paragraphs 1 through 129 above are incorporated herein by reference.

173.    Defendants ABMS and ABD have unfairly and deceptively conspired to restrict trade and commerce by attempting to create a Mohs Surgery Board.

174.    Defendants subtly disparage those physicians who are Mohs surgeons but who are not fellowship trained in Mohs surgery and who will not be able to meet the requirements of the Mohs Surgery Board.

175.    Despite there being no statutory or regulatory requirement for Mohs surgery to only be performed by physicians who have a fellowship in Mohs surgery or who will be certified by the Mohs Surgery Board, Defendants misleadingly disparage physicians in the Class by making statements that imply that they are of a lower quality.

176.    Defendants imply that Plaintiffs and members of the Class are less competent in performing Mohs surgery.

177.    Disparagement of a physician is particularly harmful to his/her career, because government agencies, health insurers, payors, hospitals, and patients tend to avoid and not use the services of physicians who have any blemish on their reputation.

178.    Defendants' Mohs Surgery Board is designed primarily to increase revenue to the Defendants and to artificially restrict competition as alleged above and not to increase or ensure quality of the service being rendered.

179.    Defendants' deception occurs in the course of conduct involving trade, profession, or commerce.

180.    Defendants are knowingly and intentionally engaging in the foregoing unfair and deceptive trade practices.

181.    Defendants' actions have no legitimate purpose and unfairly reduce the output of Mohs surgeries by Mohs surgery physicians in the Florida market.

182.    Defendants' proposed creation of a subspecialty board for Mohs surgery would create unfair methods of competition and unfair acts in the commerce of Mohs surgery.

183.    Defendants' conduct is unfair since it is immoral, unethical, oppressive, unscrupulous, and substantially injurious to Mohs surgery patients.

184.    Plaintiff Class will be injured by Defendants' actions as will trade and commerce.

185.    Defendants' conduct amounts to a per se violation of Section 501.204, Florida Statutes, because it unfairly violates other Florida Statutes that pertain to trade and commerce. Specifically, Defendant's conduct violates Sections 542.18 and 542.19, Florida Statutes, which deal with restraint of trade and monopolization, respectively.

## COUNT VI

## CIVIL CONSPIRACY

186.    This is a cause of action by Plaintiffs against both Defendants for damages for civil conspiracy.

187.    It is pleaded alternatively to and in addition to each other Count in this Complaint.

188.    For the purpose of this Count, Paragraphs 1 through 129, 133 through 142, 146 through 149, 153 through 158, 162 through 169, and 173 through 185 above are incorporated herein by reference.

189.    At all times relevant hereto, Defendants ABMS and ABD conspired with specialty organizations such as AAD, ACMS, and physicians such as Randall K. Roenigk, M.D. and Brett Coldiron, M.D. (the Unnamed Co-conspirators), to restrain trade and to diminish or force physicians who perform Mohs surgery out of the marketplace.

190.    As a direct and proximate result of said conspiracy, Plaintiffs will suffer damages.

## COUNT VII

## REQUEST FOR DECLARATORY JUDGMENT

191.    This is a cause of action by Plaintiffs against both Defendants for a declaratory judgment pursuant to Rule 57, Federal Rules of Civil Procedure, and 28 U.S.C. Section 2201.

192.    It is pleaded alternatively to and in addition to each other Count in this Complaint.

193.    For the purpose of this Count Paragraphs 1 through 129, 133 through 142, 146 through 149, 153 through 158, 162 through 169, 173 through 185, and 189 through 190, above are incorporated herein by reference.

194.    Defendant ABMS is set to vote on the creation of a subspecialty board for Mohs surgery, as set forth in Exhibit "2," at some time shortly after July 6, 2018. The creation of this subspecialty board threatens the livelihood of all the members of the class that are bringing this suit.

195.    Under 28 U.S.C. Section 2201 and Rule 57, Federal Rules of Civil Procedure, a declaration of rights is necessary and appropriate from this court.

196.    Plaintiffs request the Court to review and interpret the plan to create the Mohs Surgery Board as stated in Exhibit "2," as well as the federal antitrust statutes cited above, and issue a declaratory judgment as to whether the plan of the Defendants restrains trade and violates the Sherman Antitrust Act.

197.    A declaratory judgment is required so as to guide the parties in their future conduct.

198.    A bona fide, actual, present practical need for a declaration exists.

199.    An actual controversy exists between Plaintiffs and Defendants.

200.    The declaration requested concerns a present, ascertained or ascertainable state of facts, or present controversy as to a state of facts.

201.    A privilege or right of the Plaintiffs is dependent upon the facts or the law applicable to the facts.

202.    The Plaintiffs and the Defendants have an actual, present, adverse, and antagonistic interest in the subject matter, either in law or in fact.

203.    The relief sought by the Plaintiffs is not merely giving of legal advice or the answer to questions propounded for curiosity.

**WHEREFORE,** Plaintiffs request the Court to enter a declaratory judgment interpreting and applying the facts of this case as set forth above, advising the Parties accordingly.

## COUNT VIII

### REQUEST FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

204. This is a cause of action by Plaintiffs against both Defendants for a temporary restraining order and injunctive relief, both temporary and permanent, to enjoin the Defendants pursuant to 15 U.S.C. Section 4, and Rule 65, Federal Rules of Civil Procedure, and Section 542.23, Florida Statutes, within the equity jurisdiction of this Court.

205. Plaintiffs also request the Court enter a temporary restraining order (TRO) to maintain the status quo until a hearing can be held on this matter.

206. This Count is pleaded alternatively to and in addition to each other Count in this Complaint.

207. For the purpose of this Count, it is alleged that there are no monetary damages or legal remedies that are available or appropriate for Plaintiffs.

208. For the purpose of this Count, Paragraphs 1 through 129, 133 through 142, 146 through 149, 153 through 158, 162 through 169, 173 through 185, and 189 through 190, above are incorporated herein by reference.

209. Defendant ABMS is set to vote on the creation of a subspecialty board for Mohs surgery shortly after July 6, 2018.

210. Defendant ABMS threatens to restrict trade in the health care market for skin cancer by creating this subspecialty board.

Page 37 of 41

211. As a result of Defendants' acts, Plaintiffs will sustain great and irreparable injury throughout the United States.

212. Plaintiffs cannot be fully compensated in damages, they are without an adequate remedy at law because the exact amount of damages Plaintiffs will suffer will be difficult to determine, and relief is immediately necessary.

## ATTORNEY'S FEES

213. Plaintiffs have retained undersigned counsel to pursue their rights in connection with this matter.

214. Plaintiffs have incurred reasonable attorney's fees and costs in connection with this matter.

215. Plaintiffs are entitled to payment of their reasonable attorney's fees and costs by the Defendants pursuant to 15 U.S.C. Section 15(a), Sections 501.2105(1) and 542.22(1), Florida Statutes, and other laws.

## REQUEST FOR JURY TRIAL

216. Plaintiffs hereby request a trial by jury on all issues so triable.

## RELIEF REQUESTED

Plaintiffs request this Court enter a judgment in their favor and against the Defendants finding:

A. Plaintiffs are proper representatives of the Class and that the Class exists.

B. Awarding Plaintiffs three (3) times their actual damages pursuant to 15 U.S.C. Section 15 and Sections 542.22(1), Florida Statutes.

C. Entering a declaratory judgment that adjudges and decrees that: Defendants have engaged in an unlawful conspiracy in restraint of trade in violation of Sections 1 and 2 of the Sherman Act and the Florida Antitrust Act.

D. Enter a temporary injunction to prohibit any acts being taken by Defendants that would change the status quo from the way it existed upon the filing of this Complaint until trial can be had on the merits, as authorized by 15 U.S.C. Section 15(a).

E. Enter a permanent injunction to prohibit the Defendants from creating a Mohs Surgery Board or any similar organization or taking any other acts that would limit in any way the ability of the Plaintiffs to perform Mohs surgery or to be fully reimbursed by any payor for performing a Mohs surgery upon a patient.

F. That Plaintiffs shall recover from the Defendants their reasonable attorneys' fees and costs of this suit.

G. Such other relief as the Court may deem appropriate, in law or in equity.

STATE OF FLORIDA        )
                        )
COUNTY OF _Shake)_      )

## VERIFICATION AND DECLARATION

I, the undersigned, having been duly sworn, do hereby depose and state, the facts stated above are true and I have personal knowledge of the same. This Verified Complaint is being filed in good faith and not for the purpose of unnecessary delay.

I further certify and declare that immediate loss or injury will result of a temporary restraining order and a temporary injunction are not entered to maintain the status quo pending a determination of the case on its merits.

_____
Signature
DAVID ALLYN, M.D.

## NOTARIZATION

SWORN TO AND SUBSCRIBED before me this ___9th.___ day of July 2018, by David Allyn, M.D., who is personally known to me or who did produce the appropriate identification and is the person who signed above.

- SEAL -

NOTARY SIGNATURE

SHAKIRA V BROWN
MY COMMISSION # GG044029
EXPIRES February 05; 2021

NAME: _Shakira V Brown_
LICENSE NO.: _GG,044029_
EXPIRATION: _2/05/21_

Done this 11th day of July 2018.

/s/  George F. Indest III

**GEORGE F. INDEST III, J.D., M.P.A., LL.M.**
Florida Bar No.:  382426
Primary e-mail:  GIndest@TheHealthLawFirm.com
Secondary e-mail:  CourtFilings@TheHealthLawFirm.com
TRIAL COUNSEL/LEAD ATTORNEY
ATTORNEY TO BE NOTICED
**CAROLE C. SCHRIEFER, R.N., J.D.**
Florida Bar No.:  835293
Primary e-mail:  CSchriefer@TheHealthLawFirm.com
Secondary e-mail:  CourtFilings@TheHealthLawFirm.com
TRIAL COUNSEL/LEAD ATTORNEY
ATTORNEY TO BE NOTICED
**LANCE O. LEIDER, J.D., LL.M.**
Florida Bar No.:  96408
Primary e-mail:  LLeider@TheHealthLawFirm.com
Secondary e-mail:  CourtFilings@TheHealthLawFirm.com
TRIAL COUNSEL/LEAD ATTORNEY
ATTORNEY TO BE NOTICED
**THE HEALTH LAW FIRM**
1101 Douglas Avenue
Altamonte Springs, Florida 32714
Telephone:  (407) 331-6620
Telefax:  (407) 331-3030
**ATTORNEYS FOR PLAINTIFFS**

Attachments (filed separately):
      Index to Exhibits to Complaint
      Exhibits to Complaint

GFI/gi
S:\001-1699\002\002-ABMS Antitrust Suit\410-Pleadings-Drafts & Finals\Complaint-MD Florida-rev-Final.wpd