# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

DAVID ALLYN, *et al.*

      Plaintiffs,

      v.

AMERICAN BOARD OF MEDICAL
SPECIALTIES, INC., *et al.*

      Defendants.

Case no. 5:18-cv-00355-JSM-PRL

---

## DEFENDANTS' DISPOSITIVE MOTION TO DISMISS THE COMPLAINT, REQUEST FOR FEES AND COSTS, AND SUPPORTING MEMORANDUM OF LAW

Russell LaPeer
**LANDT, WIECHENS, LaPEER,
& AYRES LLP**
Florida Bar no. 200530
445 N.E. 8th Avenue
Ocala, Florida 34470
Telephone No.  (352) 732-8622
Facsimilie No.  (352) 732-1162
rlapeer@aol.com &
lawsec70@yahoo.com

Jack R. Bierig
Benjamin I. Friedman
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, Illinois 60603
Telephone No.  (312) 853-7000
Facsimile No.   (312) 853-7036
jbierig@sidley.com
benjamin.friedman@sidley.com

Admitted *Pro Hac Vice*

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), defendants American Board of Medical Specialties ("ABMS") and American Board of Dermatology, Inc. ("ABD") (collectively "Defendants") move to dismiss Plaintiffs' Verified Complaint. If this Court dismisses the Complaint under Rule 12(b)(6), Defendants respectfully request that the dismissal be with prejudice. Defendants also move for the costs and reasonable attorneys' fees that they incurred in making this motion in light of Plaintiffs' refusal to withdraw the Complaint (a) despite Plaintiffs' own recognition that there is no actual case or controversy at this time and (b) despite Plaintiffs' having been repeatedly advised that basic allegations of the Complaint are fundamentally false.

## INTRODUCTION

The principal allegations of the Complaint (Counts I–IV) are that Defendants have conspired to violate the Sherman Act and analogous state law by "creat[ing] a subspecialty board . . . to limit the practice of the procedure known as . . . 'Mohs surgery.'"[1] The Complaint also alleges (Count V) that Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. ("FDUTPA") by making false statements about the quality of dermatologists who do not receive subspecialty certification. Comp. ¶¶ 170–85 (ECF No. 1). Further, it alleges (Count VI) that Defendants engaged in a civil conspiracy in violation of Florida law.

---

[1]Mohs surgery (also called Mohs micrographic surgery or micrographic surgery) is a specialized form of dermatologic surgery whereby skin cancers are removed through techniques that comprehensively map the margins of the cancer. Declaration of Thomas D. Horn, M.D. ¶ 7 ("Horn Dec."). The goals are to ensure that the cancer is removed in its entirety and to preserve as much healthy tissue as possible. *Id.*

For purposes of this motion to dismiss under Rule 12(b)(6), Defendants will, as we must, accept as true the well-pleaded facts set forth in the Complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, for purposes of the motion under Rule 12(b)(1), Defendants are free to challenge the factual allegations in the Complaint. *See, e.g.*, *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). Thus, we would point out that, as counsel for Defendants has repeatedly advised counsel for Plaintiffs, the Complaint is replete with basic and demonstrable errors of fact. *See*, *e.g*., Declaration of Jack R. Bierig ¶¶ 3–5 & Ex. 1 ("Bierig Dec."). Nevertheless, Plaintiffs have steadfastly refused to withdraw the Complaint and file an Amended Complaint that corrects their obvious factual errors. *See*, *e.g.* Bierig Dec. ¶¶ 9–10 & Ex. 2 (email of July 25 from Shannon Gentry).

The actual facts are these: ABD has applied to ABMS for authorization to award subspecialty certification in Micrographic Dermatologic Surgery ("MDS"), a category of dermatologic surgery that includes, but is not limited to, Mohs surgery. *See* Horn Dec. ¶ 7. The ABMS Committee on Certification ("COCERT") will be accepting comments on that application until September 7 and will not make a recommendation on that application to the ABMS Board of Directors until September 11. *See* Declaration of Richard E. Hawkins, M.D. ¶ 6–7 ("Hawkins Dec."); 7/12/2018 Order at 3 (ECF No. 5). The ABMS Board will not vote on the application until October. *See* Hawkins Dec. ¶ 8.

It is far from clear that COCERT will recommend, or that the ABMS Board of Directors will approve, the application. After all, two previous efforts by ABD to secure authorization for similar subspecialty certifications have not been successful. *See* Horn Dec. ¶ 9. Specifically, in 1987, ABMS denied ABD's application to issue a subspecialty

certification in Mohs Micrographic Surgery. *Id.*; *see also* Compl. ¶ 31(a). Subsequently, in 2009, ABD applied for subspecialty certification in Procedural Dermatology, but withdrew the application before COCERT made a recommendation. Horn Dec. ¶ 9; *see also* Compl. ¶ 31(b). Significantly, moreover, as this Court pointed out in its July 12 Order (ECF No. 5 at 3), Plaintiffs "do not allege how soon after the vote to create the MSB that the MSB would actually be created."[2]

Essentially, Plaintiffs contend that they will be harmed *if* COCERT recommends approval of the MDS subspecialty certification application of ABD; *if* the ABMS Board of Directors adopts that recommendation and approves the ABD application; *if* hospitals decide to require certification in the MDS subspecialty to permit dermatologists to perform Mohs surgery at their facilities; and *if* Medicare and private insurers decide to require certification in the MDS subspecialty in order for dermatologists to be reimbursed for Mohs surgery. Thus, the Complaint contains not a single allegation that hospitals require subspecialty certification in MDS if a dermatologist wants to perform Mohs surgery. Likewise, it contains not a single allegation that Medicare, or indeed any payor, requires or would require subspecialty certification in MDS as a condition for payment. The inescapable fact is that Plaintiffs' claims are entirely speculative and abstract. They are not ripe for review under Article III of the Constitution.

Beyond the lack of an actual case or controversy, the Complaint fails to state a cause

---

[2] Contrary to the allegations in the Complaint, *see, e.g.*, ¶ 1, 61, 62, ABD did not apply for authorization to create a "Mohs Surgery Board." As the documents attached to and incorporated in the Complaint show, ABD has applied to ABMS for authorization to issue a subspecialty certification in "Micrographic Dermatologic Surgery." ECF No. 1-3 at 1; *see also* Horn Dec. ¶ 7. If approved, the subspecialty certification would be issued by ABD, not by a separate Board. Moreover, the requested subspecialty certification would not be limited to Mohs surgery.

of action under the Sherman Act or analogous Florida law. To begin with, Plaintiffs lack standing because they have not alleged, and cannot allege, that they have been injured. As this Court noted in its July 12 Order (ECF No. 5 at 4–5), "Plaintiffs—who are all ABD board certified dermatologists—would not have to complete a fellowship to receive MSB board certification" – or, to receive subspecialty certification in MDS from ABD.

 Even more fundamentally, Plaintiffs have not alleged, and cannot allege, any restraint of trade. Assuming that the application to award subspecialty certification in MDS is granted, all that that that certification will do is provide information on the credentials of dermatologists who choose to obtain the credential. It will then be for the market – in the form of independent decisions by hospitals, payors, and patients – to determine how that information will be used. As the Seventh Circuit aptly put it in *Schachar v. American Academy of Ophthalmology*, 870 F.2d 397, 397 (7th Cir. 1989), "there can be no restraint of trade without a restraint."

Likewise, Plaintiffs have not alleged, and cannot allege, facts that, if proven, would make out a violation of FDUTPA. Specifically, they have not alleged, and cannot allege, a single false or misleading statement by ABMS or ABD about physicians who have not received subspecialty certification in MDS. Because Plaintiffs' civil conspiracy claims depend on their antitrust and FDUTPA claims, those claims fail as well. For these reasons, Plaintiffs have failed to state a cause of action even if this case were ripe for review.

## BACKGROUND

Founded in 1933, ABMS is a nationally recognized, not-for-profit corporation that strives to improve the quality of health care in the United States. *See* Compl. ¶ 29; Hawkins Dec. ¶ 3. ABMS consists of twenty-four Member Boards that cover a range of medical

specialties, from allergy and immunology to urology. *See* Compl. ¶ 29; Hawkins Dec. ¶ 3. Each Member Board offers general certification in its medical specialty and, if authorized by ABMS, certain subspecialties within that specialty.

These certifications provide useful information to hospitals as they credential physicians; payors as they determine what sort of payment to make; and patients as they choose what physician to use for a specific condition. Certification "helps demonstrate to the public that a physician meets nationally recognized standards for education, knowledge, experience, and skills." Hawkins Dec. ¶ 5. Recertification indicates that certified physicians have sought to maintain their knowledge and skill through continuous learning and practice improvement. *Id*. As one court has recognized, "[c]ertification by a Member Board is a voluntary process and no physician is required as a condition of medical licensure to be initially certified by an ABMS Member Board." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, No. CIV.A. 13-2609 PGS, 2014 WL 1334260, at *1 (D.N.J. Apr. 2, 2014).

Incorporated in 1932, ABD is one of the twenty-four ABMS Member Boards. Horn Dec. ¶ 3. ABD is a non-profit corporation established to advance the public interest by establishing standards of training, education, and qualifications for physicians specializing in dermatology. *Id*. In addition to certification in general dermatology, ABD offers subspecialty certifications in dermatopathology and in pediatric dermatology. Compl. ¶ 32. Board certification by ABD is voluntary. Horn Dec. ¶ 4; *see also* Hawkins Dec. ¶ 5. Like ABMS, ABD does not "define requirements for membership on hospital staffs," "gain special

recognition or privileges" for the physicians whom it certifies (referred to as "Diplomates"), and "does not define who may, or may not, practice dermatology." Horn Dec. ¶ 4.

On April 6, 2018, the ABMS received the ABD application for authorization to award subspecialty certification in MDS. Hawkins Dec ¶ 6. The dermatologic subspecialty known as MDS integrates clinical dermatology, surgical dermatology, dermatopathology, and basic knowledge of carcinogenesis in order to treat various cutaneous cancers. Horn Dec. ¶ 7. One of the procedures within this subspecialty of dermatology is Mohs surgery, which is often performed by Board certified dermatologists with training in MDS. Compl. ¶ 2. In a typical Mohs surgical procedure, the physician "cuts around and removes a visible skin cancer (a melanoma, basal cell carcinoma, or squamous cell carcinoma) on a patient's skin." *Id*. A thin layer of the surrounding tissue is then removed and analyzed to determine if any cancer cells remain. *Id*. If cancer cells are still present, the physician will remove additional tissue and then re-analyze the tissue at the margins. *Id*. The physician repeats the process until all of the cancer cells have been removed. *Id*.

Mohs surgery has been practiced since the 1930s, and training programs in MDS have existed for fifty years. Compl. ¶ 2 n.1 & Ex. 2 at 1 (ECF No. 1-3). Since 1970, the American College of Mohs Surgery has accredited fellowship programs specializing in MDS. Compl. Ex. 2 at 2. A fellowship "is a specialty training program for a physician who has already completed a medical residency program." Compl. ¶ 6 n.2. In 2004, the Accreditation Council for Graduate Medical Education took over the accreditation process and now accredits 76 fellowship programs in Micrographic Surgery and Dermatologic Oncology. Compl. Ex. 2 at 2. Since fellowship accreditation began in 1970, more than 1,500 Board certified dermatologists

have completed a fellowship in MDS. *Id*.

As this Court has noted (July 12 Order at 4), ABD's application to ABMS proposes that, for five years after approval, "any dermatologist certified by the ABD in good standing . . . will be allowed to sit for the examination provided s/he attests that [Micrographic Dermatologic Surgery] comprises some portion of practice." ECF No. 5 at 4; *see also* Compl. Ex. 2 at 8; Compl. ¶ 82 (acknowledging the "grandfathering period"). Once the initial five-year period closes, "only ABD-certified dermatologists who have successfully completed [an accredited] fellowship program will qualify to take the examination to become certified." Compl. Ex. 2 at 8.

After ABD submitted its subspecialty application, ABMS sought comments from all interested parties. Hawkins Dec. ¶ 6. As stated in ABMS's call for comments, stakeholders could submit their views on the proposal through the ABMS website until July 6 and via email or other correspondence until September 7. *Id*. The ABMS Committee with initial responsibility for evaluating the application, COCERT, will consider the ABD application at its September 11 meeting, and will recommend to the ABMS Board of Directors whether to approve or deny the application sometime thereafter. *Id*. ¶ 7. The ABMS Board of Directors will act on the COCERT recommendation on October 26. *Id*. ¶ 8.

On July 11, 2018, three Board certified dermatologists, David Allyn, James Lynott, and Joseph Masessa, filed this verified, eight-count Complaint against Defendants. ECF No. 1. In Counts I-IV, Plaintiffs allege that Defendants, and a number of unnamed co-conspirators, have "conspired, combined, and agreed . . . to limit the number of physicians who are 'board certified' to perform Mohs surgery and thus are allowed to bill and collect for performing the

Mohs surgery procedure" – in violation of Sections 1 and 2 of the Sherman Act and Florida Statutes §542.18 and § 542.19. Compl. ¶¶ 4, 130–169. In Count V, Plaintiffs allege that Defendants "are engaging in deceptive trade practices" by "misleadingly disparag[ing] physicians who decline to participate in a Mohs surgery fellowship" and by "falsely implying that such physicians will be of inferior quality to those who do Mohs surgery fellowships and will become certified" in MDS in violation of FDUTPA." Compl. ¶¶ 9, 170–85. In Count VI, they assert a claim for civil conspiracy based on Defendants' alleged violations of federal and Florida antitrust laws, and the FDUTPA. Compl. ¶¶ 186–90. Count VII requests a declaratory judgment, and Count VIII requests a temporary restraining order and injunctive relief. Compl. ¶¶ 191–212.

## LEGAL STANDARD

ABMS and ABD move to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Motions to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) may attack jurisdiction facially or factually. *Carmichael*, 572 F.3d at 1279. When a defendant challenges subject matter jurisdiction under Rule 12(b)(1), a court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case without presuming the truthfulness of the plaintiff's allegations." *Makro Capital of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1258 (11th Cir. 2008) (internal quotation marks omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning that, from the facts alleged, the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Although the Court assumes for purposes of a motion to dismiss that the factual allegations in the Complaint are true, it need not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## ARGUMENT

The Complaint should be dismissed for two independent reasons. *First*, Plaintiffs have not alleged a constitutional "case or controversy" because their claims are not ripe for review. *Second*, Plaintiffs have failed to state a cause of action. They do not have antitrust standing to bring the claims alleged in Counts I-IV, and they have not alleged a restraint of trade to support their claims under Section 1 of the Sherman Act and Fla. Stat. § 542.18. Likewise, with respect to their FDUPTA claim in Count V, Plaintiffs have not identified a single statement attributable to Defendants that "disparages" Plaintiffs. To the extent that Plaintiffs' remaining claims depend entirely on their antitrust and FDUPTA claims, the Court should dismiss Counts VI-VIII.

## I.  PLAINTIFFS' CLAIMS ARE NOT RIPE FOR REVIEW.

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies that are ripe for review. *Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). To determine whether a claim is ripe, a court (1) evaluates the fitness of the issues for judicial decision; and (2) assesses the hardship to the parties from withholding court consideration. *Id*. Included in this inquiry is "whether the courts would benefit from further factual development of the issues presented." *Pittman v. Cole*, 267 F.3d 1269, 1278

(11th Cir. 2001) (citation omitted). If claims are not ripe for review, then a federal court does not have subject-matter jurisdiction to hear the case. *Digital*, 121 F.3d at 591 & n.5.

Apart from constitutional issues, the ripeness requirement ensures that "the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court." *Id*. at 589 (citations and quotations omitted). In other words, the ripeness requirement prevents "federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Id*. (citations and quotations omitted). Here, both prongs of the ripeness inquiry, as well as the policies underlying them, lead to the conclusion that this case is premature and should, therefore, be dismissed.

### A.       Plaintiffs' Claims Are Not Fit for Judicial Review.

Plaintiffs' claims are not fit for review because they rely on a future decision that ABMS may well not make – and on speculation as to what hospitals and insurers might do if ABMS approves the application of ABD to issue subspecialty certification in MDS. The Supreme Court and Eleventh Circuit have each repeatedly stressed that "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also Pittman*, 267 F.3d at 1278 ("claims are less likely to be considered 'fit' for adjudication when they . . . require speculation about contingent future events." (citation omitted)).

Here, Plaintiffs are asking this Court to speculate on the outcome of the ABMS review process and on conduct that may, or may not, materialize after a predicted decision by ABMS approving the application. It is quite possible that ABMS will not approve the application of ABD for authorization to grant subspecialty certification in MDS. Indeed, the entire purpose

of the comment period is to provide input that will allow ABMS to determine whether to permit the subspecialty certification. Similarly, the actions of hospitals and insurers about which Plaintiffs speculate may never materialize even if the subspecialty certification in MDS is approved. Accordingly, it is quite possible that, if the Court decides the merits of this case now, the Court will have spent its time on an issue that need never be decided.

It is telling that that Plaintiffs' antitrust claims are couched in the future tense. *See, e.g.*, Compl. ¶¶ 136, 139, 156, 162. For example, Plaintiffs predict, with no foundation whatsoever, that: "Defendant ABMS will unreasonably restrain trade by creating a subspecialty board for Micrographic Dermatologic Surgery" and "Defendant ABMS will monopolize the Mohs surgery market by creating a Mohs Surgery Board" *Id.* ¶¶ 136, 162. Similarly, Plaintiffs repeatedly state, again with no foundation, that "[o]nce the Mohs Surgery Board is formed, Defendants and Unnamed Co-conspirators will act . . . ." Compl. ¶¶ 61–64. (emphasis added). Yet it is anything but a foregone conclusion that the application for subspecialty certification will be granted – or that the actions by third parties predicted by Plaintiffs will come to pass.

This Court has already observed that Plaintiffs' claims are premature. In its Order denying Plaintiffs' Temporary Restraining Order, the Court noted that ABMS review of ABD's application is not yet complete. 7/12/2018 Order at 3 (ECF No. 5). Indeed, ABMS has yet even to receive a recommendation from COCERT – let alone make a decision on ABD's application. *See id*. As this Court observed, the ABMS website states that the ABMS committee on certification, or COCERT, "'will consider the application [for creation of the

Micrographic Dermatologic Surgery subspecialty] at its meeting in September 2018.'" *Id.* at 3 n.1.

Plaintiffs themselves have acknowledged that this case is not ripe for adjudication. In their Notice of Withdrawal of Motion for Temporary Injunction following the Court's denial of their request for a TRO, Plaintiffs recognized that COCERT "will only be making a recommendation for later consideration by ABMS." ECF No. 10 at 4. Nevertheless, rather remarkably in light of this statement, Plaintiffs have refused to withdraw the Complaint.

In short, adjudication of Plaintiffs' claims at this time would cause this Court not only to jump ahead of ABMS's ongoing review of the ABD application, but also to assume that ABMS will approve that application. Further, it would require the Court to assume that, if ABMS does approve the application, hospitals and payors will take the actions that Plaintiffs, again without any foundation, predict.[3] Despite Plaintiffs' assertions to the contrary, federal courts are not in the business of forecasting future events. *See Jacks v. Wells Fargo Bank N.A.*, 642 F.3d 1323, 1332 (11th Cir. 2011) (holding that a court lacks jurisdiction over "claims [that] are based on events that may take place in the future."). Because Plaintiffs' claims rest on decisions not yet made and actions not yet taken, their claims are not ripe for judicial review and therefore should be dismissed. *See Staver v. Am. Bar Assoc.*, 169 F. Supp. 2d 1372, 1377 (M.D. Fla. 2001) (dismissing antitrust claims against the American Bar Association because

---

[3] The actions taken by hospitals and third-party payors are completely independent of the actions of ABMS and ABD. Any decision regarding the creation of a new subspecialty certification is based on the existence of a body of knowledge regarding the subspecialty and how the approval of the application would affect patient care, patient access, et cetera. Horn Dec. ¶ 10; Hawkins Dec. ¶ 9. There is no discussion with hospitals, insurers, Medicare or other third-party payors. Horn Dec. ¶ 10; Hawkins Dec. ¶ 9. Decisions are made based on providing the best medical care, not economic outcomes. Horn Dec. ¶ 10; Hawkins Dec. ¶ 9.

the lawsuit was filed before the ABA had reached a final decision regarding a school's application for accreditation); *Florida Coastal School of Law, Inc. v. Am. Bar Ass'n*, No. 3:18-cv-621-J-39JBT, Slip Op. 10, (M.D. Fla. July 9, 2018) (ECF No. 39) (holding that "because [administrative] review of the ABA's decision is still pending, judicial review at this time is not appropriate").

> **B.     Plaintiffs Will Not Suffer Hardship In the Absence of Judicial Intervention.**

Hardship from withholding adjudication may exist if a plaintiff "has suffered injury or come into immediate danger of suffering injury." *Waldman v. Conway*, 871 F.3d 1283, 1290 (11th Cir. 2017). The Eleventh Circuit has stressed that "the hardship prong is inherently fact-sensitive, and [courts] should look for actual prejudice to the Plaintiffs from withholding adjudication." *Pittman*, 267 F.3d at 1281. A merely speculative threat of injury is insufficient to satisfy a finding of hardship. *Waldman*, 871 F.3d at 1290.

Here, no injury has occurred, and none will occur in the immediate future, if at all. Tellingly absent from the Complaint are any allegations suggesting that Plaintiffs are currently suffering any injury. And even if the application of ABD is approved, it will be a long time before any of the injuries alleged in the Complaint could possibly occur since it will take ABD substantial time to implement the new program. Similarly, it would take hospitals and payors some time before adopting the policies about which Plaintiffs speculate.

That is why Plaintiffs have resorted to alleging vague and imprecise forecasts of potential injuries that may or may not arise in the future. *See* Compl. ¶¶ 49–51. Well-established Eleventh Circuit precedent instructs that predictions of future injury are an inadequate basis for concluding that a claim is ripe for review. *See Wilderness Soc. v. Alcock*,

83 F.3d 386, 390–91 (11th Cir. 1996) (affirming district court's finding that claims were not ripe because "we do not yet know when or how an injury to the appellants will occur, and this factual underpinning is vital to a full-fledged judicial review of the Plan"); *see also Vandenbrink v. Voneschen*, 542 F. App'x 728, 730 (11th Cir. 2013) (finding that plaintiff's claims were not ripe for review because she "does not face even the threat of an injury.").

Moreover, even if the ABMS Board of Directors votes in favor of creating the MDS subcertification, Plaintiffs would, as this Court has noted, still be able to sit for a certification examination during the first five years of the subspecialty's existence. 7/12/2018 Order at 4–5 (ECF No. 5). Indeed, the application for the creation of the MDS expressly states that "a practice pathway to certification will exist for 5 years. During this period, any dermatologist certified by the ABD, in good standing and up to date in MOC (if applicable) will be allowed to sit for the examination provided that s/he attests that MDS comprises some portion of practice." Compl. Ex. 2 at 8; *see also* 7/12/2018 Order at 4 (ECF No. 5). In this Court's own words, "Plaintiffs—who are all ABD board certified dermatologists—would not have to complete a fellowship to receive [MDS] board certification, which is the crux of their claims in the Verified Complaint." *Id.* at 4–5.

Against this backdrop, it can hardly be said that Plaintiffs are in "immediate danger" of suffering an injury. In effect, Plaintiffs are calling upon this Court to issue an advisory opinion. But that is precisely what federal courts are not to do. *See Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) ("Strict application of the ripeness doctrine

prevents federal courts from rendering impermissible advisory opinions and wasting resources through review of potential or abstract disputes.").

For all these reasons this Court should dismiss Plaintiffs' claims as unripe for adjudication. Indeed, Plaintiffs' claims are so clearly unripe – and, particularly after the decision of this Court denying the TRO were so clearly known by Plaintiffs and their counsel to have not been ripe – that the costs of this motion, including attorneys' fees, should be awarded against Plaintiffs. Plaintiffs have chosen to persist with their Complaint even after having been told by this Court that their claims are not ripe and even after having been advised by Defendants that their factual allegations are fundamentally incorrect. They have chosen to persist despite having twice been told that Defendants would seek sanctions if they did not withdraw the Complaint. *See* Bierig Dec. ¶¶ 6, 8. In the circumstances, there is absolutely no justification for Defendants to have to bear the substantial fees and costs associated with this Motion to Dismiss. This Court should tax the fees and costs of this Motion to Plaintiffs under its inherent equitable powers. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 35 (1991) (holding that a court can "invoke[] its inherent power in assessing as a sanction for a party's bad-faith conduct attorney's fees and related expenses").

## II.   PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE DISMISSED.

To plead claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Plaintiffs must allege that they have suffered an "antitrust injury" – that is, an "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977). As explained below, Plaintiffs have not alleged *any* injury that would flow from MDS subspecialty certification by ABD, since all Board certified dermatologists

who perform Mohs surgery, including Plaintiffs, would be eligible for that certification. Moreover, even if Plaintiffs had alleged an antitrust injury and had antitrust standing, their Section 1 claim still would fail because they have not adequately pleaded that MDS subspecialty certification would constitute a restraint of trade. 15 U.S.C. § 1.[4]

### A.      Plaintiffs Lack Standing To Assert Their Antitrust Claims.

In an antitrust case, standing "involves more than the 'case or controversy' requirement that drives constitutional standing." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991). Whereas constitutional standing depends on the Court finding a "case or controversy" that is ripe for review, antitrust standing "involves an analysis of prudential considerations aimed at preserving the effective enforcement of antitrust laws." *Id*. A plaintiff seeking an injunction "must allege threatened injury that would constitute antitrust injury if inflicted upon the plaintiff and the defendant's causal responsibility for such threatened injury." *Id*. at 1452 (citing *Cargill, Inc. v. Monfort, Inc.*, 479 U.S. 104, 112 (1986)). The Complaint fails to allege any antitrust injury but, even if it had, Defendants would not be the cause of that injury.

### 1.      *Plaintiffs Have Not Alleged an "Antitrust Injury."*

Plaintiffs have not alleged *any* injury, much less one that is cognizable under the Sherman Act. Plaintiffs allege that "each . . . will suffer a loss of patients, a loss of income, and will have their ability to provide Mohs surgery procedures for their patients artificially

---

[4] The Complaint also alleges violations of Florida antitrust law. Compl. ¶¶ 130–69 (alleging violations of Fla. Stat. § 542.18 and § 542.19). As the Eleventh Circuit has observed, "Federal and Florida antitrust laws are analyzed under the same rules and case law." *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 749 n.11 (11th Cir. 1998) (citing Fla. Stat. § 542.32). Thus, Defendants' "discussion of the law under the Sherman Act is equally applicable to [Plaintiffs] state antitrust claims," which should be dismissed for the same reasons as explained in this section. *Id*.

restrained or prohibited." Compl. ¶ 49. To begin, such losses are a figment of Plaintiffs' collective imagination. Each of the Plaintiffs is Board certified in dermatology and, as such, is eligible to be certified in MDS without completing a fellowship. Compl. ¶¶ 18, 21, 24, 82; *see also* 7/12/2018 Order at 4–5 (ECF No. 5). There is no reason to think that Plaintiffs would not become Board certified in MDS if they so desired. Therefore, the creation of the subspecialty in and of itself "does not remove [Plaintiffs'] output from the market and does not raise prices for consumers." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994), *as amended on denial of reh'g* (Jan. 11, 1995). Moreover, Plaintiffs will be able to continue to perform Mohs surgery even after the creation of the subspecialty certification – whether or not they choose to seek this certification.

Second, even if this Court assumed that Plaintiffs could not obtain the subspecialty certification, the supposed injury about which they complain is not cognizable under the antitrust laws. As the Supreme Court has explained, "the antitrust laws were enacted for the protection of competition, not competitors." *Brunswick*, 429 U.S. at 488. As a result, "[t]here is no antitrust injury when the harm alleged is harm to the business of one competitor (or a group of competitors)—the injury must be to the market." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, No. 14-CV-02705, 2017 WL 6821094, at *6 (N.D. Ill. Dec. 13, 2017). Here, there is no plausible allegation of injury to competition in the market for MDS – as opposed to supposed injury to these Plaintiffs.

On this point, *Sanjuan v. American Board of Psychiatry and Neurology, Inc.*, 40 F.3d 247 (7th Cir. 1994) and *Daniel v. American Board of Emergency Medicine*, 428 F.3d 408 (2d Cir. 2005) are particularly instructive. In *Sanjuan*, the American Board of Psychiatry and

17

Neurology denied certification to plaintiffs after they failed the Board's oral examination. Plaintiffs alleged that the Board's certification practices violated the Sherman Act. 40 F.3d at 249. The Seventh Circuit rejected these claims – holding that harm to plaintiffs' psychiatry practices is not an antitrust injury. *Id*. at 251. Indeed, "[t]he claim that a practice reduces (particular) producers' incomes *has nothing to do with the antitrust laws*." *Id*. (emphasis added).

In *Daniel*, the Second Circuit reached a similar conclusion. There, several licensed physicians practicing emergency medicine alleged that the American Board of Emergency Medicine had "manipulated the residency training requirement for ABEM certification to limit the number of doctors certified in emergency medicine." 428 F.3d at 414. Following the Seventh Circuit's lead in *Sanjuan*, the Second Circuit concluded that "the injury alleged by plaintiffs—their ability to earn higher pay—was not 'an antitrust injury.'" *Id*. at 439–42.

This precedent disposes of Plaintiffs' claims. Like the plaintiffs in *Sanjuan* and *Daniel*, Plaintiffs here allege a host of injuries to their incomes, not to the market for MDS or Mohs surgery. Compl. ¶ 49 (". . . Plaintiff will suffer a loss of patients, a loss of income, and will have their ability to provide Mohs surgery procedures . . . artificially restrained or prohibited."); *id*. ¶ 50 (". . . Defendants will cause the Plaintiffs . . . to be excluded from insurance networks and the networks of private payors . . . ."); *id*. ¶ 51 (". . . Defendants will artificially and arbitrarily restrict the income of the Plaintiffs . . . ."). Courts consistently have held that these types of injuries are not "the type the antitrust laws were intended to prevent." *Brunswick*, 429 U.S. at 489; *Sanjuan*, 40 F.3d at 249; *Daniel*, 428 F.3d at 414; *Ass'n of Am.*

*Physicians & Surgeons*, 2017 WL 6821094, at *6.[5]

### 2.    *Defendants Are Not the Cause of Plaintiffs' Alleged Injuries*.

Plaintiffs' do not have antitrust standing for another reason: There is simply no direct causal connection between Defendants' conduct and the harm that Plaintiffs posit will come to pass. *Todorov*, 921 F.2d at 1448. Defendants do not control hospitals or third-party payors. Plaintiffs do not, and could not, allege otherwise. Quite to the contrary, Plaintiffs themselves tacitly acknowledge that Defendants do not control these third parties. Thus, they allege that Defendants "*will convince* payors for medical services, specifically the Medicare Program, to limit payments for Mohs surgery procedures to only those" with subspecialty certification. Compl. ¶ 11 (emphasis added). Beyond the entirely speculative nature of this assertion, use of the word "convince" implies that Defendants cannot require third parties to take any of the actions about which Plaintiffs are concerned.

If third-party payors limit payments for Mohs surgery to those who have MDS certification and if hospitals prohibit physicians who do not have the subspecialty certification from performing Mohs surgery in their facilities, as Plaintiffs fear, that would be the result of the independent judgment of these third parties – not of some conspiracy. *See Poindexter v. Am. Bd. of Surgery, Inc.*, 911 F. Supp. 1510, 1520 (N.D. Ga. 1994), *aff'd* 56 F.3d 1391 (11th

---

[5] This Court should not credit Plaintiffs' allegations that the creation of an MDS subspecialty certification will reduce access to Mohs surgery providers and increase the procedure's price because those allegations are conclusory at best and lack factual support. *Iqbal*, 556 U.S. at 678. Moreover, Plaintiffs' allegations, and the documents attached to the Complaint, undermine any suggestion that MDS subspecialty certification will harm consumers. All Board certified dermatologists will be eligible for the subspecialty certification. And, the supply of dermatologists trained in MDS is only increasing: "[f]rom 2007 to 2017 [American College of Mohs Surgery] membership" – which requires completion of a fellowship – "increased from 696 to 1333; a total increase of 92%, with an annual average increase of 9%." ECF No. 1-3 at 2. Thus, the number of dermatologists who can perform Mohs surgery will either remain the same or increase, and there is no plausible threat of injury to patients who need Mohs surgery.

Cir. 1995) ("Hospitals, patients and insurers voluntarily rely on the Board's certification decision, much like an ordinary consumer might rely on a trade group's seal of approval. After the Board expresses its informed opinion regarding the sufficiency of a surgeon's academic training or credentials, users of that information have the sole power to determine whether that surgeon is entitled to patronage, surgical privileges, or preferred insurance rates."). The lack of subcertification in MDS by itself, "do[es] not impact whether physicians are licensed [under state law] to practice," does not remove Plaintiffs from hospital staffs, and does not impact whether Plaintiffs can charge third-party payors for Mohs surgery. *See Ass'n of Am. Physicians & Surgeons, Inc.*, 2017 WL 6821094, at *6.

**B.    Plaintiffs Have Not Alleged A Restraint of Trade.**

Plaintiffs' Section 1 claims fail for the additional reason that Plaintiffs have not alleged facts that, if proven, would constitute a "restraint of trade or commerce." 15 U.S.C. § 1. As Judge Easterbrook succinctly put it, "[t]here can be no restraint of trade without a restraint." *Schachar*, 870 F.2d at 397. Medical specialty certifications simply do not constitute a restraint since all that such certifications do is provide information to hospitals, third-party payors, and patients.

In *Schachar*, the Seventh Circuit considered whether the American Academy of Ophthalmology's decision not to endorse a particular surgical procedure constituted an unlawful restraint of trade. Judge Easterbrook's opinion applies equally here: The decision of a private body to withhold its endorsement is not a restraint at all, let alone an unlawful one.

20

870 F.2d at 397.[6] Notably, in *Schachar* as here, the entity in question "ha[d] no authority over hospitals, insurers, state medical societies or licensing boards, and other persons who might be able to govern the performance of [medicine.]" 870 F.2d at 398. To be sure, a certification by ABD that a physician has met applicable standards may be respected by independent decision-makers. However, even "[a]n organization's towering reputation does not reduce its freedom to speak out." *Id*. at 399.

Applying these principles, courts in this Circuit and around the country have consistently rejected antitrust claims based on the certification processes of ABMS Member Boards. *See Poindexter*, 911 F. Supp. at 1520 (holding that a Member Board did not "constrain Plaintiff's ability to compete." (emphasis added)).[7] As one court put it in a case brought against an ABMS Member Board, it is "abundantly clear that [a] plaintiff's Sherman Act claim should be dismissed" when brought against an entity that "neither grants licenses to practice medicine, nor does it have any authority to do so." *DeGregorio v. Am. Bd. of Internal Medicine*, No. 92-cv-4924, 1993 WL 719564, at *10 (D.N.J. Oct. 1, 1993), *adopted in relevant part*, 844 F. Supp. 186, 187 (D.N.J. 1994).

Plaintiffs provide no reason to depart from this established precedent. As in these cases, certification by an ABMS Member Board, helps demonstrate to the public that a physician

---

[6] *See also Marrese v. Am. Academy of Orthopaedic Surgeons*, No. 91-1366, 1992 WL 246906, at *6 (7th Cir. Oct. 1, 1992) ("[T]here is no evidence that membership in these societies is necessary to practice sports medicine or hand surgery. In other words, there is no evidence of any restraint of trade.").

[7] *See also Sanjuan*, 40 F.3d at 251 ("It is hard to see how the [Member] Board's activities could amount to an exercise of market power, which entails cutting back output in the market and thus driving up prices to consumers."); *Patel v. Am. Bd. of Psychiatry & Neurology, Inc.*, No. 89-cv-1751, 1989 WL 152816, at *3 (N.D. Ill. Nov. 21, 1989) ("Plaintiff has failed to allege that defendant [Member Board] has any authority or control over the private hospitals and institutions . . . ."); *Bishara v. Am. Bd. of Orthopaedic Surgery, Inc.*, No. 85-cv-3400, 1986 WL 15265, at *1 (N.D. Ill. Dec. 30, 1986) ("This court . . . finds that the [Member] Board's certification process does not violate the antitrust laws.").

21

meets nationally-recognized standards for education, knowledge, experience, and skills. *See Peel v. Attorney Registration & Disciplinary Commission of Illinois*, 496 US 91, 102 n.11 (1990) ("Board certification of specialists in various branches of medicine, handled by the 23 member boards of the American Board of Medical Specialties, is based on various requirements of education, residency, examinations and evaluations . . . . The average member of the public does not know or necessarily understand these requirements, but board certification nevertheless has come to be regarded as evidence of skill and proficiency of those to whom they [have] been issued.").

Certification may also signal that a physician maintains his or her knowledge and skill through continuous learning and practice improvement. Neither ABMS nor ABD "define requirements for membership on hospital staffs," "gain special recognition or privileges" for physicians, or "define who may or may not practice dermatology." *See supra* p.5. As such, creation of a subspecialty certification in MDS, if it occurs at all, would not constitute a restraint. Indeed, the Complaint is a frontal assault on the Board certification system that has provided useful information to the market for nearly a century. For if Plaintiffs are correct that subcertification of physicians in MDS is an unlawful restraint of trade because it may create issues for those physicians who choose not to seek such certification, then the same can be said of all Board certification – and the entire system that is designed to operate for the benefit of patients will be undermined. Indeed, even allowing this case to proceed beyond the pleading stage would impose enormous costs on the Board certification system.

### III.   PLAINTIFFS' FDUTPA CLAIM SHOULD BE DISMISSED.

In Count V, Plaintiffs assert a claim under the FDUTPA based on Defendants' alleged "disparage[ment]" of physicians who have not completed a fellowship in MDS. *See, e.g.*, Compl. ¶¶ 174–76.[8] But Plaintiffs have failed to allege the very first element of any FDUTPA claim: the existence of a "deceptive act or unfair practice," – *i.e.*, a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007). As courts in this district have explained, pleading this element requires Plaintiffs to "provide . . . a[] substantiating factual predicate . . . , such as what misrepresentations, concealments, acts, or omissions allegedly deceived them and the public" and to provide "support for their allegation that Defendants' acts caused confusion in the marketplace and negatively affected their customers." *Eli Research, LLC v. Must Have Info Inc.*, No. 2:13-CV-695-FTM-38CM, 2014 WL 4540110, at *9 (M.D. Fla. Sept. 11, 2014).[9]

Plaintiffs' allegations fall well short of satisfying these requirements. Although the Complaint alleges that Defendants "disparage[d]" Plaintiffs, it alleges no facts to substantiate that bare conclusion. The Complaint does not allege what Defendants said or did to disparage Plaintiffs, when these alleged statements or actions occurred, and how those statements or

---

[8] Count V also alleges that that Defendants conduct "amounts to a per se violation" of the FDUTPA, Fla. Stat. § 501.24, because it violates Florida antitrust law (which is the same as federal law). Compl. ¶ 185 (emphasis in original); *see supra* n.4. To the extent Count V relies on Florida antitrust law, it fails for the reasons explained in Section II, *supra*.

[9] *See also Fid. Nat'l Fin., Inc. v. Attachmate Corp.*, No. 315CV01400HESPDB, 2017 WL 3726687, at *3 (M.D. Fla. Mar. 1, 2017) (dismissing FDUTPA claim because the complaint did not "identif[y] the contested terms of the license agreement(s), [or] address[] Defendant's representations or omissions of the agreement(s)").

actions have "cause[d] confusion in the marketplace and negatively affected their customers." *Eli Research*, 2014 WL 4540110, at *9.

Particularly telling is the Complaint's allegation that "Defendants *subtly disparage* those physicians who are Mohs surgeons but who are not fellowship trained in Mohs surgery." Compl. ¶ 174 (emphasis added). Of course, this allegation is directly refuted by the fact that the application itself envisions a five-year period during which dermatologic surgeons who were not fellowship trained in Mohs surgery may nonetheless receive subspecialty certification in MDS. Regardless, by stating that Defendants' disparagement is "subtle," Plaintiffs effectively concede that they cannot identify a single disparaging statement made by Defendants against them.

Indeed, the facts alleged in the Complaint undermine any suggestion that Defendants have disparaged dermatologists who have not completed an MDS fellowship. As this Court pointed out, the MDS proposal allows all Board certified physicians to become subcertified in MDS – whether the physician completed an MDS fellowship or not. 7/12/2018 Order 4–5 (ECF No. 5). This fact is inconsistent with Plaintiffs' conclusory allegations of disparagement. If Defendants wanted to imply that dermatologists who do not complete an MDS fellowship are inferior, they would have excluded non-fellowship trained dermatologists from eligibility for subcertification in MDS. *See, e.g.*, Compl. ¶ 9.

## IV.    PLAINTIFFS' REMAINING CLAIMS SHOULD BE DISMISSED.

Plaintiffs' remaining claims are entirely derivative of their antitrust and FDUTPA claims. Count VI asserts a claim for civil conspiracy based on alleged violations of the Sherman Act, Florida antitrust law, and the FDUPTA *See* Compl. ¶ 188 (incorporating allegations from

Counts I, II, III, VI, and V). Civil Conspiracy, however, is "not a freestanding tort," and thus depends on whether Plaintiffs have stated a claim in Counts I-V. *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 764 F.3d 1327, 1339 (11th Cir. 2014). Count VII requests that the court "review and interpret the plan to create" an MDS subspecialty certification, "as well as the federal antitrust statutes, . . . , and issue a declaratory judgment as to whether the plan of the Defendants restrains trade and violates the Sherman Antitrust Act." Compl. ¶ 196. Lastly, Count VIII requests a TRO and injunctive relief based on the alleged violations of state and federal antitrust law, and the FDUTPA. Compl. ¶¶ 208. Because these claims depend entirely on pleading of the claims discussed above, the Court should dismiss them as well. *See SFM Holdings,* 764 F.3d at 1339.

CONCLUSION

For these reasons, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint in its entirety and award all reasonable costs and attorneys' fees for this motion to Defendants.

Dated:  August 22, 2018

Respectfully submitted,

By: */s/ Jack R. Bierig*

Russell LaPeer
**LANDT, WIECHENS, LaPEER,
& AYRES LLP**
Florida Bar no. 200530
445 N.E. 8th Avenue
Ocala, Florida 34470
Telephone No.  (352) 732-8622
Facsimilie No.  (352) 732-1162
rlapeer@aol.com &
lawsec70@yahoo.com

Jack R. Bierig
Benjamin I. Friedman
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, Illinois 60603
Telephone No.  (312) 853-7000
Facsimile No.   (312) 853-7036
jbierig@sidley.com
benjamin.friedman@sidley.com

Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this case.

 _/s/ Jack R. Bierig_____
Jack R. Bierig
Benjamin I. Friedman
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, Illinois 60603
Telephone No.  (312) 853-7000
Facsimile No.   (312) 853-7036
jbierig@sidley.com
benjamin.friedman@sidley.com

Admitted *Pro Hac Vice*