IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Ocala, Florida

DAVID ALLYN, M.D.,
JAMES V. LYNOTT, M.D.,
JOSEPH M. MASESSA, M.D.,
JEFFREY BAUER HORTON, M.D., J.D.,           No.:  5:18-cv-355-Oc-30PRL
and MONT JAY CARTWRIGHT, M.D.,

   Plaintiffs,

vs.

AMERICAN BOARD OF MEDICAL
SPECIALTIES, INC., an Illinois corporation, Verified Amended Class Action
and AMERICAN BOARD OF DERMA- Complaint for Damages and for
TOLOGY, INC., a Delaware corporation, Injunctive Relief (Against Combination
authorized to do business in Massachusetts, in Violation of Sections 1 and 2 of the
            Sherman Act) and Other Causes of
   Defendants.      Action
_____/

VERIFIED AMENDED COMPLAINT FOR DAMAGES

AND DEMAND FOR JURY TRIAL, INJUNCTIVE RELIEF SOUGHT

COME NOW Plaintiffs and class action representatives David Allyn, M.D., James V.

Lynott, M.D., Joseph M. Masessa, M.D., Jeffrey Bauer Horton, M.D., J.D., and Mont Jay

Cartwright, M.D. (Plaintiffs), and file this Amended Complaint pursuant to Rule 15(a)(1)B,

Federal Rules of Civil Procedure, to amend and correct its original complaint, and sue Defendants

the American Board of Medical Specialties, Inc. (ABMS), an Illinois corporation, and the

American Board of Dermatology, Inc. (ABD), a Delaware corporation, stating as follows:

## SUMMARY OF THE ACTION

1.      This is a class action suit by Plaintiffs of several different medical specialties, against Defendants ABMS and ABD, for causes of action including, but not limited to, violations of antitrust law and restraint of trade, because of their past, present, and ongoing actions, agreements, plans, and conspiracy, to artificially restrict trade in and monopolize the medical procedure known as Mohs Surgery, for at least the past five (5) years, in violation of federal and state antitrust laws and the Florida Unfair and Deceptive Trade Practices Act.  Mohs Surgery is the medical procedure also known as "micrographic dermatologic surgery" or "MDS."  It will be referred to herein as "Mohs Surgery."

## GENERAL ALLEGATIONS

### A.  The Parties

2.      Plaintiff David Allyn, M.D., is a medical doctor licensed in the state of Florida. He is board certified by the American Board of Dermatology.  He resides in Clermont, Florida. He has performed thousands of Mohs surgeries and routinely performs Mohs Surgery on patients with skin cancer in his dermatology practice.

3.      The vast majority of Dr. Allyn's Mohs Surgery procedures are performed on Medicare and Tricare patients and are paid by the Medicare and Tricare Programs.

4.      Plaintiff Dr. Allyn has not had a fellowship in Mohs Surgery.  He would only be able to qualify for the Mohs Surgery subspecialty if he applied to sit for a certification examination within five (5) years of the plan's adoption, he took and passed such examination (requiring a significant amount of professional time and fees to prepare for and take), paid a significant amount

of money as fees to do so, and could otherwise meet the restrictions placed on physicians who were not fellowship trained in Mohs Surgery, as further detailed below.

5.      Plaintiff James V. Lynott, M.D., is a medical doctor licensed in the state of Wisconsin.  He is board certified by the American Board of Dermatology.  He resides in Racine, Wisconsin.  He has performed thousands of Mohs surgeries and routinely performs Mohs Surgery on patients with skin cancer in his dermatology practice.

6.      The vast majority of Dr. Lynott's Mohs Surgery procedures are performed on Medicare and Tricare patients and are paid by the Medicare and Tricare Programs.

7.      Plaintiff Dr. Lynott, has not had a fellowship in Mohs Surgery.  He would only be able to qualify for the Mohs Surgery subspecialty if he applied to sit for a certification examination within five (5) years of the plan's adoption, he took and passed such examination (requiring a significant amount of professional time and fees to prepare for and take), paid a significant amount of money as fees to do so, and could otherwise meet the restrictions placed on physicians who were not fellowship trained in Mohs Surgery, as further detailed below.

8.      Plaintiff Joseph M. Masessa, M.D., is a medical doctor licensed in the state of Florida.  He is board certified by the American Board of Dermatology.  He resides in West Palm Beach, Florida.  He has performed thousands of Mohs surgeries and routinely performs Mohs Surgery on patients with skin cancer in his dermatology practice.

9.      The vast majority of Dr. Masessa's Mohs Surgery procedures are performed on Medicare and Tricare patients and are paid by the Medicare and Tricare Programs.

10.      Plaintiff Dr. Masessa has not had a fellowship in Mohs Surgery.  He would only be able to qualify for the Mohs Surgery subspecialty if he applied to sit for a certification

examination within five (5) years of the plan's adoption, he took and passed such examination (requiring a significant amount of professional time and fees to prepare for and take), paid a significant amount of money as fees to do so, and could otherwise meet the restrictions placed on physicians who were not fellowship trained in Mohs Surgery, as further detailed below.

11.     Plaintiff Jeffrey Bauer ("Bauer") Horton, M.D., J.D., is a medical doctor licensed in the state of Texas.  He is a plastic surgeon board certified by the American Board of Plastic Surgery.  He resides in Amarillo, Texas.  He has performed thousands of Mohs surgeries.  Since he is a plastic surgeon and is not a board certified dermatologist, he would not qualify to become certified in the subspecialty of Mohs Surgery under the plan proposed by the Defendants.

12.     Plaintiff Mont Jay Cartwright, M.D., is a medical doctor licensed in the state of Florida.  He is board certified as an ophthalmologist and as a cosmetic surgeon.  He resides in Kissimmee, Florida.  He has performed thousands of Mohs surgeries.  Since he is not a board certified dermatologist, he would not qualify to become certified in the subspecialty of Mohs Surgery under the plan proposed by the Defendants.

13.     Each of the Plaintiffs has been harmed by the conduct of the Defendants and the Unnamed Co-conspirators.   Each of them has lost income because of the conduct of the Defendants and the Unnamed Co-conspirators.  In fact, Plaintiffs Horton and Cartwright would not be allowed to apply for or become certified in the Mohs Surgery subspecialty proposed by the Defendants.

14.     The foregoing five named Plaintiffs have interests in common with the Class and are proper representatives of the Class.

15.     Defendant ABMS is a corporation which has its principal place of business in Chicago, Illinois.

16.     Defendant ABMS was established in 1933 and is a self-declared non-profit corporation that actively engages in lobbying activities.  It is an "umbrella organization" having 24 member medical specialty boards (officially referred to as the "Member Boards"), each representing a specific broad medical specialty.[1]

17.     Defendant ABMS creates various medical specialty boards which then are authorized to set requirements for and issue certifications for physicians who qualify in different medical specialties.   ABMS also authorizes various medical "subspecialties" under those specialties.

18.     To date, Defendant ABMS has never allowed the creation of a medical specialty or subspecialty for a single isolated medical procedure such as Mohs Surgery.  All medical specialties created to date have been for broad general areas of medicine, such as general surgery and internal medicine.

a.     In fact, creation of a separate subspecialty in Mohs Surgery was considered by Defendant ABMS in 1987 and abandoned or rejected, because it centered on only one surgical procedure instead of an area of medicine.

---

[1]     The member boards represent broad medical specialties such as the American Board of General Surgery, Inc., the American Board of Internal Medicine, Inc., the American Board of Obstetrics and Gynecology, Inc., the American Board of Dermatology, Inc., etc.  The last two boards the ABMS created were the American Board of Emergency Medicine, Inc. (in 1979), and the American Board of Medical Genetics and Genomics, Inc. (in 1991).

b.      In 2009, a similar proposal as the present one was put forth again. However, the subspecialty was called "Procedural Dermatology" to create the false illusion that the subspecialty would encompass a greater body of knowledge than just Mohs Surgery.  It was rejected by fifteen (15) state dermatology societies as being too narrow of a field of medicine to deserve a separate subspecialty and Defendant ABMS did not approve it.

c.      The foregoing shows that Defendants have been attempting to monopolize the service of Mohs Surgery since at least 1987, continuing through the present.

19.      Defendant American Board of Dermatology, Inc. (ABD), is a medical specialty board, originally created by the ABMS.  It is a separate Delaware corporation authorized to do business in Massachusetts.  Its principal place of business is Newton, Massachusetts.  It certifies physicians in the medical specialities of dermatology, dermatopathology, and pediatric dermatology.

20.      Defendant ABD is conspiring with, agreeing with, and acting in coordination with the ABMS to create the Mohs Surgery subspecialty.  It is conspiring with, agreeing with, and acting in coordination with the ABMS to prohibit the performance of Mohs Surgery by anyone other than a physician certified by the ABD in the Mohs Surgery subspecialty.

21.      Defendant ABD has submitted an application to the ABMS to create the Mohs Surgery subspecialty.

22.      The American College of Mohs Surgery, Inc. (ACMS) is a Wisconsin corporation, composed of 1,500 physician members, who are all fellowship-trained in Mohs Surgery.  Its principal place of business is in Milwaukee, Wisconsin.  It is conspiring with, agreeing with, and acting in coordination with Defendants ABMS and ABD to create the Mohs Surgery subspecialty.

It is conspiring with, agreeing with, and acting in coordination with the ABMS to prohibit the performance of Mohs Surgery by anyone other than a physician who is a dermatologist and who is also certified by Defendant ABD in the Mohs Surgery subspecialty.  It is <u>not</u> being named as a defendant in this case at this time.

23.     The American Academy of Dermatology, Inc. (AAD), is a professional association made up of dermatologists, having its principal place of business in Illinois.  It is not a member board of the ABMS.

24.     The AAD is conspiring with, agreeing with, and acting in coordination with the ABMS to create the Mohs Surgery subspecialty.  It is conspiring with, agreeing with, and acting in coordination with the ABMS to prohibit the performance of Mohs Surgery by anyone other than a physician certified by ABD in the Mohs Surgery subspecialty.   It is <u>not</u> being named as a defendant in this case at this time.  The AAD is actively encouraging its members to support the efforts of the ABD and the ABMS to create the Mohs Surgery subspecialty and is otherwise lobbying for it.

25.     Randall K. Roenigk, M.D., is a resident of Rochester, Minnesota.  He is a Mohs Surgery fellowship trained dermatologist.  He is an officer of unnamed co-conspirator AAD.  He is also a member of the Board of Directors of Defendant American Board of Medical Specialties.  He is a member of the Committee on Certification (COCERT) of Defendant ABMS, the committee of ABMS which must approve the new Mohs Surgery subspecialty application being submitted by Defendant ABD.  He is also the Assistant Executive Director of Defendant ABD.

26.    As such Dr. Roenigk is coordinating, combining, and conspiring with the Defendants and with the Unnamed Co-conspirators to create the Mohs Surgery subspecialty.  He is not named as a Defendant at this point in time.

27.    Brett M. Coldiron, M.D., is a resident of Cincinnati, Ohio.  He is a Mohs Surgery fellowship trained dermatologist.  He is a member of the Board of Directors of Unnamed Co-conspirator AAD.  He is the individual who is most aggressively advocating and lobbying the ABMS and individual physicians to create the Mohs Surgery subspecialty.

28.    As such Dr. Coldiron is coordinating, combining, and conspiring with the Defendants and with the Unnamed Co-conspirators to create the Mohs Surgery subspecialty.  He is not named as a Defendant at this point in time.

29.    The individuals and organizations whose names appear above who are not named as Defendants shall collectively be referred to herein as the "Unnamed Co-conspirators."


B.  Venue and Jurisdiction

30.    This action arises under Section 16 of the Clayton Act, 15 U.S.C. § 26, to secure equitable relief against a violation by Defendant ABMS of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 & 2.  Interstate commerce for medical services is substantially affected by Defendants' conduct alleged herein.  This Court has subject matter jurisdiction here pursuant to 15 U.S.C. § 15, and 28 U.S.C. §§ 1331 & 1337(a).

31.    Supplemental jurisdiction over Plaintiffs' additional claims exists under 28 U.S.C. § 1367.  In addition, this Court has subject matter jurisdiction over these matters pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship of the parties and the amount in

controversy exceeds $75,000.00, exclusive of attorney's fees, costs and interest, or is otherwise within the jurisdiction of the Court, as stated in each Count below.

32.     Venue is proper in this United States District Court for the Middle District of Florida, under 15 U.S.C. §§ 15 & 22, and 28 U.S.C. § 1391(b)(1), because Plaintiffs Dr. Allyn, Dr. Masessa, and Dr. Cartwright reside here;  because the actions of the Defendants are have caused harm, are causing harm, or will cause harm here;  because Defendants conduct their business here;  because the actions of the Defendants will damage commerce here;  because the Defendants transact substantial business here;  and because one or more of the member boards of the ABMS are located here.[2]  Defendants' actions extend into and they have a presence in the Middle District of Florida.  The actions of Defendants will artificially restrain commerce in the Middle District of Florida.

## C.  Standing

33.     Plaintiffs are each physicians who are experienced in performing Mohs Surgery and who each now perform and have in the past performed a large number of Mohs Surgery procedures on patients every year.  They have each lost substantial income in the form of lost professional fees and have lost patients because of the actions of the Defendants and the Unnamed Co-conspirators.

_____

[2]     The American Board of Pathology, Inc., a member board of the ABMS, is a Michigan corporation, authorized to do business in and having its principal place of business in Tampa, Florida.  On information and belief, it is also actively promoting the creation of the Mohs Surgery subspecialty.

34.     Plaintiffs each receive payment from the Medicare Program, the Tricare Program, and other government and private health care payors, for the Mohs Surgery procedures they perform.

35.     In the case of Plaintiffs Dr. Horton and Dr. Cartwright, they have been denied membership in the ACMS and will not be allowed to become certified in the Mohs Surgery subspecialty being proposed by the Defendants.

36.     If the actions of the Defendants are allowed to continue, each Plaintiff will further suffer a loss of patients, a loss of income, and will have their ability to provide Mohs Surgery procedures for their patients artificially restrained or prohibited.

37.     The actions of the Defendants will cause the Plaintiffs and other members of the Class to be excluded from insurance networks and the networks of private payors as providers of Mohs Surgery.

38.     The actions of the Defendants in adopting a Mohs Surgery subspecialty will further artificially and arbitrarily restrict the income of the Plaintiffs individually, will reduce the number of physicians available to provide Mohs Surgery procedures to patients in the marketplace, and will reduce patient access to physicians having the ability to provide Mohs Surgery.

39.     Access to Mohs Surgery physicians by patients have in the past been, and will further be, reduced and restricted by the actions of the Defendants, with the adoption of a Mohs Surgery subspecialty.   The price of Mohs Surgery will increase because of the reduction in availability of the service.   The quality of patient care will not be increased.

40.     Plaintiffs have an interest in seeing that the availability of physicians who may provide Mohs Surgery to patients is not limited or reduced;  that the payment for Mohs Surgery

procedures to patients by government payors and insurers is not controlled or limited by a small group of physicians;  that there are a sufficient number of physicians available to provide Mohs Surgery procedures to patients across the U.S., especially in Medically Underserved Areas (MUSAs) and Health Professional Shortage Areas (HPSAs); and that physicians who are skilled and experienced in performing Mohs Surgery are not restricted from providing such services to patients who need them.

41.    Plaintiffs have an interest in making sure that the maximum number of physicians who are experienced in or trained in Mohs Surgery are allowed to provide it without the restrictions or limitations being placed on them such as those proposed by Defendants.

42.    For these reasons, the Plaintiffs are representative of the Class and have standing to bring this action.


D.  History and Background of the Action

43.    Mohs Surgery was originally invented in the 1930's by Frederic Mohs, M.D., a general surgeon.

44.    Mohs Surgery involves a single surgical procedure in which a physician cuts around and removes a visible skin cancer (a melanoma, basal cell carcinoma, or squamous cell carcinoma) on a patient's skin.  The physician then removes a thin layer of surrounding tissue while the patient waits.  The physician then analyzes the tissue surrounding the lesion under a microscope in an office laboratory to determine if there are any cancer cells in the margin of the tissue removed.

45.     If the physician finds that cancer cells are still present, then the physician removes a larger portion of tissue and analyzes that tissue under a microscope.  The physician repeats this procedure until there are no more cancer cells seen in the margin of the tissue removed.  This indicates that all cancer cells have been removed.  The physician then closes the surgical site.

46.     Mohs Surgery is a simple technique, usually performed using only a local anesthetic, in the physician's office.  It can take from a few minutes to a few hours, depending on how many times the procedure must be repeated.

47.     At the present time, Mohs Surgery is merely one of the many different procedures that physicians in different specialties are taught as part of their residency training programs, mostly in dermatology residency programs.  However, general surgeons, oncologists, plastic surgeons, and other medical specialists may also routinely perform Mohs Surgery.

48.     A description of the Mohs Surgery procedure written for patients by Unnamed Co-conspirator American College of Mohs Surgery, Inc., is included in Exhibit 1.

49.     Specifically, Defendant ABMS has acted, conspired, combined, planned, and agreed with Defendant ABD, and other medical specialty organizations, with individual physicians, and with others, including the "Unnamed Co-conspirators,"[3] to artificially limit the number of physicians who are "certified" to perform Mohs Surgery and thus are allowed to bill and collect for performing the Mohs Surgery procedure on patients who need it.

_____

[3]     The actual names of these co-conspirators are included below.  They are referred to herein as "Unnamed Coconspirators" because the Plaintiffs are not including them as named Defendants in this suit at this point in time, choosing instead to concentrate on the two main actors.

50.     Defendant ABMS has acted, conspired, combined, and agreed with Defendant ABD, and other medical specialty organizations, with individual physicians, and with others, including the Unnamed Co-conspirators, to restrain trade by reducing the availability of an essential skin surgery for skin cancer by creating the Mohs Surgery subspecialty and restricting qualified physicians from performing Mohs Surgery in violation of Sections 1 and 2 of the Sherman Act and state antitrust law.

51.     The actions of the Defendants, together with those of the other Unnamed Co-conspirators have artificially reduced the availability of Mohs Surgery for patients with skin cancer and increased the cost of its treatment;  such action continues through the present time.

52.     The continuing course of conduct has included actions taken by the Defendants and the Unnamed Co-conspirators:

a.      As early as 2001 to have the codes used for billing Mohs Surgery amended by the American Medical Association (AMA) so that only dermatologists who were fellowship trained in Mohs Surgery were allowed to bill them to federal programs;

b.      Have fellowship programs in Mohs Surgery prohibit admission to physicians who had not completed full residencies in dermatology;

c.      For at least the past seven (7) years, to have government health care agencies, such as the Veterans Administration (VA), artificially restrict the performance of Mohs Surgery procedures in its hospitals and clinics, to limit their performance to only those physicians who were fellowship trained in Mohs Surgery;

d.      For at least the last seven (7) years have government health care agencies such as the VA refuse payment for Mohs Surgery procedures performed outside of a VA facility by any physician who was not fellowship trained in Mohs Surgery, regardless of their past experience in performing Mohs Surgery;

e.      From at least 2010 through the present, convincing private health insurers, such as Humana, Inc., a large health insurer and one of the largest payers for health care services, to refuse payment for Mohs Surgery procedures unless performed by a physician who would certify that he or she had completed a Mohs Surgery fellowship;

f.      Most recently in proposing the creation of a medical subspecialty in Mohs Surgery that would be completely and exclusively under the control of Defendant ABD.

53.     Under the plan that Defendants are considering, in order to become a member of and be certified by the proposed Mohs Surgery subspecialty, a physician would have to meet the following requirements, among others:   1)   have a separate fellowship specifically in Mohs Surgery,[4] 2)   be a board certified dermatologist, and 3)   pay an application fee of approximately

---

[4]      A "fellowship" in graduate medical education (GME) is a specialty training program for a physician who has already completed a medical residency program in a medical specialty. An example would be a fellowship in maternal-fetal medicine, which is considered to be a subspecialty of the medical specialty of obstetrics and gynecology.  Fellowships in Mohs Surgery are either one year or two years of additional training.   Thus, a physician who had already completed a residency program in dermatology and was already board certified as a dermatologist by the American Board of Dermatology (ABD), would be required to pursue an additional one or two year fellowship in Mohs Surgery in order to become eligible for certification in the

$1,600, among other requirements.   This is regardless of the number of Mohs Surgeries the physician had previously performed or the physician's actual clinical skills and experience in performing Mohs Surgery.

54.     Under the plan that Defendants are considering and are expected to adopt, those physicians who are currently performing Mohs Surgery procedures who are plastic surgeons, general surgeons, reconstructive surgeons, ophthalmologists, otolaryngologists, oncologists, and any other nondermatologists, would not be allowed to apply for the Mohs Surgery subspecialty. In fact, of the seventeen (17) plastic surgeons who have taken Mohs Surgery fellowships, none would be allowed to apply for or become certified in the Mohs Surgery subspecialty.

55.     Advertising to the public published by Unnamed Co-conspirator American College of Mohs Surgery, Inc. (ACMS), and adopted and promoted by Defendant ABD and the other Unnamed Co-conspirators, falsely implies that those who are fellowship trained in Mohs Surgery or who will be certified as Mohs Surgery subspecialists currently have and will have greater skills, higher standards, and better outcomes than those who are not.

56.     For example, in the publication from its website attached as Exhibit 1, Unnamed Co-conspirator ACMS has stated for at least the past two (2) years and through the present time, to the general public:

> a.      Under the caption "Why Choose a Fellowship Trained Mohs Surgeon" the
>         patient information published by the ACMS states:  "You want your skin
>         cancer treatment to be performed with the highest standards of quality and

subspecialty of Mohs Surgery, under the plan proposed by the Defendants.

competence."  Exhibit 1.  This implies that the physicians performing Mohs Surgery who are not fellowship trained in Mohs Surgery have lower quality standards and lesser competence in performing Mohs Surgery procedures than those who are fellowship trained.

b.      The same publication advises patients that such Mohs Surgery performed by its fellowship trained physicians can:  "Cur[e] skin cancer when other methods have failed."  Exhibit 1.

c.      The same publication falsely states "The aesthetic outcome of the surgery is optimized" if it is performed by a fellowship trained Mohs Surgeon.

57.     In a different publication for the general public from its website, Unnamed Co-conspirator ACMS has stated for at least the past two (2) years and through the present time:  "The ACMS serves as the voice of the specialty [of Mohs Surgery], promoting and advancing the highest standards of patient care, through fellowship training, research, education, and public advocacy."  Exhibit 2 (emphasis added).  This statement is deceptive, among other reasons, because at all times in the past and through the present time, Mohs Surgery has not been and is not a medical "specialty."  Unnamed Co-conspirator ACMS is already promoting Mohs Surgery as a medical "specialty."

58.     Defendants and the Unnamed Co-conspirators misleadingly imply that the physicians who are fellowship trained in Mohs Surgery will be better qualified to perform the surgery than physicians who are not so certified.

59.     The statements made in Paragraphs 56 through 58 above are designed to confuse and mislead the public and specifically patients and potential patients of the Plaintiffs.  These same

deceptive and misleading statements have been made by Defendant ABD and Unnamed Co-conspirators in support of their application to ABMS for a Mohs Surgery subspecialty. Specifically, they are contained in an article written by Unnamed Co-conspirator Dr. Coldiron attached to the ABD's application.

60.    Additional reasons the Mohs Surgery subspecialty plan being considered by Defendants would cause misrepresentations to and confuse the public are set forth in a letter from the American Society for Mohs Surgery to Dr. Richard E. Hawkins, President and CEO of Defendant ABMS, dated May 24, 2018, opposing it.   Exhibit 3.   It also details the lack of necessity for such a subspecialty and why it is undesirable,  as well as detailing some of the conduct of the Unnamed Co-conspirators in support of their plan.

61.    There is medical evidence showing that there is no difference in the quality of physicians who would be eligible to be certified by the ABD as Mohs Surgery subspecialists and those who currently perform Mohs Surgery and who would not be eligible to become Mohs Surgery subspecialists.

62.    In addition, Defendants are engaging in deceptive trade practices, because Defendants ABMS and ABD, and the Unnamed Co-conspirators, specifically the American College of Mohs Surgery (ACMS), disparage the services of other physicians currently performing Mohs Surgery procedures.  This is shown by their false and misleading representations that those Mohs surgeries performed by physicians with a fellowship in Mohs Surgery are of higher quality, governed by higher standards, and are more effective.

63.    Specifically, Defendant ABD and ACMS misleadingly disparage physicians who decline to participate in a Mohs Surgery fellowship, by falsely implying that such physicians will

be of inferior quality to those who have Mohs Surgery fellowships and will become certified as Mohs Surgery subspecialists by ABD.

64.     The plan proposed by the Defendants and the Unnamed Co-conspirators is also misleading to the public because it allows the physicians who received the Mohs Surgery subspecialty to hold themselves out as "Mohs surgeons" when, historically, the specialty of dermatology is not a surgical specialty.[5]

65.     Furthermore, having a Mohs Surgery subspecialty would cause a reduction in the number of physicians allowed to perform Mohs Surgery, thus reducing the availability of a needed medical service for patients.

66.     Defendants and Unnamed Co-conspirators have already acted to attempt to limit payments by Medicare and private health insurers, prohibiting payment for Mohs Surgery procedures performed by those who have not completed a Mohs Surgery fellowship.  This has caused lost income to each of the Plaintiffs.

67.     Defendants and Unnamed Co-conspirators have lobbied and taken other actions to cause Medicare's administrative contractors (MACs) to rewrite local coverage determinations (LCDs) which set forth restrictions on the qualifications of the physicians who can bill Medicare

---

[5]     Historically, since before the time of Hippocrates, there have been two different distinct branches of medical practice, medicine and surgery.  To date, surgical specialists, such as plastic surgeons, general surgeons, otolaryngologists, and obstetrician/gynecologists, are considered to be "surgeons" and have intensive surgical training;  whereas, dermatologists (the only specialty that will be allowed to apply for the Mohs Surgery subspecialty) are within the general practice of medicine (non-surgical), and receive very limited, if any, surgical training.  In hospitals, the Department of Dermatology is under the Medical Division, whereas the other specialties named immediately above are under the Surgery Division.

for performing Mohs Surgery procedures, specifically to restrict Plaintiffs from being able to bill Medicare for such procedures.

68.    Defendants and Unnamed Co-conspirators have lobbied for and taken actions to have the Centers for Medicare and Medicaid Services (CMS) rewrite its requirements for clinical laboratories in physicians' offices to artificially prevent nondermatologists from being able to perform Mohs Surgery and bill for it.

69.    The plan being considered by Defendant ABMS will further promote such restrictions on payment for Mohs Surgery procedures and will cause payers such as Medicare, Medicaid, Tricare, and the VA to further restrict such payments to only physicians who are certified by the ABD as Mohs Surgery subspecialists.  This will immediately exclude the Plaintiffs.

70.    This latest action will also artificially reduce the number of physicians able to provide such services to patients, especially to the elderly, to indigents, to the families of military personnel, and to veterans.

71.    In pursuit of their attempt to monopolize, Defendant ABD, co-conspirator ACMS, and the Unnamed Co-conspirators have acted to have the American Medical Association (AMA) revise the Coding Procedures and Techniques (CPT) Manual codes (used for virtually all medical billing in the United States), to include language restricting the qualifications for those allowed to bill and receive payment for the Mohs Surgery CPT codes (CPT Codes 17311 through 17315).

72.    Internal documents of Unnamed Co-conspirator American Academy of Dermatology, Inc. ("AAD"), show that the Mohs Surgery CPT codes were established with the express intent "to prevent plastic surgeons and general surgeons from collaborating with

pathologists to perform Mohs Surgery."  It was an effort to eliminate the competition being given by physicians who were not dermatologists.  This conduct was endorsed by and is part of the ongoing conspiracy involving the Defendants.

73.     This has artificially increased the amount of reimbursement to physicians meeting the qualifications to bill for Mohs Surgery procedures, while artificially reducing the number of physicians who could meet such qualifications.

74.     The results have been to increase the overall costs for Mohs Surgery procedures while reducing the number of physicians who meet the requirements to bill for them.  Under the plan being considered by Defendants, it is expected that even fewer physicians will qualify to bill for Mohs Surgery codes and the fees to be paid for them will increase even further.

75.     In summary, the Defendants' and Unnamed Co-conspirators' plan to create the Mohs Surgery subspecialty is in furtherance of their past efforts to limit the number of physicians authorized to perform and receive payment for Mohs Surgery procedures, while increasing the costs paid for such procedures, in an attempt to monopolize the market for such services.

76.     The plan to create a Mohs Surgery subspecialty, as proposed by Defendant ABD and to be acted on by Defendant ABMS, is not the beginning of the wrongful conduct for which this suit is brought, nor does it stand alone;  however, it is one of the significant acts of the Defendants in furtherance of their conspiracy, and one of the continuing actions in restraint of trade and to monopolize the market for the medical service.  The actions of the Defendants and the Unnamed Co-conspirators in attempting to carve out and monopolize an area of medical practice is similar to the past actions of obstetric and gynecology specialists to restrict midwives, of medical doctors to restrict chiropractic physicians, of medical doctors to restrict osteopathic

physicians, of orthopedic specialists to limit hand and wrist surgeons, and other similar solely economically motivated "turf battles."

77.     Ironically, Frederick Mohs, M.D., the inventor of Mohs Surgery, could not qualify for the Mohs Surgery subspecialty under the Defendants' plan, because he was a general surgeon and not a dermatologist.

78.     Plaintiffs, on behalf of the Class as further defined below, seek damages as well as declaratory relief and injunctive relief to prevent the actions being pursued by the ABMS and its co-conspirators.


E.   Creating a Subspecialty Certification for a Single Procedure Is Unique in the History of Defendant ABMS and Must Be Seen as an Artificial Attempt to Restrain Trade

79.     The creation of a separate subspecialty in Mohs Surgery is a historically unique event in the history of the ABMS.  All other specialty boards certify physicians in broad areas of medicine.  If Defendants ABMS and ABD succeed in their attempts to create a Mohs Surgery subspecialty, this will be the first time one individual surgical procedure will be placed under the exclusive authority and control of one Board with the artificial limitations placed on it being proposed.[6]

80.     Currently Mohs Surgery is being performed by dermatologists, general surgeons, plastic surgeons, oncologists, otolaryngologists, ophthalmologists, and other types of physician specialists.

---

[6]     As indicated above the ABMS considered doing this in 1987 and 2009 and rejected it because the certification would be for a single surgical procedure only and not a broad, general area of medicine.  See Para. 31, supra.

81.     Taking Mohs Surgery and creating a separate board certification for it would be analogous to creating a separate board for labor and delivery of babies[7] which would require a physician to take an extra one-year or two-year fellowship in labor and delivery of babies, before he or she would be qualified to perform such a delivery.  Other analogous situations are made in the opposition to the plan submitted by the American Association of Mohs Surgeons.  Exhibit 3.

## ADDITIONAL FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

82.     In furtherance of the Defendants' efforts to restrain and monopolize the market, Defendant ABD submitted an application to Defendant ABMS to create the Mohs Surgery subspecialty.

83.     The Committee on Certification (COCERT) of Defendant ABMS will vote on a recommendation of the plan on September 11, 2018.  Regardless of the vote of COCERT, the Board of Directors of Defendant ABMS will consider the plan on or before October 26, 2018.  Defendant ABMS may approve the plan for a Mohs Surgery subspecialty certification, whether or not it is recommended by COCERT.  If it is approved, Plaintiffs expect it to be fully operational within one (1) year.

84.     Defendants ABMS and the Unnamed Co-conspirators have conspired and agreed to create a subspecialty for Mohs Surgery in order to further attempt to monopolize the Mohs Surgery market and they are acting to accomplish that end.

---

[7]     Currently, delivery of babies in the U.S. is routinely performed by obstetrician/ gynecologists, family practice physicians, certified nurse midwives and midwives, among others.

85.     Once the Mohs Surgery subspecialty is formed, Defendants and Unnamed Co-conspirators will act to have the Medicare Program change its requirements so as to require physicians to be certified in the new Mohs Surgery subspecialty, in order for the physician to be reimbursed by Medicare for performing Mohs Surgery procedures.

86.     Once the Mohs Surgery subspecialty is formed, Defendants and Unnamed Co-conspirators will act to have health insurers require physicians to be certified by the ABD in the new Mohs Surgery subspecialty in order for the physician to be paid by the health insurer for performing Mohs Surgery procedures.

87.     Defendants' and Unnamed Co-conspirators' actions and agreements, as detailed above and as alleged in further detail below, constitute an illegal agreement in restraint of a trade, an illegal agreement to divide service markets, and an attempt to monopolize under the Sherman Act.

88.     The proposed requirements to become certified in the Mohs Surgery subspecialty include, among others:  a one (1) to two (2) year fellowship in Mohs Surgery;  a passing score on an examination administered by the ABD;  and payment of significant fees to the ABD.

A.   <u>Defendants' Ability to Fix Prices and Eliminate Competition</u>

89.     Because skin cancer is most predominant in elderly patients, most Mohs Surgery patients have their surgery paid by the Medicare Program.

90.     Required guidelines for obtaining payments from the Medicare Program are set forth in documents known as National Coverage Determinations (NCDs) and Local Coverage Determinations (LCDs), the latter covering various geographical regions of the United States.

91.     NCDs and LCDs for the Medicare Program[8] are prepared by specialists in the procedures that are covered by the NCDs and LCDs.

92.     NCDs and LCDs require that the procedures they cover be performed only by physicians trained in and certified to provide the particular service or procedure covered by the NCD and the LCD, or Medicare will not pay for the procedure.

93.     If subspecialty certification in Mohs Surgery becomes authorized, then NCDs and LCDs will be rewritten to require that a physician can only be paid for a Mohs Surgery procedure if he or she is certified in the Mohs Surgery subspecialty.

94.     Other federal programs such as the Tricare program usually adopt the same restrictions and payment guidelines as those of the Medicare Program.

95.     State Medicaid programs usually adopt the same restrictions and payment guidelines as those of the Medicare Program.

96.     Health insurance companies often adopt the same restrictions and payment guidelines as those of the Medicare Program.

97.     Thus, by controlling board certification for performing Mohs Surgery procedures, the ABD is able to control payments to physicians for performing Mohs Surgery.  Those who are not certified in the Mohs Surgery subspecialty will not be able to obtain payment for performing

---

[8]     The Medicare Program is the federal insurance program for the elderly.  It is administered by the Centers for Medicare and Medicaid Services (CMS), a division of the U.S. Department of Health and Human Services (HHS).  CMS contracts with independent contractors, usually large health insurance companies, to provide administrative and regulatory services within a geographical areas of the U.S.  These are known as Medicare Administrative Contractors or "MACs."

Mohs Surgery.  This will greatly reduce the number of physicians available to provide Mohs Surgery procedures to patients.

B. <u>Restraint of Trade by Defendants ABMS, ABD, and Unnamed Co-conspirators</u>

98.    The Defendants and the Unnamed Co-conspirators have in the past and would further restrain trade by acting to have hospitals, surgical centers, health insurers, and government payors (such as the Medicare Program, the Tricare Program, and the state Medicaid programs) impose the requirement of being certified in the Mohs Surgery subspecialty as a condition for obtaining payment for performing Mohs Surgery.  This would decrease the number of physicians able to compete for performing Mohs Surgery procedures, reduce the availability of Mohs Surgery procedures, and increase the prices to consumers in the relevant market.

99.    Many physicians choose not to undergo a Mohs Surgery fellowship because it would impinge on their time to spend caring for their patients.  Furthermore, dermatologists are required to complete at least two (2) rotations (months) of training in performing Mohs Surgery procedures.  Thus all residency trained dermatologists already have training in performing the procedure.

100.    Physicians spend more time in training than almost all other professionals.

101.    Despite this, the additional burdens on physicians' time imposed by the plan of the ABD and ABMS for the Mohs Surgery subspecialty would be substantial, because physicians will now be forced to undergo an additional fellowship as well as recertification every five (5) years.

102.    It is contrary to public policy for ABMS and ABD, as private entities lacking in public accountability and transparency, to impose their own proprietary product as a condition for

patients to have access to Mohs Surgery physicians through government programs such as Medicare, insurance networks, and in hospitals.

103.    Defendants' proposed Mohs Surgery subspecialty imposes far greater burdens than any similar program in any other profession.  A survey administered in 2017 by the American Academy of Dermatology showed that an overwhelming majority of dermatologists who have not completed a Mohs Surgery fellowship (approximately sixty-four percent (64%)), believed that the creation of a Mohs Surgery subspecialty was unjustified and unnecessary.

104.    Although Defendant ABD also proposes a five (5) year "grandfathering period," during which time the ABD would, allegedly, be willing to certify dermatologists who are already board certified by Defendant ABD, this does not negate the anti-competitive effects of this conduct, in that:

a.    This is nothing more than a statement that Defendants will refrain from violating anti-competition laws for a period of five (5) years;

b.    The "grandfathering period" would include board certified dermatologists only and would exclude physicians in other medical specialty areas who are currently performing Mohs Surgery, such as Plaintiffs Dr. Horton and Dr. Cartwright;  and

c.    Even for the three Plaintiffs who are currently board certified dermatologists, who have not had a fellowship in Mohs Surgery, the requirements set forth by the ABD for becoming certified in the subspecialty of Mohs Surgery are capricious and arbitrary and are subject to change or reinterpretation by the ABD at any time.

105.    Regarding the last requirement above, the language in the application states that the three (3) dermatologist Plaintiffs:  "will be allowed to sit for the examination provided that s/he attests that MDS [Mohs Surgery] apprises some portion of practice."   However, the actual "portion" or percentage of practice is not specified and is left completely up to the Defendant ABD to specify.

106.    In the past, a similar proposal was made by the ABD for a subspecialty in pediatric dermatology.   Language on the grandfathering provision for that subspecialty was the same.   However, when Plaintiffs such as Dr. Allyn applied for the subspecialty, the ABD prohibited them from sitting for the examination or becoming certified in the subspecialty, informing them that the "portion" or percentage required was more than fifty percent (50%) of the dermatologist's practice, a requirement impossible for most dermatologists to meet.   It would be able to do the same with a Mohs Surgery subspecialty.

C.  Lack of Improvement in Quality of Care with Mohs Surgery Subspecialty

107.    There is no proven benefit to patient care by requiring Mohs Surgery physicians to become certified in a Mohs Surgery subspecialty.

108.    There is no proven benefit to patient care by requiring Mohs Surgery physicians to undergo a fellowship in Mohs Surgery.

109.    Medical studies have shown that Mohs Surgery currently has a success rate of 99%. This means that 99% of all Mohs surgeries, whether performed by fellowship-trained Mohs surgeons or not, successfully cure the patient of the skin cancer.[9]

110.    Academic physicians have been critical of the lack of benefits from the proposed Mohs Surgery subspecialty, observing that the additional years of fellowship training and board testing do not actually increase the quality of care, that is the quality of the Mohs Surgery performed.

111.    The lack of any genuine value in certification by a Mohs Surgery subspecialty as a measure of professional skill or competence is demonstrated by the high success rates of Mohs Surgery when performed by physicians who currently perform it without such certification.

112.    In or about 2015, in a renewed effort to create a subspecialty in Mohs Surgery, Defendant ABD made a proposal for a subspecialty in "Micrographic Dermatologic Surgery" or Mohs Surgery.   This is similar to the proposal by the ABD that the ABMS currently is considering.   The proposal to create a Mohs Surgery subspecialty is solely for the purpose of allowing Defendant ABD and the Unnamed Co-conspirators to monopolize the Mohs Surgery market.

D.   The Relevant Geographic Market

113.    The relevant geographic market is the United States.

---

[9]    Unnamed Co-conspirator Dr. Coldiron has an article published in 2014 that gives this statistic.

114.    In 2018, the American Association of Dermatology ("AAD") estimated that there were at least 20,149 practicing dermatologists in the United States.

115.    However, in addition to dermatologists, other types of physicians also perform Mohs Surgery, such as:

> Critical Care, Emergency Medicine, Family Practice, General Practice, General Surgery, Internal Medicine, Neurology, Otolaryngology, Pathology, Plastic and Reconstructive Surgery, and Surgical Oncology physicians.

The Plaintiffs in this case include a plastic surgeon and an ophthalmologist, both nondermatologists, who perform Mohs Surgery.

116.    The number of dermatologists being produced by dermatology residency programs in the U.S. has not kept up with demand for dermatology services.

117.    The American Cancer Society estimates that about 91,270 new melanomas will be diagnosed in 2018 and 9,320 people are expected to die of melanoma.

118.    In 2012, the American Cancer Society estimated that about 5.4 million basal and squamous cell skin cancers are diagnosed each year in the United States.

119.    Statistics provided by the Medicare Program for 2016 show that 1,395,162 Mohs Surgery procedures were performed by physicians and reimbursed by the Medicare Program alone in that year.

120.    A market profile of dermatological services in the U.S. for 2015[10] showed that over fifty percent (50%) of dermatologists saw more than fifty (50) patients a day.

---

[10]    Market analysis published by Cegedim Relationship Management of Bedminster, N.J.

121.    There is an average of one (1) dermatologist for approximately every 16,165 people in the United States.

122.    In 2017, there were only 85 physicians in the entire United States who were enrolled in a Mohs Surgery fellowship.

123.    In 2018, the number of physicians enrolled in a Mohs Surgery fellowship increased to 86.  This reflects an increase of only 1.2% from the previous year, which is woefully behind the increasing rates of skin cancer.


E.   The Relevant Product/Service Market

124.    The relevant product or service market is the provision of the Mohs Surgery procedure to treat skin cancers.  This is true whether speaking of melanoma, squamous cell carcinomas, or basal cell carcinomas.  There is only the one procedure to effectively treat it.

125.    It does not matter whether the service is provided by a dermatologist, by a plastic surgeon, by an oncologist, or by a different medical specialist.

126.    The proposed Mohs Surgery subspecialty would limit those who may apply to it for certification to only board certified dermatologists who are fellowship trained.  It would completely prohibit Plaintiffs Dr. Horton and Dr. Cartwright and other similarly situated Class members.

127.    There is no substitute for the service.  There is no alternative medical treatment for Mohs Surgery that has proven effective.

128.    The proposed Mohs Surgery subspecialty would not admit or certify plastic surgeons, oncologists, general surgeons, or the many other medical specialists who are currently performing Mohs Surgery.

129.    Control of the performance of this one surgical procedure by one specialty board is an unjustifiable restraint of trade.

130.    Reduction of the number of physicians who can be reimbursed for providing this service is an unjustifiable restraint of trade.

F.    <u>Detrimental Impact on Relevant Market;  Injury to Market;  and Harm to Competition</u>

131.    Presently, in 2018, the United States has approximately one (1) dermatologist for every 4.5 new cases of melanoma.  This is calculated by dividing the number of new melanoma cases the ACS estimated for 2018 (91,270), by the number of dermatologists in the U.S. as estimated by the AAD (20,149).[11]

132.    The ACMS (American College of Mohs Surgery) states that there are approximately 1,500 physicians in the U.S. who have completed a fellowship in Mohs Surgery.

133.    If payment is artificially restricted to payment to physicians certified in the Mohs Surgery subspecialty, most patients will be required to seek out one of the certified physicians. This will result in a reduced supply of physicians to provide this service, down to approximately one (1) physician for every 60.85 new cases of melanoma.  This figure is obtained by dividing the

_____

[11]    It is noted that different organizations publish different estimates.  However, they are all roughly the same.

number of new melanoma cases the ACS estimated for 2018 (91,270), by the number of Mohs Surgery fellowship trained physicians, as estimated by the number of members in the ACMS (1,500).

134.    Similarly, there is approximately one (1) dermatologist for every 268 new cases of basal and squamous cell skin cancers.  This is calculated by dividing the number of estimated cases of basal and squamous cell skin cancers by the ACS (5.4 million), by the number of dermatologists estimated by the AAD (20,149).

135.    With the creation of a Mohs Surgery subspecialty, there will be approximately one (1) Mohs Surgery physician for every 3,600 new cases of basal and squamous cell skin cancers. This figure is obtained by dividing the number of estimated cases of basal and squamous cell skin cancers as stated by the ACS (5.4 million), by the number of Mohs Surgery fellowship trained physicians as estimated by the number of members in the ACMS (1,500).

136.    The creation of a Mohs Surgery subspecialty reduces the available providers of Mohs Surgery by approximately 92.6% of the original service provider market size.  This figure is obtained by using the number of fellowship trained Mohs physicians as stated by the ACMS (1,500), and dividing that number by the total number of dermatologists in the United States (20,149).

137.    In addition, most patients would be forced to undergo two (2) different physician visits instead of just one (1), to have their skin cancer diagnosed and treated.  The patient would ordinarily see a dermatologist (who would diagnose the skin cancer) and then be referred out to a Mohs surgeon (to have the Mohs Surgery performed).  This would double the number of required medical visits patients would have to make and would likewise increase the costs of

medical care.   Currently, the same physician who diagnoses the skin cancer also performs the Mohs Surgery.

138.    The conduct of the Defendants and Unnamed Co-conspirators will reduce the number of physicians able to perform Mohs Surgery and receive payment for it.

139.    The conduct of the Defendants and Unnamed Co-conspirators will reduce the number of physicians allowed to perform Mohs Surgery in U.S. hospitals.

140.    The conduct of the Defendants and Unnamed Co-conspirators will decrease the availability of Mohs Surgery in the market.

141.    The actions of the Defendants and Unnamed Co-conspirators are an attempt to artificially fix the supply of the services available, by limiting the numbers and specialties of physicians allowed to provide them.

142.    The actions of the Defendants and Unnamed Co-conspirators are an attempt to fix the demand for services, by acting with and agreeing with the insurance company payors and government programs that pay for such services.

143.    The conduct of the Defendants and Unnamed Co-conspirators constitutes a horizontal agreement to fix prices and to divide the market.

144.    The conduct of the Defendants and Unnamed Co-conspirators constitutes an attempt to monopolize the service market and the geographic market.

145.    The market will be artificially limited vertically, as well.   Hospitals and payors will restrict the number of physicians who will be allowed to perform Mohs Surgery to those certified in the Mohs Surgery subspecialty.

<u>CLASS ACTION ALLEGATIONS</u>

A. <u>Plaintiffs bring these claims on behalf of a class (the "Class") defined as follows:</u>

146.     The Class is all physicians who perform Mohs Surgery in the United States who have not taken a specific fellowship in Mohs Surgery.

B. <u>Numerosity.  Fed. R. Civ. P. 23(a)(1).</u>

147.     The Class members are so numerous that joinder of all is impractical.  The Class members total thousands of physicians.  There are currently 20,149 dermatologists in the United States.  It is estimated that at least one-third (1/3) of them perform Mohs surgeries.

148.     In addition, there are other medical specialists that perform Mohs Surgery, numbered in the thousands.

C. <u>Existence and Predominance of Common Questions of Law and Fact.</u>
<u>Fed. R. Civ. P. 23(a)(2).</u>

149.     Common questions of law and fact exist and predominate as to all members of the Class.  The common legal and factual questions include whether Defendants will improperly restrain trade under the Sherman Act.

D. <u>Typicality.  Fed R. Civ. P. 23(a)(3).</u>

150.     Plaintiffs' claims are typical of the claims of each Class member.  Plaintiffs have the same claims for injunctive relief that it seeks for all the class members.

### E.   Adequacy.  Fed. R. Civ. P. 23(a)(4).

151.    Plaintiffs are adequate representatives of the Class.  Plaintiffs' interests are aligned with, and are not antagonistic to, the Class.  Plaintiffs and their counsel intend to prosecute this action vigorously on behalf of the Class.  Plaintiffs' counsel will fairly and adequately protect the interests of the members of the Class.

### F.   Injunctive Relief Appropriate.  Fed. R. Civ. P. 23(b)(2).

152.    The Defendants' conduct as alleged herein applies generally to the members of the Class, such that final injunctive relief is appropriate with respect to the Class, as is set forth in the relevant Count below.

### G.   Predominance and Superiority.  Fed R. Civ. P. 23(b)(3).

153.    Questions of law and fact common to the Class predominate over questions affecting only individual members, and thus a class action is superior to other available methods for adjudication.  Individual litigation would prove burdensome and expensive for the complex issues presented.  It would be virtually impossible for Class members individually to redress effectively the wrongs done to them.  Even if Class members could afford such individual litigation, it would be an unnecessary, time-consuming burden on the courts.  A class action would benefit litigants and the Court by resolving individual claims in one proceeding, without the risk of inconsistent results.

CAUSES OF ACTION

COUNT I

RESTRAINT OF TRADE IN VIOLATION OF SECT. 1 OF THE SHERMAN ACT

154.    This is a cause of action by Plaintiffs against both Defendants for damages for restraint of trade in violation of Section 1 of the Sherman Act.

155.    It is pleaded alternatively to and in addition to each other Count in this Complaint.

156.    For the purpose of this Count, Paragraphs 1 through 153 above are incorporated herein by reference.

157.    At all times relevant hereto, there existed the federal statute commonly known as the Sherman Antitrust Act, 15 U.S.C. § 1.

158.    Section 1 of the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

159.    Section 15 of the Sherman Act (15 U.S.C. § 15) allows private persons injured by "anything forbidden in antitrust laws" to file suit and to recover treble damages and attorney's fees:

> (a)  Amount of recovery[.] [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

160.     Plaintiffs believe that Defendant ABMS will unreasonably restrain trade by creating a subspecialty in Mohs Surgery under the exclusive control of the ABD.

161.     Defendants' actions have no legitimate purpose and reduce the output of medical services by physicians in the relevant market.

162.     Defendants' actions have been undertaken with a common design and understanding to exclude from the relevant market dermatologists and other Mohs Surgery physicians, including members of this class, who choose not to spend time and money on becoming board-certified in Mohs Surgery.

163.     Defendants' actions will injure and continue to injure competition by causing anti-competitive effects within the relevant market for services provided by dermatologists, thereby reducing output and increasing prices on consumers.

164.     Defendants' conduct constitutes an unlawful tying agreement under Section 1 of the Sherman Act, where health insurers and hospitals having sufficient market power are induced by the Defendants to require subspecialty certification in Mohs Surgery by only dermatologists, and specifically excluding all other qualified physicians who wish to perform Mohs Surgery for them.

165.     Defendants' agreements and tying arrangements constitute a per se violation of Section 1 of the Sherman Act because they are plainly anticompetitive, decreasing the supply of Mohs Surgery providers and reducing patient choice of physicians while increasing insurance premiums and other prices to consumers.

166.     In the alternative, Defendant's agreements and tying arrangements violate Section 1 of the Sherman Act under the rule of reason, by unreasonably restricting the ability of members

of the Class to provide services in the relevant market, and reducing patient choice of physicians while increasing insurance premiums and other prices to consumers.

## COUNT II

### RESTRAINT OF TRADE IN VIOLATION OF SECT. 2 OF THE SHERMAN ACT

167.    This is a cause of action by Plaintiffs against both Defendants for damages for restraint of trade in violation of Section 2 of the Sherman Act.

168.    It is pleaded alternatively to and in addition to each other Count in this Complaint.

169.    For the purpose of this Count, Paragraphs 1 through 153 above are incorporated herein by reference.

170.    At all times relevant hereto, there existed the federal statute commonly known as the Sherman Antitrust Act, 15 U.S.C. § 2, et seq.

171.    Section 2 of the Sherman Act further provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony.

172.    Section 15 of the Sherman Act allows private persons injured by "anything forbidden in antitrust laws" to file suit and to recover treble damages and attorney's fees:

> (a)  Amount of recovery[.] [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages

by him sustained, and the cost of suit, including a reasonable attorney's fee.

173.    Plaintiffs contend that Defendants and Unnamed Co-conspirators are attempting to monopolize, combine, and conspire with each other to monopolize, the medical service Mohs Surgery.


## COUNT III

### RESTRAINT OF TRADE IN VIOLATION OF FLORIDA ANTITRUST LAW

174.    This is a cause of action by Plaintiffs against both Defendants for damages for restraint of trade in violation of Section 542.18, Florida Statutes.

175.    It is pleaded alternatively to and in addition to each other Count in this Complaint

176.    For the purpose of this Count, Paragraphs 1 through 153 above are incorporated herein by reference.

177.    Defendants have conspired with each other and with the Unnamed Co-conspirators, to unreasonably restrain trade and commerce in the state of Florida by attempting to create a Mohs Surgery subspecialty.

178.    Defendants' actions have no legitimate purpose and reduce the output of medical services by physicians in the Florida market.

179.    Defendants' actions have been undertaken with a common design and understanding to exclude from the Florida market dermatologists and other Mohs Surgery physicians, including Plaintiffs and other members of this class, who choose not to spend time and money on becoming board-certified in Mohs Surgery.

180.     Defendants' actions will injure and continue to injure competition and the market by causing anti-competitive effects within Florida for services provided by dermatologists, thereby reducing output and increasing prices on Florida's consumers.

181.     Defendants' agreements and tying arrangements with insurance providers constitute a per se violation of Section 542.18, Florida Statutes, because they are plainly anticompetitive, decrease the supply of Mohs Surgery providers, and reduce patient choice of physicians while increasing insurance premiums and other prices on consumers.

182.     In the alternative, Defendant's agreements and tying arrangements violate Section 542.18, Florida Statutes, under the rule of reason, by unreasonably restricting the ability of members of the Class to provide services to the Florida market, and reducing patient choice of physicians while increasing insurance premiums and other prices to consumers.

COUNT IV

CONSPIRACY TO MONOPOLIZE IN VIOLATION OF FLORIDA ANTITRUST LAW

183.     This is a cause of action by Plaintiffs against both Defendants for damages for attempting to monopolize the Mohs Surgery market in the state of Florida in violation of Section 542.19, Florida Statutes.

184.     It is pleaded alternatively to and in addition to each other Count in this Complaint.

185.     For the purpose of this Court, Paragraphs 1 through 153 above are incorporated herein by reference.

186.     Defendants ABMS and ABD will monopolize the Mohs Surgery market by creating a Mohs Surgery subspecialty.

187.    The proposed Mohs Surgery subspecialty will exclude dermatologists and other Mohs Surgery physicians from the Florida market, including members of this Class, who choose not to spend time and money on becoming certified in a Mohs Surgery subspecialty or who Defendant ABD will not allow to become so certified.

188.    The proposed Mohs Surgery subspecialty, under the control of the ABD, will allow the ABD to have exclusive control of the supply of Mohs Surgery providers in the state of Florida.

189.    Defendants have the specific intent to monopolize the Mohs Surgery market.

190.    By forcing physicians to be certified in the Mohs Surgery subspecialty in order to be reimbursed by insurance providers, Defendants ABMS and ABD will prevent all other Mohs Surgery physicians from acting as effective competitors in the Mohs Surgery market.

191.    Defendants ABMS and ABD engaged in this conspiracy for the purpose and effect of controlling who becomes a Mohs Surgery physician.  It was understood by Defendants that the conduct alleged in this claim would greatly reduce the number of Mohs Surgery physicians.

192.    By engaging in the practices described above, creation of a Mohs Surgery subspecialty will achieve monopoly power of the Mohs Surgery market in Florida.

193.    There are no legitimate pro-competitive justifications of ABMS's and ABD's attempt to monopolize the Mohs Surgery market.

COUNT V

VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR
TRADE PRACTICES ACT

194.    This is a cause of action by Plaintiffs against both Defendants for damages for restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Section 501.204, Florida Statutes.

195.    It is pleaded alternatively to and in addition to each other Count in this Complaint.

196.    For the purpose of this Court, Paragraphs 1 through 153 above are incorporated herein by reference.

197.    Defendants ABMS and ABD have unfairly and deceptively conspired to restrict trade and commerce by attempting to create a Mohs Surgery subspecialty.

198.    Defendants have made statements which disparage those physicians who are Mohs surgeons but who are not fellowship trained in Mohs Surgery and who will not be able to meet the requirements to become certified in Mohs Surgery subspecialty, including those as specifically set forth in Paragraphs 55 through 64 above.

199.    Despite there being no statutory or regulatory requirement for Mohs Surgery to only be performed by physicians who have a fellowship in Mohs Surgery or who will be certified in the Mohs Surgery subspecialty, Defendants misleadingly disparage physicians in the Class by making statements that imply that they are of a lower quality, including those as specifically set forth in Paragraphs 55 through 64 above.

200.    Defendants imply that Plaintiffs and members of the Class are less competent in performing Mohs Surgery,  including those as specifically set forth in Paragraphs 55 through 64 above.

201.    This type of unfair comparison or disparagement of a physician is particularly harmful to his/her career, because government agencies, health insurers, payors, hospitals, and patients tend to avoid and not use the services of physicians who have any blemish on their reputation.

202.    Defendants' Mohs Surgery subspecialty is designed primarily to increase revenue to the Defendants and to artificially restrict competition as alleged above and not to increase or ensure quality of the service being rendered.

203.    The statements as set forth in Paragraphs 55 through 64 above are false and misleading statements and are designed to confuse and mislead the public.

204.    Furthermore, the statements of the Defendants are designed to confuse and mislead the public and potential patients of the Plaintiffs.

205.    Defendants' deception occurs in the course of conduct involving trade, profession, or commerce.

206.    Defendants are knowingly and intentionally engaging in the foregoing unfair and deceptive trade practices.

207.    Defendants' actions have no legitimate purpose and unfairly reduce the output of Mohs surgeries by Mohs Surgery physicians in the Florida market.

208.    Defendants' proposed creation of a subspecialty for Mohs Surgery would further create unfair methods of competition and unfair acts in the commerce of Mohs Surgery.

209.    Defendants' conduct is unfair since it is immoral, unethical, oppressive, unscrupulous, and substantially injurious to Mohs Surgery patients.

210.    Plaintiff Class will be injured by Defendants' actions as will trade and commerce.

211.    Defendants' conduct amounts to a per se violation of Section 501.204, Florida Statutes, because it unfairly violates other Florida Statutes that pertain to trade and commerce. Specifically, Defendant's conduct violates Sections 542.18 and 542.19, Florida Statutes, which deal with restraint of trade and monopolization, respectively.

COUNT VI

CIVIL CONSPIRACY

212.    This is a cause of action by Plaintiffs against both Defendants for damages for civil conspiracy.

213.    It is pleaded alternatively to and in addition to each other Count in this Complaint.

214.    For the purpose of this Count, Paragraphs 1 through 153, 157 through 166, 170 through 173, 177 through 182, 186 through 193, and 197 through 211 above are incorporated herein by reference.

215.    At all times relevant hereto, Defendants ABMS and ABD conspired with specialty organizations such as AAD, ACMS, and physicians such as Randall K. Roenigk, M.D. and Brett Coldiron, M.D. (the Unnamed Co-conspirators), to restrain trade and to diminish or force physicians who perform Mohs Surgery out of the marketplace.

216.    As a direct and proximate result of said conspiracy, Plaintiffs will suffer damages and commerce will suffer damages.

COUNT VII

REQUEST FOR DECLARATORY JUDGMENT

217.    This is a cause of action by Plaintiffs against both Defendants for a declaratory

judgment pursuant to Rule 57, Federal Rules of Civil Procedure, and 28 U.S.C. § 2201.

218.    It is pleaded alternatively to and in addition to each other Count in this Complaint.

219.    For the purpose of this Count, Paragraphs 1 through 153, 157 through 166, 170

through 173, 177 through 182, 186 through 193, 197 through 211, and 215 through 216, above

are incorporated herein by reference.

220.    A subcommittee of Defendant ABMS, the COCERT, will vote on the plan and

make a recommendation to the Board of Directors of ABMS on September 11, 2018.  The Board

of Directors of ABMS will make a final decision on the plan on or before October 26, 2018.

Regardless of the recommendation to be made by COCERT, the Board of Directors of ABMS can

approve the creation of the subspecialty in Mohs Surgery, pursuant to the plan.  The creation of

the subspecialty threatens the livelihood of all the members of the class that are bringing this suit.

221.    However, in addition to this latest action, the past acts and conduct of the

Defendants and the Unnamed Co-conspirators are believed to have violated and be in violation of

both federal and state antitrust laws as set forth in Counts I through VI above.

221.    Under 28 U.S.C. § 2201 and Rule 57, Federal Rules of Civil Procedure, a

declaration of rights is necessary and appropriate from this court.

222.    Plaintiffs request the Court to review and interpret the plan to create the Mohs

Surgery subspecialty, as well as the federal and state antitrust statutes cited above, and issue a

declaratory judgment as to whether the plan of the Defendants restrains trade and violates the Sherman Antitrust Act and the Florida Antitrust Act.

223.    A declaratory judgment is required so as to guide the parties in their future conduct.

224.    A bona fide, actual, present practical need for a declaration exists.

225.    An actual controversy exists between Plaintiffs and Defendants.

226.    The declaration requested concerns a present, ascertained or ascertainable state of facts, or present controversy as to a state of facts.

227.    A privilege or right of the Plaintiffs is dependent upon the facts or the law applicable to the facts.

228.    The Plaintiffs and the Defendants have an actual, present, adverse, and antagonistic interest in the subject matter, either in law or in fact.

229.    The relief sought by the Plaintiffs is not merely giving of legal advice or the answer to questions propounded for curiosity.

WHEREFORE, Plaintiffs request the Court to enter a declaratory judgment interpreting and applying the facts of this case as set forth above, advising the Parties accordingly.


COUNT VIII

REQUEST FOR INJUNCTIVE RELIEF

230.    This is a cause of action by Plaintiffs against both Defendants for injunctive relief, to enjoin the Defendants pursuant to 15 U.S.C. § 4, and Rule 65, Federal Rules of Civil Procedure, and Section 542.23, Florida Statutes, within the equity jurisdiction of this Court.

231.    This Count is pleaded alternatively to and in addition to each other Count in this Complaint.

232.    For the purpose of this Count, it is alleged that there are no monetary damages or legal remedies that are available or appropriate for Plaintiffs.

233.    For the purpose of this Count, Paragraphs 1 through 153, 157 through 166, 170 through 173, 177 through 182, 186 through 193, 197 through 211, and 215 through 216, above are incorporated herein by reference.

234.    Defendants and Unnamed Co-conspirators have acted and continue to act to monopolize the market and to restrain trade.  The latest plan for a subspecialty in Mohs Surgery is merely one of the latest acts in furtherance of their conspiracy.

235.    If approved by the ABMS, it appears that the ABD is ready to immediately implement the Mohs Surgery subspecialty and to have it fully operational in less than a year, in furtherance of its ongoing attempts to monopolize the market.

236.    Defendant ABMS threatens to further restrict trade in the health care market for skin cancer by creating this subspecialty.

238.    As a result of Defendants' acts and those of the Unnamed Co-conspirators, Plaintiffs have in the past and will in the future sustain great and irreparable injury.

239.    As a result of Defendants' acts and those of the Unnamed Co-conspirators, commerce will sustain great and irreparable injury throughout the United States.

240.    Plaintiffs cannot be fully compensated in damages, they are without an adequate remedy at law because the exact amount of damages Plaintiffs will suffer will be difficult to determine, and relief is immediately necessary.

241.     Injunctive relief is authorized to enjoin the actions set forth in Counts I through VI above.

## ATTORNEY'S FEES

242.     Plaintiffs have retained undersigned counsel to pursue their rights in connection with this matter.

243.     Plaintiffs have incurred reasonable attorney's fees and costs in connection with this matter.

244.     Plaintiffs are entitled to payment of their reasonable attorney's fees and costs by the Defendants pursuant to 15 U.S.C. § 15(a), Sections 501.2105(1) and 542.22(1), Florida Statutes, and other laws.

## REQUEST FOR JURY TRIAL

245.     Plaintiffs hereby request a trial by jury on all issues so triable.

## RELIEF REQUESTED

Plaintiffs request this Court enter a judgment in their favor and against the Defendants finding:

A.      Plaintiffs are proper representatives of the Class and that the Class exists.

B.      Awarding Plaintiffs three (3) times their actual damages pursuant to 15 U.S.C. § 15 and Section 542.22(1), Florida Statutes.

C.      Entering a declaratory judgment that adjudges and decrees that:  Defendants have engaged in an unlawful conspiracy in restraint of trade, taken actions in restraint of trade and in an attempt to monopolize the market, and have otherwise acted in violation of Sections 1 and 2 of the Sherman Act and the Florida Antitrust Act.

D.      Enter a permanent injunction to prohibit the Defendants from further violations of law as set forth in Counts I through VI above as well as from creating a Mohs Surgery subspecialty or taking any other acts that would limit in any way the ability of the Plaintiffs to perform Mohs Surgery or to be fully reimbursed by any payor for performing a Mohs Surgery on patients.

E.      That Plaintiffs shall recover from the Defendants their reasonable attorneys' fees and costs of this suit.

F.      Such other relief as the Court may deem appropriate, in law or in equity.

## VERIFICATION OF AMENDED COMPLAINT

I, the undersigned, having been duly sworn, do hereby depose and state, the facts stated above are true and I have personal knowledge of the same.  This Amended Verified Complaint is being filed in good faith and not for the purpose of unnecessary delay.

_____

Signature

**DAVID ALLYN, M.D.**

## NOTARIZATION

SWORN TO AND SUBSCRIBED before me this 10th day of September 2018, by David Allyn, M.D., who is personally known to me or who did produce the appropriate identification and is the person who signed above.

SEAL

JESSICA LYNN JOHNS
Commission # GG 244347
Expires July 31, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

_____

NOTARY SIGNATURE

NAME: Jessica Lynn Johns

LICENSE NO.: GG 244347

EXPIRATION: 7-31-2022

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have filed this document electronically with the Clerk of Court via the CM/ECF System, which automatically serves all counsel of record; on this 10th day of September 2018.

/s/ George F. Indest III
_____
GEORGE F. INDEST III, J.D., M.P.A., LL.M.
Florida Bar No.: 382426
Primary e-mail:  GIndest@TheHealthLawFirm.com
Secondary e-mail:  CourtFilings@TheHealthLawFirm.com
TRIAL COUNSEL/LEAD ATTORNEY
ATTORNEY TO BE NOTICED
CAROLE C. SCHRIEFER, R.N., J.D.
Florida Bar No.: 835293
Primary e-mail:  CSchriefer@TheHealthLawFirm.com
Secondary e-mail:  CourtFilings@TheHealthLawFirm.com
TRIAL COUNSEL/LEAD ATTORNEY
ATTORNEY TO BE NOTICED
LANCE O. LEIDER, J.D., LL.M.
Florida Bar No.: 96408
Primary e-mail:  LLeider@TheHealthLawFirm.com
Secondary e-mail:  CourtFilings@TheHealthLawFirm.com
TRIAL COUNSEL/LEAD ATTORNEY
ATTORNEY TO BE NOTICED
THE HEALTH LAW FIRM
1101 Douglas Avenue
Altamonte Springs, Florida 32714
Telephone:  (407) 331-6620
Telefax:  (407) 331-3030
ATTORNEYS FOR PLAINTIFFS

Attachments (filed separately):
      Index to Exhibits to Amended Complaint
      Exhibits to Amended Complaint

GFI/gi
S:\001-1699\002\002-ABMS Antitrust Suit\410-Pleadings-Drafts & Finals\Complaint, Amended-rev25-FINAL.wpd