**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

DAVID ALLYN, *et al.*

       Plaintiffs,

       v.

AMERICAN BOARD OF MEDICAL
SPECIALTIES, INC., *et al.*

       Defendants.

Case no. 5:18-cv-00355-JSM-PRL

---

**DEFENDANTS' DISPOSITIVE MOTION TO DISMISS THE**
**AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW**

Russell LaPeer
**LANDT, WIECHENS, LaPEER,**
**& AYRES LLP**
Florida Bar no. 200530
445 N.E. 8th Avenue
Ocala, Florida 34470
Telephone No.  (352) 732-8622
Facsimilie No.  (352) 732-1162
rlapeer@aol.com &
lawsec70@yahoo.com

Jack R. Bierig
Benjamin I. Friedman
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, Illinois 60603
Telephone No.  (312) 853-7000
Facsimile No.   (312) 853-7036
jbierig@sidley.com
benjamin.friedman@sidley.com

Admitted *Pro Hac Vice*

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), defendants American Board of Medical Specialties ("ABMS") and American Board of Dermatology, Inc. ("ABD") (collectively "defendants") move to dismiss plaintiffs' Verified Amended Complaint (ECF No. 26). If this Court dismisses the Complaint under Rule 12(b)(6), defendants respectfully request that the dismissal be with prejudice.

## INTRODUCTION

The initial Motion to Dismiss (ECF No. 21) demonstrated that the original Complaint (ECF No. 1) should be dismissed for three reasons: First, the Complaint was not ripe for adjudication because (a) ABMS had not approved ABD's application to issue the challenged Micrographic Dermatologic Surgery ("MDS") subcertification; (b) no insurer or third-party payor requires MDS subcertification as a condition of payment; and (c) no hospital requires MDS subcertification for a physician to perform MDS in its facility. Second, the Complaint failed to state a claim under the Sherman Act both because it failed to allege antitrust injury (as opposed to injury to plaintiffs) and because it failed to allege any restraint at all. Third, the Complaint failed to state a claim under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. ("FDUTPA") because it did not identify a single allegedly false or deceptive statement made by either of the defendants.

Tacitly acknowledging the force of defendants' Motion to Dismiss, plaintiffs have made three changes in their Amended Complaint:

1. They have added two new plaintiffs – a Board certified plastic surgeon and a Board certified ophthalmologist and cosmetic surgeon. These physicians were added presumably because they have not been certified by ABD in general dermatology and

1

therefore will not be subcertified by ABD.

2. They now allege that defendants' purportedly anticompetitive conduct extends beyond the application by ABD for authorization to grant subcertification in MDS – and includes alleged conduct dating back to 2001. This conduct is said to consist of lobbying Medicare, the Veterans' Administration, and other third parties to adopt rules that plaintiffs don't like. These allegations were presumably added because plaintiffs recognize that their challenge to the subspecialty application is not ripe.

3. They now assert claims based on statements made by "Unnamed Co-Conspirator," the American College of Mohs Surgery, Inc. ("ACMS"). These claims were presumably made because plaintiffs recognize that they cannot point to any actionable statements by either defendant.

As explained below, these changes do not cure the defects in the Complaint. *First*, the addition of two physicians who would not be eligible for MDS subcertification by ABD does not change either the lack of ripeness or the lack of antitrust injury. On the ripeness issue, the inescapable fact is that ABMS still has not acted on the application, and it will take substantial time before that application is implemented if it is approved at all. Moreover, it is noteworthy that ABD has voted unanimously to expand the list of Qualifying Boards for the practice pathway to include the American Board of Plastic Surgery and American Board of Otolaryngology—and that is open to expanding the list of Qualifying Boards to accommodate physicians in other specialties including ophthalmology. Supplemental Declaration of Jack R. Bierig ¶ 3–4 ("Supp. Bierig Dec."). As a matter of antitrust injury, the two new plaintiffs, like the original three plaintiffs, fail to allege any specific facts showing injury to competition as

opposed to injury to themselves.

*Second*, the *Noerr-Pennington* doctrine and the statute of limitations bar plaintiffs' claims based on the alleged prior conduct of defendants. Specifically, plaintiffs now allege that defendants violated the Sherman Act by "act[ing]" to "have government health care agencies, such as the Veterans Administration (VA), artificially restrict the performance of Mohs Surgery procedures . . . to only those physicians who were fellowship trained in Mohs Surgery." Am. Compl. ¶ 52(c). Putting aside the fact that there is absolutely no specific factual allegation to support this conclusion, the *Noerr-Pennington* doctrine "shields from the Sherman Act a concerted effort to influence public officials *regardless of intent or purpose*." *TEC Cogeneration Inc. v. Fla. Power & Light Co.*, 76 F.3d 1560, 1571 (11th Cir. 1996) (emphasis added). Plaintiffs also allege that "[f]rom at least 2010" Defendants have "convinc[ed] private health insurers . . . to refuse payment for Mohs Surgery procedures unless performed by a physician . . . [who] had completed a Mohs Surgery fellowship." Am. Compl. ¶ 52(e). Again, beyond the fact that there are, and can be, no specific allegations to support this claim, efforts to persuade a third party to act is the exercise of First Amendment rights and is not unlawful. In any event, plaintiffs' claims based on alleged conduct more than four years prior to the filing of the original Complaint are barred by the statute of limitations. 15 U.S.C. § 15b; Fla. Stat. § 95.11(3)(f).

*Third*, plaintiffs have still not identified a single statement by ABMS or ABD that is unfair or deceptive. Instead, the Amended Complaint cites several statements by ACMS (none of which are deceptive) and concludes that "[t]hese same deceptive and misleading statements have been made by Defendant ABD." Am. Compl. ¶ 59. Notably, plaintiffs fail to identify any

3

allegedly deceptive statements made by ABMS or ABD. And plaintiffs' conclusory allegation that ABD has made statements similar to the ACMS is insufficient to state a claim under Rule 8. Plaintiffs' FDUTPA claim also fails because they have not shown that the statements alleged in the Amended Complaint will result in "probable . . . deception that is likely to cause injury to a reasonable relying consumer." *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007).

## BACKGROUND

Founded in 1933, ABMS is a nationally recognized, not-for-profit corporation that strives to improve the quality of health care in the United States. *See* Am. Compl. ¶ 16; Declaration of Richard E. Hawkins, M.D. ¶ 3 ("Hawkins Dec.") (ECF No. 24). ABMS consists of twenty-four Member Boards that cover a range of medical specialties, from allergy and immunology to urology. *See* Am. Compl. ¶ 16; Hawkins Dec. ¶ 3. Each Member Board offers general certification in its medical specialty and, if authorized by ABMS, certain subspecialties within that specialty. Am. Compl. ¶ 16.

These certifications and subcertifications provide useful information to hospitals as they credential physicians; payors as they determine what sort of payment to make; and patients as they choose what physician to use for a specific condition. Certification "helps demonstrate to the public that a physician meets nationally recognized standards for education, knowledge, experience, and skills." Hawkins Dec. ¶ 5. As one court has recognized, "[c]ertification by a Member Board is a voluntary process and no physician is required as a condition of medical licensure to be initially certified by an ABMS Member Board." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, No. CIV.A. 13-2609 PGS,

4

2014 WL 1334260, at *1 (D.N.J. Apr. 2, 2014).

Incorporated in 1932, ABD is one of the twenty-four ABMS Member Boards. Declaration of Thomas D. Horn, M.D. ¶ 3 ("Horn Dec.") (ECF No. 23). ABD is a non-profit corporation established to advance the public interest by establishing standards of training, education, and qualifications for physicians specializing in dermatology. *Id*.; *see also* Am. Compl. ¶ 19. In addition to certification in general dermatology, ABD offers subspecialty certifications in dermatopathology and in pediatric dermatology. Am. Compl. ¶ 19. Board certification by ABD is voluntary. Horn Dec. ¶ 4; *see also* Hawkins Dec. ¶ 5. Like ABMS, ABD does not "define requirements for membership on hospital staffs," "gain special recognition or privileges" for the physicians whom it certifies (referred to as "Diplomates"), and "does not define who may, or may not, practice dermatology." Horn Dec. ¶ 4.

On April 6, 2018, ABMS received ABD's application for authorization to award subspecialty certification in MDS. Hawkins Dec ¶ 6. The dermatologic subspecialty known as MDS integrates clinical dermatology, surgical dermatology, dermatopathology, and basic knowledge of carcinogenesis in order to treat various cutaneous cancers. Horn Dec. ¶ 7. One of the procedures within this subspecialty of dermatology is Mohs surgery, which is often performed by Board certified dermatologists with training in MDS. Am. Compl. ¶ 1. In a typical Mohs surgical procedure, the physician "cuts around and removes a visible skin cancer (a melanoma, basal cell carcinoma, or squamous cell carcinoma) on a patient's skin." Am. Compl. ¶ 44. A thin layer of the surrounding tissue is then removed and analyzed to determine if any cancer cells remain. *Id*. If cancer cells are still present, the physician will remove additional tissue and then re-analyze the tissue at the margins. *Id*. The physician repeats the

process until all of the cancer cells have been removed. *Id.*

Mohs surgery has been practiced since the 1930s, and training programs in MDS have existed for fifty years. Am. Compl. ¶¶ 44, 53 n.4 & ECF No. 1-3 at 1. Since 1970, the American College of Mohs Surgery has accredited fellowship programs specializing in MDS. ECF No. 1-3 at 2. A fellowship "is a specialty training program for a physician who has already completed a medical residency program." Am. Compl. ¶ 53 n.4. In 2004, the Accreditation Council for Graduate Medical Education took over the accreditation process and now accredits 76 fellowship programs in Micrographic Surgery and Dermatologic Oncology. ECF No. 1-3 at 2. Since fellowship accreditation began in 1970, more than 1,500 Board certified dermatologists have completed a fellowship in MDS. *Id.*

As this Court has noted (July 12 Order, at 4), ABD's application to ABMS proposes that, for five years after approval, "any dermatologist certified by the ABD in good standing . . . will be allowed to sit for the examination provided s/he attests that [Micrographic Dermatologic Surgery] comprises some portion of practice." ECF No. 5 at 4; *see also* ECF No. 1-3 at 8; Am. Compl. ¶ 104 (acknowledging the "grandfathering period"). The Centers for Medicare and Medicaid Services reports that dermatologists submit *98% of all bills for micrographic surgery*, meaning that 98% of all physicians that perform micrographic surgery for the government would be eligible for the practice pathway. Compl. Ex. 2 at 2. Nevertheless, on July 17, 2018, ABD unanimously agreed to expand the list of specialties whose members could sit for the MDS subcertification exam to include Diplomates of the American Board of Otolaryngology and American Board of Plastic Surgery. Supp. Bierig Dec. ¶ 3. ABD is open to further expansion of the list of Qualifying Boards to include the American Board of

Ophthalmology. Supp. Bierig Dec. ¶ 4. Once the initial five-year period closes, MDS subcertification will require completion of an accredited fellowship program." Compl. Ex. 2 at 8.

After ABD submitted its subspecialty application, ABMS sought comments from all interested parties. Hawkins Dec. ¶ 6. As stated in ABMS's call for comments, stakeholders could submit their views on the proposal through the ABMS website until July 6 and via email or other correspondence until September 7. *Id*. The ABMS Committee on Certification, or "COCERT," considered the ABD application at its September 11 meeting. *Id*. ¶ 7. The ABMS Board of Directors will act on the COCERT recommendation on October 26. *Id*. ¶ 8; Am. Compl. ¶ 83.

On July 11, three Board certified dermatologists filed a verified, eight-count Complaint. ECF No. 1. On September 10, Plaintiffs amended the Complaint to add two new plaintiffs and additional factual allegations. In Counts I–IV, plaintiffs allege that defendants "will unreasonably restrain trade by creating a subspecialty in Mohs surgery" and "are attempting to monopolize . . . the medical service Mohs [sic] Surgery" – in violation of Sections 1 and 2 of the Sherman Act and Florida Statutes §542.18 and § 542.19. Am. Compl. ¶¶ 162, 173; *see also id*. ¶¶ 174–193. In Count V, plaintiffs allege that defendants "disparage those physicians who are Mohs surgeons but who are not fellowship trained in Mohs Surgery" by "making statements that imply that they are of a lower quality" in violation of the FDUTPA. Am. Compl. ¶¶ 198–99. Count VI asserts a claim for civil conspiracy based on defendants' alleged violations of federal and Florida antitrust laws and the FDUTPA. Am. Compl. ¶¶ 212–216. Count VII requests a declaratory judgment, and Count VIII requests injunctive relief.

Compl. ¶¶ 217–41.

## LEGAL STANDARD

ABMS and ABD move to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Motions to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) may attack jurisdiction facially or factually. *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). When a defendant challenges subject matter jurisdiction under Rule 12(b)(1), a court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case without presuming the truthfulness of the plaintiff's allegations." *Makro Capital of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1258 (11th Cir. 2008) (internal quotation marks omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning that, from the facts alleged, the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court assumes for purposes of a motion to dismiss that the factual allegations in the Complaint are true, it need not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## ARGUMENT

The Amended Complaint should be dismissed for several reasons. *First*, claims based on the creation of an MDS subcertification continue to be unripe. *Second*, plaintiffs do not have antitrust standing to bring the claims alleged in Counts I–IV because they have not alleged an

antitrust injury—*i.e.*, a harm to competition. Plaintiffs allege that they lost profits as a result of defendants' actions, but that is not an antitrust injury. And, although plaintiffs allege that the defendants' actions have limited the supply of physicians performing MDS, the Amended Complaint contains no specific facts to support this assertion and, in fact, the Amended Complaint actually undermines it. *Third,* plaintiffs have not plausibly alleged a restraint of trade under Section 1 of the Sherman Act and Fla. Stat. § 542.18. *Fourth*, the *Noerr-Pennington* doctrine and statute of limitations bar plaintiffs' claims premised on alleged conduct said to have occurred long before the filing of the Complaint. *Fifth*, with respect to their FDUPTA claim in Count V, plaintiffs have not identified a single statement attributable to defendants that "disparages" plaintiffs, and they do not allege that the alleged misleading statements harmed them or anyone else. The remaining claims (Counts VI–VIII) rest entirely on plaintiffs' antitrust and FDUTPA claims, and should be dismissed too.

## I.   PLAINTIFFS' CLAIMS BASED ON THE MDS SUBSPECIALTY CERTIFICATION ARE UNRIPE FOR REVIEW.

Under Article III, this Court's may hear only "cases or controversies" that are ripe for review. *Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). To satisfy this requirement, "the claim [must be] sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decision-making by the court." *Id*. at 589 (citations and quotations omitted).

Here, plaintiffs are asking this Court to speculate on the outcome of the ABMS review process and on conduct that may, or may not, materialize after a predicted decision by ABMS approving the application. It is quite possible that ABMS will not approve the application of ABD. Indeed, the entire purpose of the comment period is to provide input that will allow

ABMS to determine whether to permit the subspecialty certification. Similarly, the actions of hospitals and insurers about which plaintiffs speculate may never materialize even if the subspecialty certification in MDS is approved. Accordingly, it is quite possible that, if the Court decides the merits of this case now, the Court will have spent its time on an issue that need never be decided.

Adjudication of the Amended Complaint at this time would cause this Court to jump ahead of ABMS's ongoing review of the ABD application and to assume that ABMS will approve that application. Further, it would require the Court to conclude that, if ABMS does approve the application, hospitals and payors will take the actions that plaintiffs, again without any foundation, predict.[1] Federal courts are not in the business of forecasting future events. *See Jacks v. Wells Fargo Bank N.A.*, 642 F.3d 1323, 1332 (11th Cir. 2011) (court lacks jurisdiction over "claims [that] are based on events that may take place in the future."). Because plaintiffs' claims based on the subcertification application rest on decisions not yet made and actions not yet taken, these claims are not ripe for judicial review and therefore should be dismissed. *See Staver v. Am. Bar Assoc.*, 169 F. Supp. 2d 1372, 1377 (M.D. Fla. 2001) (dismissing antitrust claims against the ABA because the lawsuit was filed before the ABA had reached a final decision regarding a school's application for accreditation); *Florida Coastal School of Law, Inc. v. Am. Bar Ass'n*, No. 3:18-cv-621-J-39JBT, Slip Op. 10, (M.D. Fla. July 9, 2018) (ECF

---

[1] The actions taken by hospitals and third-party payors are completely independent of the actions of ABMS and ABD. Any decision regarding the creation of a new subspecialty certification is based on the existence of a body of knowledge regarding the subspecialty and how the approval of the application would affect patient care, patient access, et cetera. Horn Dec. ¶ 10; Hawkins Dec. ¶ 9. There is no discussion with hospitals, insurers, Medicare or other third-party payors. Horn Dec. ¶ 10; Hawkins Dec. ¶ 9. Decisions are made based on providing the best medical care, not economic outcomes. Horn Dec. ¶ 10; Hawkins Dec. ¶ 9.

No. 39) (holding that "because [administrative] review of the ABA's decision is still pending, judicial review at this time is not appropriate").

Moreover, the documents attached to the Complaint (and incorporated by reference in the Amended Complaint), undermine any suggestion that the creation of an MDS subspecialty will harm consumers. Under ABD's current proposal, all Board certified dermatologists will be eligible for the subspecialty certification, which includes 98% of physicians that perform MDS for government payors. ECF No. 1-3 at 2. Were that not enough, ABD has already unanimously approved an expansion of the practice pathway to allow physicians Board certified in plastic surgery and otolaryngology to become certified in MDS, and it is willing to consider further expansions of the practice pathway "in the spirit of inclusion." Supp. Bierig Dec. ¶ 3–4. Not only will the current number of physicians performing MDS stay the same, it is actually likely to increase in the coming years: "[f]rom 2007 to 2017 [American College of Mohs Surgery] membership" – which requires completion of a fellowship – "increased from 696 to 1333; a total increase of 92%, with an annual average increase of 9%." ECF No. 1-3 at 2. Given these facts, there is no plausible threat of injury to patients who need MDS or Mohs Surgery.

Plaintiffs have tacitly concede this point by throwing in allegations of conduct that allegedly occurred separately from the application for authorization to grant subspecialty certification in MDS. However, those allegations do not change the fact that the principal allegations of the Amended Complaint do not satisfy Article III requirements. Moreover, as we demonstrate below, the new allegations are themselves inadequate to survive a motion to dismiss.

## II.   PLAINTIFFS LACK STANDING TO ASSERT THEIR ANTITRUST CLAIMS.

In an antitrust case, standing "involves more than the 'case or controversy' requirement that drives constitutional standing." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991). Whereas constitutional standing depends on the Court finding a "case or controversy" that is ripe for review, antitrust standing "involves an analysis of prudential considerations aimed at preserving the effective enforcement of antitrust laws." *Id*. The antitrust standing analysis is "two-pronged," and considers "whether the plaintiff suffered an 'antitrust injury'" and whether plaintiffs are "efficient enforcer[s] of the antitrust laws." *Id*. The Amended Complaint fails to allege an antitrust injury but, even if it had, it does not establish that plaintiffs are efficient enforcers of the antitrust laws.

### A.   Plaintiffs Have Not Alleged an "Antitrust Injury."

To plead claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, plaintiffs must allege that they have suffered an "antitrust injury" – that is, an "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977). As the Supreme Court has explained, "the antitrust laws were enacted for the protection of competition, not competitors." *Brunswick*, 429 U.S. at 488. As a result, "[t]here is no antitrust injury when the harm alleged is harm to the business of one competitor (or a group of competitors)—the injury must be to the market." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, No. 14-CV-02705, 2017 WL 6821094, at *6 (N.D. Ill. Dec. 13, 2017). Here, there is no plausible allegation of injury to competition in the market for MDS – as opposed to supposed injury to these plaintiffs.

On this point, *Sanjuan v. American Board of Psychiatry and Neurology, Inc.*, 40 F.3d

247 (7th Cir. 1994) and *Daniel v. American Board of Emergency Medicine*, 428 F.3d 408 (2d

Cir. 2005) are particularly instructive. In *Sanjuan*, the American Board of Psychiatry and

Neurology denied certification to plaintiffs after they failed the Board's oral examination.

Plaintiffs alleged that the Board's certification practices violated the Sherman Act. 40 F.3d at

249. The Seventh Circuit rejected these claims – holding that harm to plaintiffs' psychiatry

practices is not an antitrust injury. *Id*. at 251. Indeed, "[t]he claim that a practice reduces

(particular) producers' incomes *has nothing to do with the antitrust laws*." *Id*. (emphasis

added). In *Daniel*, the Second Circuit reached a similar conclusion. There, several licensed

physicians practicing emergency medicine alleged that the American Board of Emergency

Medicine had "manipulated the residency training requirement for ABEM certification to limit

the number of doctors certified in emergency medicine." 428 F.3d at 414. Following the

Seventh Circuit's lead in *Sanjuan*, the Second Circuit concluded that "the injury alleged by

plaintiffs—their ability to earn higher pay—was not 'an antitrust injury.'" *Id*. at 439–42.

Both *Sanjuan* and *Daniel* dispose of plaintiffs' claims. Like the plaintiffs in *Sanjuan*

and *Daniel*, plaintiffs here allege a host of injuries to their incomes, not to the market for MDS

or Mohs surgery. *See, e.g.*, Am. Compl. ¶ 13 (Plaintiffs have "lost income because of the

conduct of Defendants"); *id*. ¶ 33 ("Plaintiffs . . . . have lost substantial income in the form of

lost professional fees and have lost patients"); *id*. ¶ 35 ("If the actions of the Defendants are

allowed to continue, each Plaintiff will further suffer a loss of patients, a loss of income and

will have their ability to provide Mohs surgery procedures . . . artificially restrained or

prohibited."); *id.* ¶ 38 ("The actions of the Defendants in adopting a Mohs Surgery

subspecialty will further artificially and arbitrarily restrict the income of the Plaintiffs

individually"). Courts consistently have held that these types of injuries are not "the type the antitrust laws were intended to prevent." *Brunswick*, 429 U.S. at 489; *Sanjuan*, 40 F.3d at 249; *Daniel*, 428 F.3d at 414; *Ass'n of Am. Physicians & Surgeons*, 2017 WL 6821094, at *6.

In an attempt to remedy this glaring deficiency, plaintiffs assert that the conduct of defendants has reduced the number of physicians able to perform Mohs Surgery and has raised prices for consumers. *See, e.g.*, Am. Compl. ¶¶ 138–141. Significantly, however, they do not include a single specific factual allegation that would support this assertion. Such a bare conclusory allegation is insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678 ("[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice."); *Twombly*, 554 U.S. at 555 ("plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions"); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332 (11th Cir. 2010) (same). Moreover, the allegations of the Amended Complaint undermine this conclusory allegation. Specifically, each of the defendants alleges that he has performed and been paid for substantial numbers of Mohs procedures. Am. Comp. ¶¶ 2, 5, 8, 11, and 12.

> **B.    Plaintiffs Are Not Best Suited to Enforce the Claims Alleged in the Amended Complaint.**

"A showing of antitrust injury is necessary, but not always sufficient, to establish standing" under the Sherman Act. *Todorov*, 921 F.2d at 1449 (quoting *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986)). In addition to an antitrust injury, plaintiffs must show that they "can most efficiently vindicate the purposes of antitrust laws." *Todorov*, 921 F.2d at 1449. Courts determine whether plaintiffs are "efficient enforcers" of antitrust law by looking to the directness or remoteness of plaintiffs' injury and the certainty of damages.

*Id*. Plaintiffs lack antitrust standing by both measures.

The first factor weighs heavily against a finding that plaintiffs have standing since they cannot show a "direct link between the antitrust violation and the antitrust injury" that has been alleged. *Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 927–28 (7th Cir. 1995). The Amended Complaint alleges that defendants have lobbied the AMA and third-party payors, including the VA and CMS, to prohibit non-fellowship-trained physicians from performing, or being reimbursed for, Mohs Surgery, which allegedly "reduce[s] the number of physicians able to perform Mohs Surgery" and thereby harms consumers. Am. Compl. ¶¶ 137–38. But defendants do not control hospitals or third-party payors, and plaintiffs do not allege otherwise. In fact, the Amended Complaint acknowledges that these third parties act independently. Thus, it alleges, for example, that defendants "*have lobbied* for and taken actions to have [CMS] rewrite its requirements for clinical laboratories in physicians' offices to artificially prevent nondermatologists from being able to perform Mohs Surgery and bill for it." Am. Compl. ¶ 68 (emphasis added).[2] Beyond the entirely speculative nature of this assertion, use of the word "lobbied" implies that defendants cannot require third parties to take any of the actions about which plaintiffs are concerned.

If, as plaintiffs fear, third-party payors limit payments for Mohs surgery to those who have MDS certification and if hospitals prohibit physicians who do not have the subspecialty certification from performing Mohs surgery in their facilities, that would be the result of the

---

[2] *See also id*. ¶¶ 69 ("Defendant ABMS *will further promote* . . . restrictions on payment for Mohs Surgery procedures and will cause payers such as Medicare, Medicaid, Tricare, and the VA to further restrict such payments." (emphasis added)); *id*. ¶ 85 ("Once the [MDS] subspecialty is formed, Defendants and Unnamed Coconspirators will act to have the Medicare Program change its requirements." (emphasis added)); *id*. ¶ 86 ("Once the Mohs Surgery subspecialty is formed, Defendants and Unnamed Coconspirators will act to have health insurers require physicians to be certified by the ABD in the new [MDS] subspecialty.")

independent judgment of these third parties – not of some conspiracy. *See Poindexter v. Am. Bd. of Surgery, Inc.*, 911 F. Supp. 1510, 1520 (N.D. Ga. 1994), *aff'd* 56 F.3d 1391 (11th Cir. 1995) ("Hospitals, patients and insurers voluntarily rely on the Board's certification decision, much like an ordinary consumer might rely on a trade group's seal of approval. After the Board expresses its informed opinion regarding the sufficiency of a surgeon's academic training or credentials, users of that information have the sole power to determine whether that surgeon is entitled to patronage, surgical privileges, or preferred insurance rates."). The lack of subcertification in MDS by itself, "do[es] not impact whether physicians are licensed [under state law] to practice," does not remove plaintiffs from hospital staffs, and does not impact whether plaintiffs can charge third-party payors for Mohs surgery. *See Ass'n of Am. Physicians & Surgeons, Inc.*, 2017 WL 6821094, at *6.

The second factor—the certainty of damages—similarly weighs against a finding that plaintiffs have antitrust standing. Here, the alleged harm to plaintiffs' medical practices is uncertain, speculative, and the result of decisions by independent actors. The Amended Complaint does not suggest otherwise. Other than the wholly conclusory allegation that plaintiffs have "lost substantial income in the form of lost professional fees and have lost patients," there is not a single allegation supporting plaintiffs' claim to damages. Am. Compl. ¶¶ 33, 52. Plaintiffs do not state, for example, when they began to lose patients or professional fees, which of defendants' alleged actions caused their losses, or how much each plaintiff lost. In fact, the Amended Complaint undermines any suggestion that plaintiffs have suffered any losses by alleging that plaintiffs "routinely perform[ ] Mohs Surgery" or have performed

"thousands of Mohs surgeries." Am. Compl. ¶¶ 5, 8, 11, 12.[3] If plaintiffs continue to perform

Mohs Surgeries and third-party payors are reimbursing them for such surgeries, *see* n.4, *infra*,

they cannot plausibly allege that they have incurred any damages.

## III.   PLAINTIFFS HAVE NOT ALLEGED THAT THE CREATION OF THE MDS SUBSPECIALTY WOULD CONSTITUTE A RESTRAINT OF TRADE.

Plaintiffs' Section 1 claims fail for the additional reason that plaintiffs have not alleged

that creation of the MDS subspecialty, or any of the other conduct alleged in the Amended

Complaint, would constitute a "restraint of trade or commerce." 15 U.S.C. § 1. As Judge

Easterbrook succinctly put it, "[t]here can be no restraint of trade without a restraint."

*Schachar*, 870 F.2d at 397. Medical specialty certifications simply do not constitute a restraint

since all that such certifications do is provide information to hospitals, third-party payors, and

patients.

In *Schachar*, the Seventh Circuit considered whether the American Academy of

Ophthalmology's decision not to endorse a particular surgical procedure constituted an

unlawful restraint of trade. Judge Easterbrook's opinion applies equally here: The decision of

a private body to withhold its endorsement is not a restraint at all, let alone an unlawful one.

870 F.2d at 397.[4] Notably, in *Schachar* as here, the entity in question "ha[d] no authority over

---

[3] Publicly available CMS data, which this Court may take judicial notice of, further undermines plaintiffs' damages claim. That data shows that from 2012 through 2015: Plaintiff Allyn collected $1.9 million in Medicare payments and his most frequent procedure was Mohs Surgery, *see* Allyn, David L (available at: http://graphics.wsj.com/medicare-billing/#/1770587735); Am. Compl. ¶ 71 (alleging that Mohs Surgeries are billed to CPT Codes 17311 through 17315); plaintiff Lynott collected $2.7 million and Mohs Surgery was his most frequently performed procedure, *see* Lynnott, James V (available at: http://graphics.wsj.com/medicare-billing/#/1649277658); and plaintiff Masessa collected more than $6.2 million from CMS, with Mohs Surgery being one of his most frequently performed procedures. *See* Masessa, Joseph M. (available at: http://graphics.wsj.com/medicare-billing/#/1720115355).

[4] *See also Marrese v. Am. Academy of Orthopaedic Surgeons*, No. 91-1366, 1992 WL 246906, at *6 (7th Cir. Oct. 1, 1992) ("[T]here is no evidence that membership in these societies is necessary to practice sports medicine

---

hospitals, insurers, state medical societies or licensing boards, and other persons who might be able to govern the performance of [medicine.]" 870 F.2d at 398. To be sure, a certification by ABD that a physician has met applicable standards may be respected by independent decision-makers. However, even "[a]n organization's towering reputation does not reduce its freedom to speak out." *Id*. at 399. Applying these principles, courts in this Circuit and around the country have consistently rejected antitrust claims based on the certification processes of ABMS Member Boards. *See Poindexter*, 911 F. Supp. at 1520 (holding that a Member Board did not "constrain Plaintiff's ability to compete." (emphasis added)).[5]

Plaintiffs provide no reason to depart from this established precedent. As in these cases, certification by an ABMS Member Board helps demonstrate to the public that a physician meets nationally-recognized standards for education, knowledge, experience, and skills. *See Peel v. Attorney Registration & Disciplinary Commission of Illinois*, 496 US 91, 102 n.11 (1990) ("Board certification of specialists in various branches of medicine, handled by the 23 member boards of the American Board of Medical Specialties, is based on various requirements of education, residency, examinations and evaluations . . . . The average member of the public does not know or necessarily understand these requirements, but board

---

or hand surgery. In other words, there is no evidence of any restraint of trade."); *DeGregorio v. Am. Bd. of Internal Medicine*, No. 92-cv-4924, 1993 WL 719564, at *10 (D.N.J. Oct. 1, 1993), adopted in relevant part, 844 F. Supp. 186, 187 (D.N.J. 1994) ("it is abundantly clear that [a] plaintiff's Sherman Act claim should be dismissed when brought against an entity that neither grants licenses to practice medicine, nor does it have any authority to do so.").

[5] *See also Sanjuan*, 40 F.3d at 251 ("It is hard to see how the [Member] Board's activities could amount to an exercise of market power, which entails cutting back output in the market and thus driving up prices to consumers."); *Patel v. Am. Bd. of Psychiatry & Neurology, Inc.*, No. 89-cv-1751, 1989 WL 152816, at *3 (N.D. Ill. Nov. 21, 1989) ("Plaintiff has failed to allege that defendant [Member Board] has any authority or control over the private hospitals and institutions . . . ."); *Bishara v. Am. Bd. of Orthopaedic Surgery, Inc.*, No. 85-cv-3400, 1986 WL 15265, at *1 (N.D. Ill. Dec. 30, 1986) ("This court . . . finds that the [Member] Board's certification process does not violate the antitrust laws.").

18

certification nevertheless has come to be regarded as evidence of skill and proficiency of those to whom they [have] been issued."). Neither ABMS nor ABD "define requirements for membership on hospital staffs," "gain special recognition or privileges" for physicians, or "define who may or may not practice dermatology." *See supra* p.5. As such, creation of a subspecialty certification in MDS, if it occurs at all, would not constitute a restraint.

## IV.   THE *NOERR-PENNINGTON* DOCTRINE BARS PLAINTIFFS' CLAIMS BASED ON LOBBYING.

The Amended Complaint asserts additional antitrust claims based on defendants' attempts to lobby healthcare agencies. *See, e.g.*, Am. Compl. ¶¶ 52(c)–(d), 67–69. More than 60 years ago, the Supreme Court held that "efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). To the extent the Amended Complaint relies on allegations that defendants have lobbied healthcare organizations, like the American Medical Association, the Veterans Administration and Centers for Medicare and Medicaid Services ("CMS"), Plaintiffs claims are barred by binding Supreme Court precedent.

The *Noerr-Pennington* doctrine is rooted in the First Amendment right " to petition the government for a redress of grievances," U.S. Const., Am. 1. "The doctrine extends absolute immunity under the antitrust laws to 'businesses and other associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects.'" *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 841 (7th Cir. 2011) (quoting *Wilk v. American Medical Ass'n*, 719 F.2d 207, 229 (7th Cir. 1983)). Even if the "efforts to influence . . . public officials . . . [are] intended to eliminate competition," the

19

*Noerr-Pennington* doctrine still bars suit. *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1558 (11th Cir. 1992); *see also TEC Cogeneration*, 76 F.3d at 1571 (the *Noerr-Pennington* "shields from the Sherman Act a concerted effort to influence public officials *regardless of intent or purpose*." (emphasis added)). The doctrine "is not merely an affirmative defense," and therefore "the burden falls on [plaintiffs] in this case to allege facts sufficient to show that *Noerr-Pennington* immunity does not attach to [defendants'] actions." *McGuire Oil Co.*, 958 F.2d at 1559 n.9.

The Amended Complaint is littered with allegations that are barred by the *Noerr-Pennington* doctrine. Plaintiffs allege, for example, that defendants have acted "to have government health care agencies, such as the Veterans Administration (VA)" (1) limit the performance of MDS in its hospitals and clinics "to only those physicians who were fellowship trained in [MDS]"; and (2) refuse payment for MDS procedures performed outside of a VA facility by any physician who has not completed a fellowship in MDS. Am. Compl. ¶ 52(c), (d). The Amended Complaint goes on to allege that defendants have "lobbied and taken other actions to cause" the Centers for Medicare and Medicaid Services ("CMS") to prevent plaintiffs from billing for Medicare procedures, Am. Compl. ¶ 67–68, and that, if ABMS approves the MDS sub-certification application, ABMS will "cause payers such as Medicare, Medicaid, Tricare, and the VA" to further restrict payments to non-MDS certified physicians. Am. Compl. ¶ 69. Similarly, plaintiffs allege that defendants have acted "to have the codes used for billing Mohs Surgery amended by the American Medical Association (AMA) so that only dermatologists who were fellowship trained in Mohs Surgery were allowed to bill them to federal program." Am. Compl. ¶ 52(a).

Even if these allegations were true (and the Amended Complaint does not allege facts to support them), and even if defendants took these actions to eliminate competition, they are not actionable under the Sherman Act. *Noerr-Pennington* immunity is "absolute" and applies "regardless of intent or purpose." *TEC Cogeneration*, 76 F.3d at 1571. To the extent plaintiffs' claims rely on the lobbying of healthcare providers, the Court should dismiss them.

## V.      THE STATUTE OF LIMITATIONS BARS PLAINTIFFS NEW CLAIMS.

To bolster their antitrust claims, the Amended Complaint adds a number of allegations about defendants' past conduct. These allegations include that defendants acted:

- As early as 2001 to have the codes used for billing Mohs Surgery amended by the American Medical Association (AMA) so that only dermatologists who were fellowship trained in Mohs Surgery were allowed to bill them to federal programs;

- For at least the past seven (7) years, to have government health care agencies, such as the Veterans Administration (VA), artificially restrict the performance of Mohs Surgery procedures in its hospitals and clinics, to limit their performance to only those physicians who were fellowship trained in Mohs Surgery;

- For at least the last seven (7) years have government health care agencies such as the VA refuse payment for Mohs Surgery procedures performed outside of a VA facility by any physician who was not fellowship trained in Mohs Surgery, regardless of their past experience in performing Mohs Surgery; and

- From at least 2010 through the present, convincing private health insurers, such as Humana, Inc., a large health insurer and one of the largest payers for health care services, to refuse payment for Mohs Surgery procedures unless performed by a physician who would certify that he or she had completed a Mohs Surgery fellowship.

Am. Compl. ¶ 52.[6] Under the Sherman Act, "[a]ny action to enforce any cause of action . . . shall be forever barred unless commenced within four years." 15 U.S.C. § 15b. Florida law

---

[6] *See also id*. ¶ 1 (alleging that defendants have tried "to artificially restrict trade in and monopolize the medical procedure known as Mohs Surgery, *for at least the past five (5) years*, in violation of federal and state antitrust laws and the Florida Unfair and Deceptive Trade Practices Act." (emphasis added)).

applies an identical four-year statute of limitations to violations of state antitrust laws. *See* Fla. Stat. § 95.11(3)(f); *In re Takata Airbag Products Liability Litig.*, 255 F. Supp. 3d 1241, 1258 (S.D. Fla. 2017). Plaintiffs concede that each of the actions alleged above occurred more than four years ago, and therefore the statute of limitations bars plaintiffs from pursuing claims based on those acts.

## VI.    PLAINTIFFS' FDUTPA CLAIM SHOULD BE DISMISSED.

In Count V, plaintiffs assert a claim under the FDUTPA based on defendants' alleged "disparage[ment]" of physicians who have not completed a fellowship in MDS. *See, e.g.*, Am. Compl. ¶¶ 198–99.[7] But plaintiffs have failed to allege the very first element of any FDUTPA claim. As courts in this district have explained, pleading a deceptive act or practice requires plaintiffs to "provide . . . a[] substantiating factual predicate . . . , such as what misrepresentations, concealments, acts, or omissions allegedly deceived them and the public" and to provide "support for their allegation that Defendants' acts caused confusion in the marketplace and negatively affected their customers." *Eli Research, LLC v. Must Have Info Inc.*, No. 2:13-CV-695-FTM-38CM, 2014 WL 4540110, at *9 (M.D. Fla. Sept. 11, 2014).[8]

The Amended Complaint, like the original, still does not identify a single statement, deceptive or otherwise, *attributable to Defendants*. Indeed, the Amended Complaint does not attribute any allegedly deceptive statements to ABMS. *See* Am. Compl. ¶ 59. Instead, Plaintiffs

---

[7] Count V also alleges that that Defendants conduct "amounts to a per se violation" of the FDUTPA, Fla. Stat. § 501.24, because it violates Florida antitrust law (which is the same as federal law). Am. Compl. ¶ 211 (emphasis in original). To the extent Count V relies on Florida antitrust law, it fails for the reasons explained in Section I, *supra*.

[8] *See also Fid. Nat'l Fin., Inc. v. Attachmate Corp.*, No. 315CV01400HESPDB, 2017 WL 3726687, at *3 (M.D. Fla. Mar. 1, 2017) (dismissing FDUTPA claim because the complaint did not "identif[y] the contested terms of the license agreement(s), [or] address[] Defendant's representations or omissions of the agreement(s)").

identify two statements from "Unnamed Co-Conspirator" ACMS, and make the conclusory allegation that "[t]hese same deceptive and misleading statements have been made by *Defendant ABD*." Am. Compl. ¶ 59 (emphasis added). To state a claim, plaintiffs must allege, *inter alia*, when and where ABD allegedly made these statements. *Cf. Fid. Nat'l Fin., Inc. v. Attachmate Corp.*, No. 315CV01400HESPDB, 2017 WL 3726687, at *3 (M.D. Fla. Mar. 1, 2017) (dismissing FDUTPA claim because the complaint did not "identif[y] the contested terms of the license agreement(s), [or] address[] Defendant's representations or omissions of the agreement(s)"). This Court should not be left to guess which statements plaintiffs believe are actionable.

Even if the statements identified in the Amended Complaint were attributable to ABD, they would still not state a claim. Under the FDUTPA, a statement is actionable only if it "is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment. This standard requires a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer." *Zlotnick*, 480 F.3d at 1284. Under the heading "Why Choose a Fellowship Trained Mohs Surgeon," ACMS's website explains that patients may "want [their] skin cancer treatment to be performed with the highest standards of quality and competency," which, plaintiffs allege, implies that non-fellowship trained Mohs surgeons have lower quality standards and lesser competence. Am. Compl. ¶ 56(a).[9] But

---

[9] Plaintiffs allege that two other statements from ACMS's website are deceptive. But those allegations rest on deliberate misrepresentations. Specifically, plaintiffs allege that:

- The same publication advises patients that such Mohs Surgery performed by its fellowship trained physicians can: "Cur[e] skin cancer when other methods have failed." Am. Compl. ¶ 56(b); and
- The same publication falsely states "The aesthetic outcome of the surgery is optimized" if it is performed by a fellowship trained Mohs Surgeon. *Id*. ¶ 56(c).

plaintiffs ignore the next sentence, which explains that ACMS "is the only organization that requires its members to have successfully completed an extensive fellowship that requires at least one full year of training." ECF No. 26-2 at 1. It is undisputed that fellowship-trained physicians have undergone additional training that non-fellowship-trained physicians have not. Given this context, the statement identified in above does not "disparage" non-fellowship trained physicians; it simply highlights the additional training that ACMS members have undergone. And, importantly, there is nothing to suggest that plaintiffs' interpretation of this statement is "probable," instead of simply "possible." *Zlotnick*, 480 F.3d at 1284.[10]

Indeed, the facts alleged in the Amended Complaint undermine any suggestion that defendants have disparaged dermatologists who have not completed an MDS fellowship. As this Court pointed out, the MDS proposal allows all Board certified physicians to become subcertified in MDS – whether the physician completed an MDS fellowship or not. 7/12/2018 Order 4–5 (ECF No. 5). Although this proposal covers 98% of physicians that perform Mohs Surgery for the government (the largest healthcare provider in the Country), "in the spirit of inclusion," ABD has agreed to further expand the list of Qualifying Boards to ensure physicians in other specialties will qualify for the practice pathway. Bierig Supp. Dec. ¶ 3. These facts are inconsistent with plaintiffs' conclusory allegations of disparagement. If defendants wanted to imply that dermatologists who do not complete an MDS fellowship are inferior, they would have excluded non-fellowship trained dermatologists from eligibility for

---

But context makes clear the quoted material refers to the "Advantages of Mohs Surgery" generally, and has nothing to do with whether the physician is fellowship-trained or not. *See* ECF No. 26-2 at 1.

[10] This is especially true of plaintiffs' allegation that ACMS has deceptively stated that Mohs Surgery is a "specialty." Am. Compl. ¶ 57. The Amended Complaint does not explain how such a statement, even if it were false (and it is not), would likely deceive consumers or result in injury.

sub-certification in MDS.

**VII.   PLAINTIFFS' REMAINING CLAIMS SHOULD BE DISMISSED.**

Plaintiffs' remaining claims are entirely derivative of their antitrust and FDUTPA claims. Civil Conspiracy, alleged in Count VI, is "not a freestanding tort," *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 764 F.3d 1327, 1339 (11th Cir. 2014). Counts VII and VIII simply seek specified procedural relief for the alleged violations in the previous Counts. Because these claims depend entirely on pleading of the claims discussed above, the Court should dismiss them as well. *See SFM Holdings,* 764 F.3d at 1339.

**CONCLUSION**

For these reasons, Defendants respectfully request that this Court dismiss plaintiffs' Amended Complaint in its entirety with prejudice.


Respectfully submitted,

By: */s/ Jack R. Bierig*

| | |
|---|---|
| Russell LaPeer | Jack R. Bierig |
| **LANDT, WIECHENS, LaPEER,** | Benjamin I. Friedman |
| **& AYRES LLP** | **SIDLEY AUSTIN LLP** |
| Florida Bar no. 200530 | One South Dearborn |
| 445 N.E. 8th Avenue | Chicago, Illinois 60603 |
| Ocala, Florida 34470 | Telephone No.  (312) 853-7000 |
| Telephone No.  (352) 732-8622 | Facsimile No.   (312) 853-7036 |
| Facsimilie No.  (352) 732-1162 | jbierig@sidley.com |
| rlapeer@aol.com & | benjamin.friedman@sidley.com |
| lawsec70@yahoo.com | |
| | Admitted *Pro Hac Vice* |
| | Dated:  September 24, 2018 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 24, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this case.

           _/s/ Jack R. Bierig_        
Jack R. Bierig
Benjamin I. Friedman
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, Illinois 60603
Telephone No.  (312) 853-7000
Facsimile No.  (312) 853-7036
jbierig@sidley.com
benjamin.friedman@sidley.com

Admitted _Pro Hac Vice_