IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Ocala, Florida

DAVID ALLYN, M.D., et al.,

Plaintiffs,                                        No.:  5:18-cv-355-Oc-30PRL

vs.

AMERICAN BOARD OF MEDICAL                 Response in Opposition to Defendants'
SPECIALTIES, INC., etc., et al.,                 Dispositive Motion to Dismiss the
                                                 Amended Complaint and Supporting
Defendants.                                      Memorandum of Law

_____/

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW

COME NOW Plaintiffs in the above-referenced matter, and file this Response in

Opposition to the Defendants' Dispositive Motion to Dismiss the Amended Complaint, stating:

BACKGROUND FACTS

1.      On July 11, 2018, Plaintiffs filed their original Verified Complaint [Doc. 1], which

was served on Defendants on July 18, 2018.  On August 22, 2018, Defendants filed a Motion to

Dismiss the Complaint [Doc. 21].   On September 10, 2018, Plaintiffs served and filed an

Amended Complaint [Doc. 26].  On September 24, 2018, Defendants served and filed a Motion

to Dismiss the Amended Complaint [Doc. 31].  This Response opposes it.  The separately filed

Declaration of David L. Allyn, M.D., is also being filed in support of this Response.

SUMMARY

2.      Plaintiffs request the Court to deny Defendants' Motion to Dismiss this case with

prejudice.  Plaintiffs have sufficiently alleged that their claims are ripe for adjudication;  have

sufficiently alleged antitrust standing and antitrust injury;  have sufficiently alleged a restraint of

trade under Section 1 of the Sherman Act and Section 542.18, Florida Statutes;  are not precluded

by the *Noerr-Pennington* doctrine because of the doctrine's commercial exception;  are not barred

by the statute of limitations;  have identified misleading and disparaging statements made by Defendants against Plaintiffs;  and should <u>not</u> have the rest of their claims dismissed.

LEGAL STANDARD

3.    To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This means that, from the facts alleged, the court can "draw the reasonable inference that defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Amended Complaint meets this standard.

ARGUMENT

Defendants claim that Plaintiffs' Amended Complaint should be dismissed because the claims are "unripe";  there is no alleged antitrust injury;  there is no plausible allegation of a restraint of trade under Section 1 of the Sherman Act and Section 542.18, Florida Statutes; the *Noerr-Pennington* doctrine and statute of limitations bar Plaintiffs' claims of anti-competitive lobbying;  and Plaintiffs did not sufficiently identify a statement showing Defendants disparaged Plaintiffs, as required by Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").

Plaintiffs wholly disagree and refute Defendants' Motion to Dismiss and state as follows. *First*, the Amended Complaint and Plaintiffs' claims are ripe for adjudication in order to prevent an antitrust injury from occurring in the near future.    *Second*, Plaintiffs sufficiently alleged antitrust standing and antitrust injury to assert their antitrust claims.    *Third,* Plaintiffs plausibly and sufficiently alleged a restraint of trade under Section 1 of the Sherman Act and Section 542.18, Florida Statutes.    *Fourth*, the *Noerr-Pennington* doctrine <u>does not</u> apply to Defendants' argument due to the "commercial exception."    *Fifth,* the statute of limitations <u>does not</u> bar Plaintiffs' claims as the injury is ongoing.    *Sixth*, Plaintiffs identified statements attributable to Defendants that disparage Plaintiffs and Plaintiffs do allege that the misleading statements harmed

-2-

them as well as others.  The remaining claims (Counts VI-VIII) <u>do not</u> rest entirely on Plaintiffs' antitrust and FDUTPA claims, and should also <u>not</u> be dismissed for the reasons stated below in support of Counts I-V.  Furthermore, the Declaration of David L. Allyn, M.D., being filed contemporaneously herewith and incorporated herein by reference, supports the above statements and factually refutes Defendants' arguments.

I.    <u>PLAINTIFFS' CLAIMS ARE RIPE FOR REVIEW</u>

Plaintiffs' Amended Complaint states that the conspiracy between ABMS, ABD, and the Unnamed Co-conspirators has been ongoing for many years, as early as 2001.  Am. Compl. ¶ 52. The claims are ripe for review due to the ongoing conduct of ABMS, ABD, and Unnamed Co-conspirators.  The claims are, in fact, "sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decision-making by the court." *Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997).

Plaintiffs ask this Court to review the creation of a Mohs Surgery (or micrographic dermatologic surgery, referred to herein as "Mohs Surgery") subcertification by Defendants as merely the latest act in Defendants' ongoing course of conduct, not as a single isolated event. (See, e.g., Declaration of David L. Allyn, M.D., filed contemporaneously herewith.)  Even if ABMS does not approve ABD's application for a subcertification, the ongoing conduct by Defendants in lobbying insurance companies, hospitals, and government agencies provides sufficient basis for an antitrust lawsuit, and the Amended Complaint has sufficiently alleged this.

Defendants' primary defense "unripeness" is that this suit is premature.  This argument is based entirely on ABMS's claim that it has not approved the ABD's subcertification application. The Court should disregard this argument for two practical and factual reasons.  First, ABMS almost universally accepts the COCERT's recommendations;  since COCERT voted in favor of subcertification on September 11, 2018, approval by the ABMS is almost a foregone conclusion.

Next, the ABMS decision is imminent.[1]  Dismissing this case based on a decision that is scheduled to occur mere days away would be a waste of the resources the parties and the Court has expended and only lead to the inevitable re-filing of the complaint; this Court could just as easily merely wait a few days and have the Parties make a report to it of the outcome on October 26, 2018.

Defendants' real argument should not be "unripeness"; it should actually be that the issue may soon be moot.  In fact, the "unripeness" argument itself may soon be moot because of action to be taken by the ABMS on October 26, 2018.  And, although the ABMS could deny the ABD's application, such action does not actually close the door on the legal issue.

Legal actions can avoid mootness challenges where they seek redress of conduct which is "capable of repetition yet evading review." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603 (1984).  "[J]urisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911).

The pending subcertification vote is not Defendants' first proverbial rodeo.  ABD has submitted at least two prior applications for subcertification which were either denied or withdrawn.  Experience tells us that if the ABMS miraculously does not follow COCERT's recommendation to approve ABD's application, then ABD will most assuredly try again, as it has done in the past.  To qualify for the "capable of repetition, yet evading review" exception, the claiming party need not show a demonstrated probability that the complained of conduct will reoccur; it only needs to show that there is a "reasonable expectation that it will be repeated." *See Honig v. Doe*, 484 U.S. 305, 318-19 (1988).  In this case, the Plaintiffs have a reasonable expectation.

---

[1]   The ABMS is scheduled to make a decision on the ABD's subcertification application on October 26, 2018, a few days after this Response in Opposition is filed.

Where a court is presented with illegal conduct, it is duty-bound to pass judgment on that conduct, even when the alleged perpetrators abandon it mid-suit.  *See United States v. Trans-Missouri Freight Assoc.*, 166 U.S. 290 (1897).  In *Trans-Missouri*, the dissolution of the offending trade association during the appeal process was held not to moot the case because the dissolution did not provide the relief sought by the injunction.  *Id.*  So, even if the ABMS were to deny subcertification, or the ABD were to withdraw its application, the underlying question of law would not be answered.  Plaintiffs seek and are entitled to a declaratory judgment on the illegality of the arrangement and, if warranted, an injunction against the ongoing conduct of the Defendants and through the future, whether or not there is another similar future subcertification application.

Moreover, injunctive relief is intended to prohibit precisely the type of action Defendants' have taken in the past and are continuing.  The Amended Complaint clearly and precisely alleges a continuing course of conduct by, between and among Defendants and the Unnamed Coconspirators, whereby they have worked in concert with one another to erect an artificial barrier to the performance of Mohs Surgery now and in the future.  (*See, also*, Declaration of David L. Allyn, M.D., filed contemporaneously herewith and incorporated by reference.)

While Defendants are quick to point out that there is a "grandfathering" process available, that path is, in fact, limited to ABD.  Defendants have pointed to a letter from ABD to the American Board of Otolaryngology-Head and Neck Surgery ("ABOHNS") and the American Board of Plastic Surgery ("ABPS") dated July 17, 2018,[2] which states that ABD, "would like to provide the opportunity for the ABOHNS and ABPS to be included as Qualifying Boards <u>after</u> the

---

[2]     This letter [Doc. 32-2], prepared shortly after this lawsuit was filed, is a transparent attempt by the Defendants to scuttle this suit without actually taking any formal action to eliminate their monopolistic activities.  The Defendants mischaracterize the letter as an action by ABD to eliminate the monopolistic harm of Defendants' actions;  however, ABD's letter on its face, takes no action and shows no action is being taken by ABD.  It is an illusory, unenforceable promise to "work with" two other medical specialty boards.

MDS subspecialty certificate is approved by ABMS." ABD's letter goes on to state:

> "It is our understanding that adding Qualifying
> Boards to an established subspecialty will need to go
> through the vetting process of COCERT followed by
> approval by the ABMS board of directors and as
> such will require the three MB's [medical boards]
> file an application with details about the process."

[Doc. 32-2.] This means that ABD's application still excludes the ABOHNS and the ABPS from certifying its diplomates from becoming certified in Mohs Surgery.

In addition, the "grandfathering" pathway does not really resolve anything in terms of the anti-competitive nature of Defendants' actions. Defendants are engaged in the "long con" when it comes to this matter. Giving up something in the short term, to accomplish their anti-competitive goals in the long term. As stated numerous places in the Amended Complaint, the establishment of the subcertification is only one step or one action to accomplish the goal of monopolization.

Once the subcertification is in place, Defendants and the Unnamed Coconspirators will then continue the conspiracy to its logical conclusion, with limitations on reimbursement and restrictions on where and by whom Mohs procedures can be performed. After all, Defendants have already successfully limited reimbursement for Mohs Surgery with public and private payors including the Veterans Administration, Medicare, Medicaid, Tricare, and those private insurers who manage public and private health plans (*e.g.*, Humana, United, etc.).

Where a complaint alleges considerably more than the "natural consequences" of actions between competitors, injunction is appropriate. *See United States v. Hamilton Glass Co.*, 155 F. Supp. 878, 885 (N.D. Ill. Sept. 30, 1957). In this case, the Plaintiffs' Amended Complaint alleges considerably more than "natural consequences." Just as the producers of glass and their union laborers did in *Hamilton*, the Mohs Surgery fellowship trained members of the ABD are looking

to close the market to other physicians, and should be enjoined by this Court from doing so.

II.     PLAINTIFFS POSSESS STANDING TO ASSERT THEIR ANTITRUST CLAIMS

Antitrust standing analysis has two aspects.  The first is "whether the plaintiff suffered an 'antitrust injury'."  *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1448 (11th Cir. 1991). The second is whether Plaintiffs are "efficient enforcer[s] of the antitrust laws."  *Id.*  The Amended Complaint avers an antitrust injury to the skin cancer treatment market.  In addition, it establishes that Plaintiffs are efficient enforcers of the antitrust laws.

A.     Plaintiffs' Amended Complaint Alleged an "Antitrust Injury."

In order to plead claims under 15 U.S.C. §§ 1 and 2, Plaintiffs must allege they suffered an "antitrust injury."  An antitrust injury is an "injury of the type the antitrust laws were intended to prevent."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  The Supreme Court explained in *Brunswick*, 429 U.S. at 488, the injury must be to a market, not to one person or a group.  *Association of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, No. 14-CV-02705, 2017 WL 6821094, at *6 (N.D. Ill. Dec. 13, 2017).  In the present case, Plaintiffs' Amended Complaint clearly pleads and defines an injury to the market.

In pages 31 through 33 of the Amended Complaint, Plaintiffs describe an injury to the skin cancer treatment market.  *See, e.g.,* Am. Compl. ¶ 136 ("The creation of a  subspecialty reduces the available providers of  by approximately 92.6% of the original service provider market size."); *id.,* ¶ 140 ("The conduct of the Defendants and Unnamed Co-conspirators will decrease the availability of  in the market.");  *id.* ¶ 143 ("The conduct of the Defendants and Unnamed Co-conspirators constitutes a horizontal agreement to fix prices and to divide the market.");  *id.* ¶ 144 ("The conduct of the Defendants and Unnamed Co-conspirators constitutes an attempt to monopolize the service market and the geographic market.").

These statements allege an injury to the market by Defendants' continuing conspiracy and

actions to reduce and restrict the provider market for.

Although Plaintiffs have performed and been paid for performing Mohs Surgery procedures in the past, the primary concern of the Amended Complaint is that Plaintiffs, as well as all the physicians they represent as a class, will no longer be included in this market, thereby resulting in an artificial reduction of Mohs Surgery providers in the skin cancer market. Defendants make much of the statements in the Amended Complaint relating the economic effects of their illegal behavior to Plaintiffs' bottom lines. However, those allegations are merely meant as examples and to be indicative of the harmful effects that will be felt across the entire skin cancer surgery market.

"The Sherman Act directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). Antitrust laws are geared toward the goal of safeguarding the benefits that consumers derive from a competitive market. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013). An antitrust plaintiff can only recover if its injury stems from competition-reducing aspects of the defendant's behavior. *Elliot Indus. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124-25 (10th Cir. 2005).

Reduction in market size is clearly evidentiary of an antitrust injury. The injury being alleged is not only to Plaintiffs' incomes but the reduction in the availability of to the skin cancer market. The Sherman Act is concerned with conduct that has long run anti-competitive effects that tend to create or threaten to create substantial and persistent changes in the marketplace. *In re AOL, Inc. Version 5.0 Software Litig.*, 168 F. Supp. 2d 1359, 1375-76 (S.D. Fla. Apr. 19, 2001); *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683, 697 (10th Cir. 1989).

Defendants intend that the Mohs Surgery subcertification is permanent. Therefore, its effect on the market for skin cancer surgery is *per se* long term. The subcertification is also a significant departure from the current market standard which presently requires no

subcertification. Those physicians who have been providing Mohs Surgery services for many years will be effectively locked out of the procedure in the future for no other reason than the creation of the subcertification.

Lastly, Plaintiffs address Defendants' allegations that the instant case is analogous to *Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247 (7th. Cir. 1994) and *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005). While both *Sanjuan* and *Daniel* dealt with alleged antitrust violations stemming from certifications, the cases are inapposite to the one at bar. The Amended Complaint charges Defendants with crating a certification for a single procedure, not a body of medicine. The distinction cannot be overstated. Defendants even admit as much by saying that they welcome to the fold such diverse practitioners as ophthalmologists, dermatologists, otolaryngologists, and maybe others should they meet some as-yet unspecified criteria. The fact is, Mohs Surgery is a lucrative procedure in surgical terms. Defendants seek to corner that market and exclude the wide body of surgeons that are capable to perform it, but who do not meet their artificial criteria. The practical effect is a reduction in market size through a restraint on trade.

*Sanjuan* attacked the administration of an oral examination on the grounds that it interfered with foreign-educated physicians' ability to earn certification and thus command higher salaries. *Sanjuan*, 40 F.3d at 251. Defendants attempt to reframe the Amended Complaint as one where Plaintiffs' damages are merely their lost income, as opposed to damage to the skin cancer surgery market as a whole. [Doc. 31, p. 14]. Unfortunately, Defendants argument fails for several reasons. First, as the Southern District of New York pointed out in *Papay v. Haselhuhn*, the *Sanjaun* plaintiffs did not allege an antitrust injury because "the claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws, which were designed to drive producers' prices down rather than up. . . ." *Papay v. Haselhuhn*, 2010 U.S. Dist. LEXIS

112272 *10 (S.D.N.Y. Oct. 21, 2010).   Second, the *Sanjuan* plaintiffs attacked a part of the certification process, not the entire certification itself.  *Sanjuan*, 40 F.3d at 251.

Here, Plaintiffs do not complain of conduct that will put them at a disadvantage because they will not be able to charge as much for their services.  Rather, Plaintiffs complain that they will not be able to charge for their services *at all*.  As explained at length in the Amended Complaint, a lack of certification in Mohs Surgery will shut them out of the market entirely, not merely force them to command commensurately lower salaries like the *Sanjuan* and *Daniel* plaintiffs.  Plaintiffs' case is more like *N.C. State Bd. of Dental Exam'rs v. FTC,* 135 S.Ct. 1101, 1111 (2015) (discussed in Section III below).   In the present case there is a group of market participants, specifically the Defendants and the Unnamed Coconspirators, seeking to self-regulate and exclude others from the market for a single service.  Here, that service is Mohs Surgery.  In *N.C. State Bd. of Dental Exam'rs* the service was teeth whitening.

*Daniel* is also distinguishable for largely the same reasons *Sanjuan* is.  Additionally, the cases are distinguishable in the manner in which Plaintiffs defined the market.  Here, Plaintiffs defined the market as Mohs Surgery, a single surgical procedure.  *Daniel*, by contrast, defined the market as board certified emergency medicine physicians.  Obviously, an entire medical specialty is far more broad than a single surgical procedure for skin cancer.

More obvious, Plaintiffs are not asking to break into the cartel as the *Daniel* plaintiffs wanted.   In *Daniel*, the plaintiffs alleged that the certification board eliminated a previously available path to certification and the path's elimination was done in an effort to shore up and limit competition.  *Daniel*, 428 F.3d at 438.  The *Daniel* plaintiffs wanted the previously closed path to be reopened to them so they could then be certified and command the same super-premium salaries the certified physicians could.  *Id.*  As the Second Circuit aptly pointed out, the *Daniel* plaintiffs were of the mind set that if you can't beat them, join them.  *Id.* at 440 (stating

"[P]laintiffs cannot themselves state an antitrust injury when their purpose os to join the cartel rather than disband it.").

Here, Plaintiffs are looking to do the exact opposite of what the *Daniel* plaintiffs requested.  In the present case, Plaintiffs do no ask to or want to join the cartel;  they want to stop it before it spread even more.  Perhaps *Sanjuan* and *Daniel* would be of more use to Defendants if the plaintiffs in those cases were unable to practice medicine at all without a board certification. Indeed, Defendants even argued in their brief that ABMS certification are not a prerequisite to medical licensure.  The Mohs Surgery subcertification, in contrast and despite Defendants' wild and unsubstantiated claims, will have the practical effect of limiting the licenses, hospital credentials, health insurance panel membership, and available payment.

B.   Plaintiffs Are Best Suited to Enforce the Claims Alleged in the Amended Complaint.

In addition to the showing of an antitrust injury, Plaintiffs must show that they "can most efficiently vindicate the purposes of antitrust laws." *Todorov,* 921 F.2d at 1449.  Courts determine whether plaintiffs are "efficient enforcers" of antitrust law by looking to the directness or remoteness of plaintiffs' injury and the certainty of damages.  *Id.*  The Plaintiffs in the present case possess antitrust standing in both areas.

Section 4 of the Clayton Act broadly states that "any person who shall be injured . . . by reason of anything forbidden in the antitrust laws may sue." 15 U.S.C. § 15(a).  However, federal courts have not interpreted section 4 as literally as the language suggests.  In *Associated General Contractors v. Cal. State Council of Carpenters*, the U.S. Supreme Court determined that when analyzing antitrust standing federal courts must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated General Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983).  Plaintiffs are

-11-

participants in the market Defendants' conduct will injure, skin cancer surgery and, specifically, Mohs Surgery.  Plaintiffs stand to lose a substantial amount of business if Defendants' constant attempts to reduce the availability of in the skin cancer market reach their ultimate goal.  The relationship is direct, and the nexus is clear.  Defendants seek to limit access to a market that, left unrestricted, would permit widespread competition and lower prices through choice of provider. Defendants and Unnamed Coconspirators are acting to limit competition and exclude Plaintiffs (and other similarly situated physicians) from providing  to the skin cancer market.  Relatedly, Defendants' actions will harm the general public by reducing choice.

As alleged, Plaintiffs will suffer damages from the continuing conduct of Defendants, including approval of the Mohs Surgery certification, because insurers and payers will stop paying non-certified Mohs Surgery providers for the procedures.  Hospitals, ambulatory surgery centers, and health care institutions (such as the VA), will not allow physicians who are not certified in Mohs Surgery to perform Mohs Surgery procedures on their premises and will not reimburse them for Mohs Surgery procedures they perform off-premises in their offices.  Therefore, due to the directness of Defendants' conduct resulting in Plaintiffs' injury, and the certainty that Plaintiffs and the market in which they are participants will suffer additional damages because of Defendants' conduct, <u>Plaintiffs are efficient enforcers for this antitrust lawsuit</u>.

III.    <u>PLAINTIFFS ALLEGED THE CREATION OF THE MOHS SURGERY SUBSPECIALTY WOULD CONSTITUTE A RESTRAINT OF TRADE</u>

Defendants claim that Plaintiffs have not alleged that the creation of the Mohs Surgery subspecialty certification would constitute a restraint of trade or commerce (ignoring the fact that Plaintiffs have alleged a long-continuing course of conduct and actions taken to monopolize the trade).  However, to the contrary, Plaintiffs state in paragraph 76 of the Amended Complaint:

> The plan to create a Mohs Surgery subspecialty, as
> proposed by Defendant ABD and to be acted on by

> Defendant ABMS, is not the beginning of the
> wrongful conduct for which this suit is brought, nor
> does it stand alone; however, it is one of the
> significant acts of the Defendants in furtherance of
> their conspiracy, and one of the continuing actions in
> restraint of trade and to monopolize the market for
> [Mohs Surgery].

*See* Am. Compl. ¶ 76.

Defendants point to *Schachar v. American Academy of Ophthalmology, Inc.* as the basis to dismiss the Amended Complaint.  In *Schachar*, a group of ophthalmologists sued the American Academy of Ophthalmology, Inc. ("AAO"), for restraint of trade and violations of the Sherman Act, because the AAO issued a press release urging patients, ophthalmologists, and hospitals to approach a procedure called radial keratotomy with caution until additional research was completed.  Schachar and a group of ophthalmologists sued because they believed this to be a restraint of trade and a violation of the Sherman Act.

However, the present case is distinctly different.  Defendants attempt to equate the *Shachar* statement of caution about a particular procedure with the affirmative act of creating an entire subspecialty certification.  The Court should not be swayed by such a false equivalency.  In *Shachar*, the AAO urged patients to wait for more evidence regarding the safety and efficacy of a new procedure, radial keratotomy.  The AAO's position on radial keratotomy is a classic exercise of the organization's first amendment right to commercial speech.

Here, however, the ABMS and ABD are not exercising their right to free speech.  They are pushing for an actual certification that will limit patients' reasonable access to Mohs Surgery procedures.  If Defendants issued a statement that urged patients, insurers, hospitals, etc. to only allow Mohs fellowship-trained surgeons to perform Mohs Surgery, then perhaps *Shachar* would be more relevant.

In *Schachar*, patients were urged to wait, not <u>forced </u>to wait.  The ABMS and ABD are not

urging patients to avoid Mohs Surgery.  Instead they are conspiring with facilities and public and private insurance payers, to create a certification scheme where they will not reimburse Mohs Surgery providers, or not allow them to perform the procedure at their facility, unless the providers first obtain a certification with ABD.  That conduct is the naked establishment of a cartel over the skin cancer surgery market.  By reducing the number payers that will reimburse non-certified providers of Mohs Surgery, ABMS and ABD will reduce the number of providers for Mohs Surgery and consolidate market power in their diplomates.

ABMS and ABD issue certifications that hospitals, insurers, state medical societies, state medical licensing boards, and other persons who might be able to govern the performance of medicine rely on to determine whether to credential or reimburse a physician for certain procedures and practices.  ABMS's and ABD's certifications are essentially the keys to the kingdom for dermatologists to be able to receive compensation for their services.  The notion that these boards only issue certifications in order to inform the general public of a physician's qualifications is facile.

Hospitals will not credential physicians who are not board certified in the area of medicine the physicians desire to practice.  Insurance companies will not reimburse procedures performed by a physician who is not board certified to perform that procedure.  These certifications are not simply informational.  They impact the provider market on a one-to-one basis by limiting a physician's ability to be credentialed at a hospital or to be reimbursed by an insurance company.

In further support of its position that certifications are merely information rather than material to the operation of a given market, Defendants cite *Peel v. Attorney Registration & Disciplinary Commission of Illinois*, which stated:

> Board certification of specialists in various branches
> of medicine, handled by the 23 member boards of
> the American Board of Medical Specialties, is based

-14-

> on various requirements of education, residency, examinations and evaluations . . . . The average member of the public does not know or necessarily understand these requirements, but board certification nevertheless has come to be regarded as evidence of skill and proficiency of those to whom they [have] been issued.

*Peel v. Attorney Registration & Disciplinary Commission of Illinois*, 496 US 91, 102 n.11 (1990).

Unlike *Peel*, the present case does not concern statements to the general public or the application of a medical specialty certification.  The present case differs in two material respects. First, the subject is the certification for a single procedure, not a body of medicine like every case cited by Defendants.  Second, the antitrust violation alleged in the Amended Complaint is not the general difficulties an uncertified physician would have in the wider medical services marketplace. Rather, the issue is the ability to perform a single procedure that is not reserved to one specialty and how the certification would effect a physician's ability to contract with hospitals, surgery centers, private insurance companies, government agencies such as the Veteran's Administration, Medicare, and Medicaid.

Defendants actually seek to create an entirely new niche market and reserve participation therein to an artificially select few.  Defendants are not some fringe hangers-on in the health care market, resigned to lurk at its borders.  Defendants are the gatekeepers.  They decide who gets the best jobs;  who is credentialed with the best paying insurance companies;  and who gets to be on the medical staff at local hospitals.  Defendants cannot honestly or credibly deny that the health care market directly responds when they create a new certification by adopting that certification as a prerequisite to reimbursement or credentialing.

Simply put, Defendants are active market participants, not merely an informational body politic as they would have the Court believe.  "Active market participants cannot be allowed to regulate their own markets free from antitrust accountability."  *N.C. State Bd. of Dental Exam'rs*

-15-

*v. FTC,* 135 S.Ct. 1101, 1111 (2015).  The truth of the matter is that Defendants do not seek to establish a subcertification for altruistic purposes.  The goal is to protect their own pecuniary interests and secure higher reimbursement in terms of raw dollars and number of cases, by reserving the Mohs procedure to their diplomates only.

The facts of *N.C. State Board of Dental Examiners* are much more applicable to this case than the facts in *Peel*.  In *Peel*, an attorney challenged a state supreme court decision publicly censuring him because his letterhead stated that he was certified as a civil trial specialist by the National Board of Trial Advocacy.  Based on the standards applicable to commercial speech, the Supreme Court found that the attorney's conduct was not misleading and was protected by the First Amendment of the U.S. Constitution.  The present case does not concern itself with advertising or protecting commercial speech.

In *N.C. State Board of Dental Examiners*, "the Federal Trade Commission (FTC) filed an administrative complaint, alleging that the Board's concerted action to exclude non-dentists from the market for teeth whitening services in North Carolina constituted an anticompetitive and unfair method of competition under the Federal Trade Commission Act."  *N.C. State Bd. of Dental Exam'rs v. FTC,* 135 S.Ct. 1101, 1104 (2015).  One of the primary reasons that the Supreme Court upheld the Administrative Law Judge's decision in that case was because, "a wealth of evidence . . . suggesting that non-dentist provided teeth whitening is a safe cosmetic procedure." *N.C. State Bd. of Dental Exam'rs v. FTC,* 135 S.Ct. 1101, 1109 (2015).

The notion that a certification in Mohs Surgery will somehow be of actual value to inform the public that a certified Mohs Surgery provider is safer or better than a non-certified Mohs provider is false.

Just as was the case in *N.C. State Board of Dental Examiners* pertaining to teeth whitening, the Mohs Surgery certification is limited to a single procedure.  It can be inferred that the intent

-16-

behind the certification is to restrain other Mohs Surgery providers from being able to continue providing Mohs Surgery.

This analysis also applies to Section 542.18, Florida Statutes. Therefore, Plaintiffs have sufficiently alleged a restraint of trade for both the Sherman Act and Florida's state antitrust laws.

IV.   THE COMMERCIAL EXCEPTION TO THE *NOERR-PENNINGTON* DOCTRINE DOES NOT BAR PLAINTIFF'S CLAIMS BASED ON LOBBYING

Generally, "[c]oncerted efforts to restrain or monopolize trade by petitioning government officials are protected from antitrust liability under the doctrine established by *Noerr*." *United Mine Workers v. Pennington*, 381 U.S. 657, 669 (1965). Defendants rely on the *Noerr-Pennington* doctrine as a shield for their lobbying of healthcare agencies, the American Medical Association, the Veterans Administration (VA), and the Centers for Medicare and Medicaid Services ("CMS"). Despite the fact that the *Noerr-Pennington* doctrine is based on the First Amendment of the U.S. Constitution, the Supreme Court has carved out an exception where the *Noerr-Pennington* doctrine does not apply.

In *Allied Tube & Conduit Corp. v. Indian Head*, the Supreme Court stated: "[t]he scope of this protection depends, however, on the source, context, and nature of the anticompetitive restraint at issue." *Allied Tube & Conduit Corp., v. Indian Head*, 486 U.S. 492, 499 (1988). *Allied Tube* was a case between a manufacturer of plastic conduit and the Nation's largest producer of steel conduit. In that case, the National Fire Protection Association ("NFPA") was determining whether to add polyvinyl chloride ("PVC") conduit as an approved type of electrical conduit in the National Electrical Code ("the Code"), which establishes product and performance requirements for the design and installation of electrical wiring systems. According to the Supreme Court: "the Code is the most influential electrical code in the nation." *Allied Tube*, 486 U.S. at 495. The manufacturers of steel conduit and other interested parties agreed among

themselves to recruit numerous individuals to join the NFPA and organize those individuals into a voting bloc that voted against the proposal to include PVC in the Code.  The manufacturers of plastic conduit brought an antitrust suit against the manufacturers of steel conduit claiming restraint of trade and violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The U.S. District Court for the Southern District of New York concluded that the action was protected by the *Noerr-Pennington* doctrine because the NFPA was akin to a legislature and the interests had genuinely sought, through acceptable political methods, to influence the NFPA and thereby influence the government entities which adopt the Code.  The United States Court of Appeals for the Second Circuit, vacating the District Court's judgment and remanding with instructions to reinstate the jury's award, declined to extend the *Noerr-Pennington* doctrine to (1) the lobbying of private "quasi-legislative" bodies or (2) efforts to indirectly influence government action through such bodies.  The Supreme Court affirmed on certiorari.

The Supreme Court held that the conduct of the steel conduit interests, despite its political impact, was not immune from federal antitrust liability under the *Noerr-Pennington* doctrine, since (1) as to the immunity accorded those who merely urge the government to restrain trade, the NFPA--being (a) without official authority, (b) unaccountable to the public, and (c) composed in part of persons having economic incentives to restrain trade--could not be treated as a "quasi-legislative" body simply because legislatures routinely adopt the NEC; and (2) as to the immunity afforded to private restraints which are incidental to a valid effort to influence governmental action, an economically interested party, exercising decision-making authority in formulating a product standard for a private association that comprises market participants, enjoys no *Noerr-Pennington* immunity from any antitrust liability flowing from the effect the standard has of its own force in the marketplace.  In addition, the Supreme Court stated: "Unlike the publicity campaign in *Noerr*, the activity at issue here did not take place in the open political

-18-

arena, where partisanship is the hallmark of decisionmaking [sic], but within the confines of a private standard-setting process." *Allied Tube*, 486 U.S. at 506.

Similarly, in the present case, Defendants stand to profit from the creation of the Mohs Surgery subcertification due to the application fees and testing fees associated with subcertification. Also, trade and standard-setting associations are routinely treated as continuing conspiracies of the members. *Allied Tube*, 486 U.S. at 500 (citing 7 P. Areeda, Antitrust Law P1477, p. 343 (1986)). Applying that reasoning forward, not only do the Defendants directly benefit from fees, but as a "continuing conspiracy of their members" they benefit through the advancement of the careers and economic and market share of their constituent diplomates.

The ABMS is an economically interested party, exercising decision-making authority in formulating a product standard for ABD, a private association that comprises dermatologists who are market participants. In addition, Defendants' lobbying did not take place in the open political arena, but within the confines of a private standard-setting process and, presumably, closed-door or off the record meetings. Therefore, ABMS and ABD are not shielded by *Noerr-Pennington* immunity for antitrust litigation.

V.     THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS

In their Motion to Dismiss the Amended Complaint, Defendants cited allegations in Plaintiffs' Amended Complaint that speak to ongoing and continuous conduct by Defendants. Defendants' position is that the four (4) year statute of limitations on antitrust claims should bar claims based on those allegations. 15 U.S.C. § 15(b). However, these allegations are used to illustrate how Defendants have been engaging in antitrust conduct that is now culminating in the creation of a Mohs Surgery subcertification.

In addition, the allegations cited clarify how ABMS, ABD, and Unnamed Co-conspirators have been engaging in this antitrust conduct continuously. In *Omni Healthcare Inc. v. Health*

*First, Inc.*, the Middle District of Florida "agreed with plaintiff's assertion that it was entitled to recover damages caused by the defendants' continuation of the alleged monopoly and conspiracy that such actions should be treated 'as a continuing series of acts upon which successive causes of action may accrue.'" *Omni Healthcare Inc. v. Health First, Inc.*, No. 6:13-cv-1509-Orl-37DAB, 2016 U.S. Dist. LEXIS 107277, at *32 and 33 (M.D. Fla. Aug. 13, 2016) (quoting *Poster Exchange, Inc. v. National Screen Service Corporation*, 517 F.2d 117, 124-125 (5th Cir. 1975)). The court concluded that, "the plaintiff's complaint was 'based on continuing antitrust behavior, not merely the continuing damage it feels from a single day's monopoly and refusal to deal' outside the limitations period." Omni Healthcare Inc., U.S. Dist. LEXIS 107277 at *33 (quoting *Poster Exchange, Inc. v. National Screen Service Corporation*, 517 F.2d 117, 125 (5th Cir. 1975)). The court also concluded that, "binding authority 'la[id] to rest the theory that . . . suit upon a continued antitrust violation must be prosecuted from the first act of illegality (plus, of course, any period during which the limitations period was tolled.)'" *Omni Healthcare Inc.*, U.S. Dist. LEXIS 107277 at *33 (quoting *Poster Exchange*, 517 F.2d at 126).

In the present case, Plaintiffs have relied on this court's interpretation as stated in *Omni Healthcare Inc.* The allegations that Defendants have cited in their Motion to Dismiss the Amended complaint are evidentiary of the fact that the conspiracy to restrict the skin cancer market from having access to Mohs Surgery procedures has been ongoing and continuous. Therefore, those claims, as per *Omni Healthcare Inc.* should not be barred by this Court.

VI.    PLAINTIFFS' FDUTPA CLAIM SHOULD NOT BE DISMISSED.

Defendants' claim that Plaintiffs' Amended Complaint does not identify a single statement that is attributable to Defendants is inconsistent with what has been alleged in the Amended Complaint. Paragraph 59 of the Amended Complaint states:

These  same  deceptive  and  misleading  statements

-20-

> have been made by Defendant ABD and Unnamed
> Co-conspirators in support of their application to
> ABMS for a Mohs Surgery subspecialty.
> Specifically, they are contained in an article written
> by Unnamed Co-conspirator Dr. Coldiron attached
> to the ABD's application.

Am. Compl. ¶ 59.

By including these statements in their application, ABD is proffering those statements as if they were made by ABD itself.  ABD is endorsing those statements to ABMS by including them in ABD's application for a Mohs Surgery subcertification.

The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Molina v. Aurora Loan Servs.*, LLC, 635 F. App'x 618, 626 (11th Cir. 2015) (quoting Fla. Stat. § 501.204(1)).  Stating a claim under the FDUTPA requires the plaintiff to "allege (1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." *Dolphin LLC v. WCI Communities, Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013) (citing *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006)).

The statements made by Unnamed Co-conspirators and adopted by ABD through its Mohs Surgery subcertification application qualify as a deceptive and unfair trade practice, since they disparage the skills and abilities of non-fellowship trained dermatologists.  These statements have caused Plaintiffs damages in the form of lost business and, therefore, lost profits.

VII.   PLAINTIFFS' REMAINING CLAIMS SHOULD NOT BE DISMISSED.

Plaintiffs' remaining claims for civil conspiracy, request for declaratory judgment, and request for injunctive relief continue to have merit.

Plaintiffs' claim for civil conspiracy has been sufficiently alleged and is supported by Defendants' agreement to engage in ongoing antitrust conduct of lobbying insurance companies,

hospitals, and government agencies to not credential or reimburse non-certified Mohs Surgery providers. *Haskin v. R.J Reynolds Tobacco Co.*, 995 F. Supp. 1437 (M.D. Fla. 1998).

Plaintiffs' request for declaratory judgment has been sufficiently alleged since Plaintiffs have alleged facts from which it appears there is a substantial likelihood that they will suffer injury in the future. *GE Capital Corp. v. Estate of Nunziata*, No. 8:12-cv-00100-T-27MAP, 2012 U.S. Dist. LEXIS 63395 (M.D. Fla. May 3, 2012).

Plaintiffs' request for injunctive relief has been sufficiently alleged since Plaintiffs have demonstrated that there is a showing of a real and immediate threat that the Plaintiffs will be wronged by the creation of a Mohs Surgery subspecialty. *Wales v. Jack M. Berry, Inc.*, 192 F. Supp. 2d 1291 (M.D. Fla. 2000).

## CONCLUSION

The Court should remember the fact that the facts and acts stated in the Amended Complaint allege a continuing course of conduct, most recently including the pending ABD application. As the ABD's application is worded, even Dr. Frederick Mohs, a general surgeon and the inventor of Mohs Surgery, would not be allowed to apply for or become certified in the subspecialty. He, himself, would be shut out of the market.

## RELIEF REQUESTED

For the reasons stated above, Plaintiffs respectfully request that this Court not dismiss Plaintiffs' Amended Complaint. If the Court dismisses the Amended Complaint, it is respectfully requested that the Court do so without prejudice and grant Plaintiffs permission to file another amended complaint to correct any deficiencies the Court finds.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have filed this document electronically with the Clerk of Court via the CM/ECF System, which automatically serves all counsel of record; and I have also

served it via e-mail on Jack R. Bierig, Esquire, Sidley Austin, LLP (Counsel for Defendants), One

South Dearborn, Chicago, Illinois 60603, e-mail: JBierig@Sidley.com and E-filing@Sidley.com;

Benjamin I. Friedman, Esquire, Sidley Austin, LLP (Counsel for Defendants),

Benjamin.Friedman@Sidley.com; and Russell W. LaPeer, Landt Wiechens, et al. (Local Counsel

for Defendants), RLapeer@aol.com, and LawSec70@yahoo.com;  on this 19th day of October

2018.

/s/  George F. Indest III

_____
GEORGE F. INDEST III, J.D., M.P.A., LL.M.
Florida Bar No.:  382426
Primary e-mail:  GIndest@TheHealthLawFirm.com
Secondary e-mail:  CourtFilings@TheHealthLawFirm.com
TRIAL COUNSEL/LEAD ATTORNEY
ATTORNEY TO BE NOTICED
CAROLE C. SCHRIEFER, R.N., J.D.
Florida Bar No.:  835293
Primary e-mail:  CSchriefer@TheHealthLawFirm.com
Secondary e-mail:  CourtFilings@TheHealthLawFirm.com
TRIAL COUNSEL/LEAD ATTORNEY
ATTORNEY TO BE NOTICED
LANCE O. LEIDER, J.D., LL.M.
Florida Bar No.:  96408
Primary e-mail:  LLeider@TheHealthLawFirm.com
Secondary e-mail:  CourtFilings@TheHealthLawFirm.com
TRIAL COUNSEL/LEAD ATTORNEY
ATTORNEY TO BE NOTICED
THE HEALTH LAW FIRM
1101 Douglas Avenue
Altamonte Springs, Florida 32714
Telephone:  (407) 331-6620
Telefax:  (407) 331-3030
ATTORNEYS FOR PLAINTIFFS

GFI/AAA/se
S:\001-1699\002\002-ABMS Antitrust Suit\410-Pleadings-Drafts & Finals\Response to MTD Am Compl-7.wpd