UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

DAVID ALLYN, *et al.*

    Plaintiffs,

v.

AMERICAN BOARD OF MEDICAL
SPECIALTIES, INC., *et al.*

    Defendants.

Case no. 5:18-cv-00355-JSM-PRL

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
DISPOSITIVE MOTION TO DISMISS THE AMENDED COMPLAINT**

Russell LaPeer
**LANDT, WIECHENS, LaPEER,
& AYRES LLP**
Florida Bar no. 200530
445 N.E. 8th Avenue
Ocala, Florida 34470
Telephone No.  (352) 732-8622
Facsimilie No.  (352) 732-1162
rlapeer@aol.com &
lawsec70@yahoo.com

Jack R. Bierig
Benjamin I. Friedman
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, Illinois 60603
Telephone No.  (312) 853-7000
Facsimile No.  (312) 853-7036
jbierig@sidley.com
benjamin.friedman@sidley.com

Admitted *Pro Hac Vice*

# INTRODUCTION

Defendants American Board of Medical Specialties ("ABMS") and American Board of Dermatology ("ABD") have moved to dismiss plaintiffs' Amended Complaint because plaintiffs' claims are not ripe for adjudication and because those claims, in any event, fail to state a cause of action. (Dkt. 31.) In response, plaintiffs suggest that, although their claims may not yet be ripe, they ought to be ripe soon. They also cite cases—both on jurisdiction and on the merits—that have nothing to do with the issues presented here.

Notwithstanding all of the needless complexity that plaintiffs attempt to introduce, this case is straightforward. An Article III Court's jurisdiction is limited to adjudicating actual controversies, but plaintiffs' antitrust claims are based on harms that have not occurred and may well never occur. Those asserted harms depend on future decisions of third parties over whom defendants have no control and which there is no reason to believe will ever occur. And because a case or controversy must exist at the time of filing, the prospect that some day there may be a controversy cannot cure the lack of ripeness when the case was brought. Even if the harms *had* occurred at the time of filing, the Amended Complaint would still fail to state a claim upon which relief could be granted because the challenged conduct involves nothing more than the provision of information to decision-makers. Finally, plaintiffs' Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claims fail because plaintiffs still have not identified a single deceptive statement by ABMS or ABD.

1

# ARGUMENT

## I. Speculation That a Justiciable Controversy May One Day Arise Cannot Substitute for an Article III Case or Controversy At the Time of Filing.

Plaintiffs acknowledge that the asserted harms that form the centerpiece of their Complaint had not occurred when they filed their complaint. ABMS had not approved ABD's application to offer a subspecialty certificate in Micrographic Dermatologic Surgery ("MDS"); no hospital had made any adverse credentialing decisions based on plaintiffs' lack of a non-existent MDS certification; and no payor had declined to pay for any services provided by plaintiffs based on their lack of a non-existent MDS certification. (*See* Dkt. 43 at 3-4 (acknowledging that ABMS decision had not been made).) But in plaintiffs' erroneous view, none of that matters. They say they are entitled to a decision "on the illegality of the arrangement" even if ABMS "were to deny subcertification" (*id.* at 5), and thus even if no hospital or payor ever decided to make any decisions based on an MDS certification. In other words, plaintiffs insist that they can invoke the jurisdiction of an Article III Court to give an advisory opinion on whether they *would* have a claim under the antitrust laws if indeed someday they were harmed by downstream consequences of a potential MDS certification.

That is not how Article III's case-or-controversy requirement works however. Instead, a justiciable controversy must exist at the time of the complaint. *See, e.g.*, *Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409, 414–15 (11th Cir. 1995). As the Supreme Court has explained, the inquiry focuses "on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (emphasis added). Speculation that a plaintiff may one day suffer an actual injury cannot support the exercise of the federal judicial power.

2

Thus, for example, the Eleventh Circuit held that there was no justiciable controversy in the *Atlanta Gas Light* case because, at the time that suit was filed, there were "many material facts dependent upon future contingencies," and it was not clear that the defendant insurance companies would actually deny coverage to the plaintiff. *See* 68 F.3d at 414–15. The plaintiff's concerns about the denial of coverage may well have been "well-founded" in light of the insurer-defendants' "dealings with other insureds," but "speculation based on the insurance companies' dealings with other insureds does not present a concrete case or controversy." *Id.* at 415. Here, plaintiffs propose a self-styled "practical," wait-and-see-if-the-challenged-conduct-occurs approach. (Dkt. 43 at 3.) However, that approach was squarely rejected by the Eleventh Circuit in *Atlanta Gas Light*. Instead, the Court of Appeals focused on the alleged conduct and harm as of the filing of the suit and concluded that no justiciable controversy existed at that time. *See* 68 F.3d at 415.

Even if plaintiffs' wait-and-see approach were otherwise permissible, any actual harm remains far too remote. To minimize the remoteness of their alleged harms, plaintiffs suggest that the ripeness problems that plague the Amended Complaint are "based *entirely* on [the fact] that [ABMS] has not approved the ABD's subcertification application," which ABMS was due to act on soon.[1] (Dkt. 43 at 3 (emphasis added).) But the ripeness problems do not end there. Even if ABMS had approved ABD's application to create an MDS subspecialty certification before this suit was filed, any actual harm to plaintiffs would still be speculative.

---

[1] The subcertification application was approved on October 26, 2018. *See* ABD, "MDS Subspecialty Certification Approved," https://www.abderm.org/public/announcements/mds-subspecialty-certification-approved.aspx (last visited Nov. 12, 2018).

3

There would not be a ripe controversy because the ABMS decision does not control any downstream decisions by payors or hospitals. In plaintiffs' view, "limitations on reimbursement and restrictions on where and by whom Mohs procedures can be performed" are the "logical conclusions" of the alleged conspiracy. (Dkt. 43 at 6). However, those "logical conclusions" are anything but logical. Significantly, they have not yet, and may never, come to pass—much like the "well-founded" concerns about insurance coverage disputes in *Atlanta Gas Light*. *See* 68 F.3d at 414–15.

With nothing in their Amended Complaint to support the exercise of federal jurisdiction, plaintiffs turn to a grab-bag of jurisdictional rules that have nothing to do with this case. For example, although ABMS and ABD have never suggested that the case is moot, plaintiffs invoke multiple doctrinal exceptions to mootness. First, they turn to the "capable-of-repetition-yet-evading-review" doctrine. (Dkt. 43 at 4.) This doctrine allows federal courts to adjudicate claims for prospective relief, even where the plaintiff no longer suffers any injury, "only in the exceptional situations." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 481 (1990). Specifically, the plaintiff must show that the challenged action is "too short to be fully litigated prior to its cessation"—and thus it evades review—and there is a "reasonable expectation that the same complaining party would be subjected to the same action again." *Id.* (emphasis added). Again, mootness is irrelevant because the speculated harms have not yet occurred, but if they had, there is nothing to suggest that they would be so short-lived as to evade review.

Plaintiffs similarly invoke the voluntary cessation doctrine (Dkt. 43 at 5), *i.e.*, the rule that a defendant cannot ordinarily immunize its actions from federal review by simply

4

abandoning them after suit is filed. *See, e.g.*, *Friends of Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189 (2000). That rule has nothing to do with this case. The problem with plaintiffs' Amended Complaint is that it challenges decisions that had not been made at the time of the Complaint, *i.e.*, the decision on ABD's application, and that may well never be made, *i.e.*, any downstream decisions of hospitals and payors. Mootness is a doctrine about claims asserted too late. Plaintiffs' primary problem is that their case was filed too early.

Plaintiffs attempted to cure the jurisdictional defects of their original Complaint by filing an amended Complaint that adds conclusory allegations challenging lawful conduct. That Amended Complaint asserts alleged harms that are belied by plaintiffs' own allegations regarding (among other things) their continued routine performance of Mohs Surgery paid for by the Medicare and Tricare programs. (Dkt. 26 at ¶¶ 2-12.) These allegations cannot support the exercise of federal jurisdiction. Because plaintiffs brought suit when there was no justiciable controversy ripe for resolution by an Article III Court, the case should be dismissed for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

## II.   Even If Plaintiffs' Antitrust Claims Were Justiciable, They Are Facially Deficient.

Even if this Court had jurisdiction to consider plaintiffs' claims on the merits, the Amended Complaint does not allege sufficient facts that, if true, would establish that they are entitled to relief. Courts have repeatedly dismissed claims just like plaintiffs' at the Rule 12(b)(6) stage, and plaintiffs' efforts to overcome their failure to state a claim are unavailing.

### A. Plaintiffs Fail to Allege Facts That, If True, Would Be Sufficient to Establish Standing Under the Antitrust Laws.

Physicians who have brought antitrust challenges to certification decisions—including decisions by ABMS or its member boards—have repeatedly had their claims dismissed for failure to plead facts sufficient to establish antitrust standing. *See, e.g.*, *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251-52 (7th Cir. 1994); *Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d 408, 436–45 (2d Cir. 2005); *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, No. 14-cv-02705, 2017 WL 6821094, at *5–6 (N.D. Ill. Dec. 13, 2017). As the Seventh Circuit has explained, "[t]he claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws, which are designed to drive producers' prices down rather than up." *Sanjuan*, 40 F.3d at 251.

Plaintiffs assert in conclusory fashion that there will be a "reduction in market size through a restraint in trade" (Dkt. 43 at 9), but the Amended Complaint alleges no *facts* which, if true, would plausibly *show* that any such reduction in output has occurred—or ever will. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (quoting Fed. Rule Civ. Proc. 8(a)(2))). To the contrary, the Amended Complaint makes clear that the named plaintiffs have not been excluded from any asserted market: The plaintiffs are alleged to "routinely perform[] Mohs Surgery on patients" (Dkt. 26 at ¶¶ 2, 5, 8), and there is nothing to suggest that they have stopped doing so. *See Ass'n of Am. Physicians & Surgeons,* 2017 WL 6821094, at *6 (holding no antitrust injury at the 12(b)(6) stage because physician who failed to comply with ABMS requirements continued to practice in the market).

Plaintiffs' attempt to distinguish prior antitrust challenges brought by physicians (or their representatives) falls flat. Although they recognize that *Sanjuan* and *Daniel*, at least, "dealt with alleged antitrust violations stemming from certifications," plaintiffs assert that the difference is that those cases involved certification for "a body of medicine" rather than "a single procedure." (Dkt. 43 at 9.) Of course, in so asserting, plaintiffs ignore the fact that the subcertification at issue in this case, micrographic dermatologic surgery, is for a body of medicine—not for a single procedure.[2]

More fundamentally, plaintiffs do not, and cannot, explain why allegations of exclusion from an entire specialty (*e.g.*, dermatology or psychiatry) would be *less* of a concern from an antitrust perspective than exclusion from the practice of a single procedure, particularly when 98% (or more) of the physicians who perform that procedure for government payors will be eligible for the subspecialty certification. (*See* Dkt. 31 at 11.) Likewise, plaintiffs contend that their claims are different because the *Sanjuan* and *Daniel* plaintiffs wanted to charge more money, whereas plaintiffs are not interested in charging higher prices. (Dkt. 43 at 10.) But this misses the point. The antitrust laws are about preserving the benefits of competition—both in terms of price and quality—for *consumers*. *See Sanjuan*, 40 F.3d at 251. Plaintiffs are producers who are complaining that they will make less money—*i.e.*, be paid *less*—by consumers. That is not the type of injury the antitrust laws were designed to prevent. *See id.*

---

[2] ABD's application for a subspecialty certificate—which is expressly referred to and thus incorporated by reference into the Amended Complaint (Dkt. 26 at ¶ 56)—explains the broad range of knowledge and skills integrated into the subspecialty. *See* Application for Subspecialty Certificate, https://www.abms.org/media/182764/application-for-subspecialty-certificate-abd-micrographic-dermatologic-surgery-20180410.pdf (last visited Nov. 12, 2018).

7

In any event, plaintiffs resort to the same speculation that renders this case non-justiciable in an attempt to support the theory that they are efficient enforcers of the antitrust laws. They assert in conclusory fashion that they will suffer injury "because insurers and payers will stop paying non-certified Mohs surgery providers," and "[h]ospitals, ambulatory surgery centers, and health care institutions (such as the VA), will not allow physicians who are not certified in Mohs Surgery to perform Mohs Surgery on their premises." (Dkt. 43 at 12.) Of course, none of these speculative injuries has actually occurred, and the uncertainty of plaintiffs' damages shows that plaintiffs are *not* efficient enforcers of the antitrust laws. *See Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1449 (11th Cir. 1991). Even if plaintiffs had already suffered the speculative injuries they identify, such injuries would be multiple steps removed from the challenged conduct, further confirming that plaintiffs have no antitrust standing. *See id.* Neither ABMS nor ABD is alleged to be a payor or a hospital, and the injuries that plaintiffs may suffer at the hands of payors or hospitals are simply too remote to support antitrust standing—a point plaintiffs fail to mention, much less refute, in their response. (Dkt. 43 at 11–12.)

### B. Plaintiffs Fail to Allege Facts That, If True, Would Be Sufficient to Establish Any Actual Restraint of Trade.

Similarly, courts adjudicating antitrust challenges to certification decisions have repeatedly held that such decisions do not involve any "restraint of trade." *See, e.g.*, *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 398 (7th Cir. 1989); *Ass'n of Am. Physicians & Surgeons,* 2017 WL 6821094, at *5; *Poindexter v. American Bd. of Surgery, Inc.*, 911 F. Supp. 1510, 1520 (N.D. Ga. 1994). Although they try, plaintiffs cannot distinguish

8

these cases, and they therefore once again turn to an irrelevant Supreme Court case—this time involving state action immunity from the antitrust laws.

Plaintiffs' first move is to suggest that *Schachar* and similar cases differ from this one because, whereas those cases involved challenges to a certifying body's "speech," this case involves "certifications that hospitals, insurers, state medical societies," and others "rely on." (Dkt. 43 at 13–14.)  But like *Schachar*, *Poindexter*, and (most obviously) *Ass'n of Am. Physicians & Surgeons* (which challenged rules relating to ABMS certification), this case involves nothing more than a challenge to a certifying body's decision to certify (or not certify) particular providers or particular services.  As *Schachar* explains, a certifying body's effectiveness in persuading others to rely upon its views does *not* give rise to a restraint: "An organization's towering reputation does not reduce its freedom to speak out."  870 F.2d at 399.

Without any support in cases challenging Board-certification decisions, plaintiffs turn to the Supreme Court's decision in *North Carolina State Board of Dental Examiners v. F.T.C.*, 135 S. Ct. 1101 (2015).  (*See* Dkt. 43 at 15–17.)  But the *Board of Dental Examiners* case sheds no light on whether conduct constitutes a restraint of trade.  As the Court explains in the very first paragraph of its opinion, the question presented in that case is whether the actions of a "state regulatory board" are "protected from Sherman Act regulation under the doctrine of state-action antitrust immunity" where a "majority of the board's members are engaged in the active practice of the profession it regulates."  135 S. Ct. at 1107.  ABMS and ABD are *not* state regulatory boards; they have not invoked the doctrine of state-action antitrust immunity; and the question whether the "active market participant" exception to such immunity has nothing to do with this case.

Even on its facts, the *Board of Dental Examiners* case is different in crucial respects. There, the FTC challenged conduct by a state regulatory board that had the authority to directly regulate who could practice dentistry (including particular procedures) in the State of North Carolina. So, for example, when the State Board decided that teeth whitening constituted the "practice of dentistry," their cease-and-desist letters to non-dentists effectively shut down the provision of such services by those non-dentists. *Id.* at 1108. Here, by contrast, plaintiffs acknowledge that ABMS does not directly *regulate* hospitals or payors, for example. At most, hospitals and payors may independently decide to rely upon ABMS. (Dkt. 43 at 14.)

### C. To The Extent That Plaintiffs' Claims Challenge Lobbying Efforts, They Are Barred by *Noerr-Pennington*.

Plaintiffs' response to defendants' *Noerr-Pennington* arguments misapprehends the target of those arguments. Defendants do not contend, as plaintiffs appear to believe, that *everything* in the Amended Complaint is protected by *Noerr-Pennington*. ABMS and ABD do not invoke *Noerr-Pennington* immunity in connection with their own certification decisions; those decisions simply impose no restraint. *See supra*. But to the extent plaintiffs' claim is based on defendants' efforts to *lobby* government agencies and officials, such lobbying activities—apart from confirming that ABMS and ABD are not in a position to impose any restraints themselves—are protected by the First Amendment. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988), is entirely consistent with defendants' position. *Allied Tube* declined to extend *Noerr* immunity to a private standard-setting process, *see id.* at 506-07, but defendants do not seek immunity for their own conduct in developing certification. Rather, *Noerr-Pennington* protects defendants' alleged efforts to lobby government agencies

10

and officials, such as the Centers for Medicare and Medicaid Services. (*See, e.g.*, Dkt. 31 at 20.)

To the extent that plaintiffs' claims are based on asserted efforts to "lobby" private parties, plaintiffs' allegations are conclusory and, even if true, do not involve any restraint of trade, for the reasons set forth above. As the Seventh Circuit has explained, "[t]here can be no restraint of trade without a restraint." *Schachar*, 870 F.2d at 397.

### D.   To The Extent That Plaintiffs' Claims Challenge Actions Taken Prior to 2014, They Are Barred by the Statute of Limitations.

Similarly, plaintiffs' response misapprehends defendants' arguments regarding the statute of limitations. Defendants do not contend that all aspects of plaintiffs' claims are barred by the statute of limitations. Indeed, plaintiffs' complaint focuses on decisions that have not even been made, much less conduct that occurred more than four years ago. But in an effort to overcome justiciability concerns, plaintiffs added a series of allegations directed to alleged conduct far outside the limitations period. *That* asserted conduct cannot give rise to antitrust liability, because the statute of limitations has run (Dkt. 31 at *id.* at 21–22), which leaves plaintiffs with nothing more than a claim about hypothetical future injuries that may or may not happen depending on the decisions of third parties over whom defendants have no control.

### III.   Plaintiffs Have Failed to Identify a Single False or Deceptive Statement Made by Defendants and Thus Cannot State a Claim Under the FDUTPA.

Plaintiffs' claim under the FDUTPA is based entirely on statements made by others, *not* ABMS or ABD. Plaintiffs do not identify a single false or deceptive statement made by defendants, and they therefore have no claim against defendants. In response to defendants' motion to dismiss, plaintiffs point to a single allegation that—although defendants *themselves*

11

never said anything actionable—ABD attached a published scientific journal article co-authored by Dr. Brett Coldiron to ABD's application for a subspecialty certificate.[3] (Dkt. 43 at 20-21 (citing Dkt. 26 at ¶ 59).) Plaintiffs do not cite a single case to support the proposition that citing or attaching a scientific journal article to some other document transforms every word in that article into a statement of the entity that cites it for purposes of the FDUTPA. Plaintiffs' unprecedented theory would allow any professional who disagrees with statements in the scientific literature to sue not only the author of the publication but also anyone who cites it for engaging in an unfair trade practice. That theory has nothing to recommend it as a matter of policy. More importantly, however, plaintiffs' policy preferences cannot transform a statement made by others into a statement made by ABMS or ABD.

## CONCLUSION

Plaintiffs' Amended Complaint should be dismissed in its entirety with prejudice.

Dated:  November 12, 2018                                                   Respectfully submitted,

Russell LaPeer                                                                      /s/ Jack R. Bierig
**LANDT, WIECHENS, LaPEER,**                               Jack R. Bierig
**& AYRES LLP**                                                             Benjamin I. Friedman
Florida Bar no. 200530                                                   **SIDLEY AUSTIN LLP**
445 N.E. 8th Avenue                                                       One South Dearborn
Ocala, Florida 34470                                                       Chicago, Illinois 60603
Telephone No.  (352) 732-8622                                  Telephone No.  (312) 853-7000
Facsimilie No.  (352) 732-1162                                   Facsimile No.   (312) 853-7036
rlapeer@aol.com &                                                         jbierig@sidley.com
lawsec70@yahoo.com                                                  benjamin.friedman@sidley.com

                                                                                              Admitted *Pro Hac Vice*

---

[3] It is unclear which specific article plaintiffs have in mind, as Dr. Coldiron is a coauthor on two articles attached to the application.  *See* Application for Subspecialty Certificate, *supra* note 2, at 107 & 117.

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record in this case.

       /s/ Jack R. Bierig
Jack R. Bierig
Benjamin I. Friedman
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, Illinois 60603
Telephone No.  (312) 853-7000
Facsimile No.  (312) 853-7036
jbierig@sidley.com
benjamin.friedman@sidley.com

Admitted *Pro Hac Vice*